AMIEL L. WADE | SBN 184312
EVAN LIVINGSTONE | SBN 252008
WADE LAW GROUP - APC
262 East Main Street
Los Gatos, CA 95030
Direct Line:(408) 884-4018
Telephone: (408) 842-1688
Facsimile:  (408) 852-0614
Email: elivingstone@wadelitigation.com

Attorneys for Plaintiff Eftychios Theodorakis

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EFTYCHIOS THEODORAKIS<br><br>Plaintiff,<br><br>vs.<br><br>DFINITY STIFTUNG, DOMINIC WILLIAMS, and GIAN BOCHSLER<br><br>Defendants. | Case No. 3:23-cv-02280-AGT<br><br>**NOTICE OF PENDENCY OF OTHER ACTION(S) (LOCAL RULE 3-13.)**<br><br>Judge:        Hon Alex G. Tse |

**TO THE COURT:**

Plaintiff EFTYCHIOS THEODORAKIS files this Notice of Pendency of Other Action(s) pursuant to Local Rule 3-13.

Plaintiff is aware of the following actions which have partially overlapping subject matter and/or parties. The common subject matter of each these lawsuits is the cryptocurrency created by DFINITY Stiftung (Foundation) known as ICP Tokens.

1.      Northern District of California, Case No. 3:21-cv-06118-JD, *Valenti v. Dfinity USA Research LLC et al* (stayed and administratively closed as of 5/8/2023): This is a class action complaint for violation of the Securities Act stemming from Defendant's sale and marketing of ICP Tokens. The operative complaint filed 2/3/2022 is here: https://ecf.cand.uscourts.gov/doc1/035121573788 This case is stayed and administratively closed pending Plaintiffs securing new counsel.

2.      Southern District of New York, Case No. 1:22-cv-05418-LAK, *Dfinity Foundation v. New York Times Company et al* (active). In this case, DFINITY Foundation (Stiftung) defendant in the instant case, is suing the New York Times and other entities alleging that Defendants defamed DFINITY and in a newspaper article that reported that DFINITY insiders such as Dominic Williams sold a large number of ICP Tokens in May 2021 shortly after the cryptocurrency launched. The operative complaint filed 6/27/2022 is here: https://storage.courtlistener.com/recap/gov.uscourts.nysd.582205/gov.uscourts.nysd.582205.1.0.pdf This case has several motions to dismiss pending.

3.      Santa Mateo Superior Court, Case No. 21-CIV-03843, *Daniel Ocampo vs Dominic Williams et al* (active). This is a class action complaint for violation of the Securities Act stemming from Defendant's sale and marketing of ICP Tokens. The Third Amended Complaint, filed 2/9/2023 is attached as Exhibit A.

4.      Santa Clara Superior Court, Case No. 21CV384865, *Sacha Williams v Dominic Williams* (active). This is dispute over ICP Tokens which Dominic Williams allegedly gave to his son Sacha, and then sold for his own benefit and kept the proceeds. The complaint is sealed, however the court's Order on Demurrer and Motion to Strike, filed March 3, 2023, gives a summary of the allegations of the complaint. A copy of this order is attached as Exhibit B.

5.      Santa Clara Superior Court, Case No. 22CV403734, *Eftychios Theodorakis v DFINITY USA Research LLC, et al.* (stayed pending arbitration). This case involves breach of contract claims around Defendants' failure to deliver 12,608 ICP Tokens as required by an employment separation agreement. The operative complaint, filed 8/26/2022 is attached as Exhibit C. The case is stayed pending arbitration.

6.      Santa Clara Superior Court, Case No. 23CV415981, *Satoshi Kobayashi v DFINITY USA Research LLC, et al*. (active). Plaintiff Kobayashi alleges that his early investment in DFINITY entitled him to receive more than five million ICP Tokens which Defendants refused to deliver. The operative complaint filed 5/8/2023, is attached as Exhibit D. Plaintiff is still trying to serve Defendant Dominic Williams in Switzerland, and has asked the court for more time to effect service pursuant to the Hague Service Convention.

Notice of Pendency of Other Action

1       Plaintiff believes that none of the pending actions overlap sufficiently to warrant transfer

2   to a district court or coordination with a state court. The *Valenti* and *Ocampo* actions are class

3   actions over violation of the securities laws. The instant case, while it also involves the

4   allegations that Defendant's insiders promoted ICP Tokens using false statements and then sold

5   millions of ICP Tokens upon the cryptocurrencies' launch, is an individual case and not a class

6   action. Also, Plaintiff's complaint does not allege violations of the Securities Act, but rather

7   common laws allegations of conversion, fraud and violation of RICO by wire fraud.

8       The *Williams v Williams* case, the *Theodorakis v DFINITY* case, and the *Kobayashi v

9   DFINITY* cases share some similarities, in that they all allege that defendants breached a contract

10  to transfer ICP Tokens to the plaintiffs. However, the parties and details of each contract are

11  different.

12      The *New York Times* case is a defamation case that concerns statements about the transfer

13  of ICP Tokens, but not the actual transfer of tokens.

14      The instant district court action, *Theodorakis v DFINITY Stiftung et al*, shares a set of

15  parties in common with the Santa Clara Superior Court action, *Theodorakis v DFINITY USA

16  Research LLC, et al.* In both actions, Eftychios Theodorakis is the Plaintiff and DFINITY

17  Stiftung (Foundation) is a defendant. However, the subject matters of the two actions are distinct.

18  The Superior Court action is a breach of contract claim that defendants failed to transfer 12,608

19  ICP tokens which DFINITY USA Research LLC was required to transfer to Plaintiff pursuant to

20  an employment separation agreement.

21      The instant case, as detailed in Plaintiff's First Amended Complaint, alleges that

22  Defendants engaged in a fraudulent scheme to deceive the public into buying ICP Tokens at a

23  high price, while simultaneously preventing or discouraging seed investors, employees and ex

24  employees like Plaintiff from selling their own ICP Tokens. Plaintiff alleges that Defendants'

25  fraudulent conduct caused the value of Plaintiff's 54,274 ICP Tokens (41,666 which he

26  possessed, and 12,608 not yet delivered) to fall from $750.73 per Token to approximately $3.50

27  per Token.  Thus, the subject matter of the two lawsuits is different.

28

Notice of Pendency of Other Action

1

Dated: August 31, 2023                              WADE LAW GROUP

2

3                                              By:   /s/Evan Livingstone
                                                     Evan Livingstone
4                                                    Attorneys for Plaintiff
                                                     Eftychios Theodorakis

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Pendency of Other Action

# EXHIBIT A
## Ocampo v Williams 21-CIV-03843
## Third Amended Complaint

John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiff Daniel Ocampo*

[Additional Counsel on Signature Page.]

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON    2/9/2023
By____/s/ Vanessa Jimenez
Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| DANIEL OCAMPO, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>       v.<br><br>DFINITY USA RESEARCH LLC, DFINITY FOUNDATION STIFTUNG, AH CAPITAL MANAGMENT, POLYCHAIN CAPITAL, DOMINIC WILLIAMS, and JOHN DOES 1-20,<br><br>                              Defendants. | Case No.  21-CIV-03843<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**<br><br>JURY TRIAL DEMANDED |

Plaintiff Daniel Ocampo ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of governmental filings and commentary, publicly available reports and information, analyst and media reports, and other commentary analysis. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF ACTION

1. Plaintiff brings this securities class action under §§5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act") against (1) Dfinity USA Research LLC ("Dfinity USA Research" or the "Company"); (2) the Dfinity Foundation Stiftung (the "Foundation," together with Dfinity USA Research, "Dfinity"); (3) Polychain Capital ("Polychain"); (4) AH Capital Management LLC ("Andreessen"); and (5) Dfinity's controlling executive and director, Dominic Williams ("Williams," together with Polychain and Andreessen, the "Controlling Defendants").[1] Plaintiff alleges that Defendants sold unregistered securities to investors in violation of the Securities Act. Defendants are liable in their capacities as issuers, statutory sellers, and/or direct or indirect offerors of Internet Computer Project tokens ("ICP tokens" or "ICP").

2. Plaintiff brings this action on behalf of all investors who purchased ICP tokens on or after May 10, 2021, and was damaged thereby.

3. ICP qualifies as a security under §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1). The purchase of ICP constitutes an investment contract since ICP purchasers, including Plaintiff, provided consideration (in the form of fiat, *i.e.*, U.S. dollars or other cryptocurrencies) in exchange for ICP. ICP is an investment in a common enterprise and purchasers reasonably expected to derive profits from their ownership of ICP. Defendants promoted this profit motive as a reason to purchase ICP.

---

[1] The Foundation, Dfinity USA Research and the Controlling Defendants are collectively referred to as "Defendants."

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

4.      No registration statements have been filed with the U.S. Securities and Exchange Commission ("SEC") or have been in effect with respect to the ICP offerings alleged herein.

5.      All 469,213,710 ICPs made available during the "Genesis" listing event were created out of thin air by Dfinity.  At least 24% of all ICPs in existence were given to the Controlling Defendants, in particular, Polychain and Andreessen.

6.      Defendants have since earned massive profits by selling the retained ICP to the public, without complying with federal securities laws, in what is essentially an ongoing initial coin offering ("ICO").  Like in an initial public offering, in an ICO, digital assets are sold to consumers in exchange for legal tender or other cryptocurrencies (most often Bitcoin and Ethereum).

7.      Defendants sell ICP from the retained supply and use the proceeds from the sales to fund Company operations, to reward investors, and as governance tokens.

8.      In order to increase demand for ICP, and thereby increase the profits derived by selling ICP, Defendants portray ICP as a good investment, solicit sales, and express optimistic and misleading predictions on ICP's ability to disrupt established technologies.  Dfinity greatly increased these efforts to push ICP on the general public in recent years and months.

9.      These solicitation efforts were conducted by interstate means, as were the sales of ICP.

## JURISDICTION AND VENUE

10.      The Court has subject-matter jurisdiction over this action pursuant to the California Constitution, Article VI, and §§10 and 22 of the Securities Act, 15 U.S.C. §77v.  The claims alleged herein arise under §§5, 12(a)(1), and 15 of the Securities Act.  *See* 15 U.S.C. §§77e, 77l, and 77o.  Section 22 of the Securities Act, 15 U.S.C. §77v(a), expressly states that "[e]xcept as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  *See* 15 U.S.C. §77v(a).  Section 77p(c) refers to "covered class action[s] brought in any State court involving a covered security, as set forth in subsection (b)," and subsection (b) of §77p in turn includes within its scope only covered class actions "based upon the statutory or common law of any State or subdivision thereof."  *See* 15 U.S.C. §77p.  This is an action asserting only federal law claims.  Thus, this action is not removable to federal court.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

11.     Venue is proper in this jurisdiction pursuant to the provisions of California Code of Civil Procedure §395(a) because certain Defendants reside in San Mateo County.

12.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in and/or aimed at the State of California in connection with Defendants' unregistered offer and sale of securities in violation of §§5, 12(a)(1), and 15 of the Securities Act.

13.     This Court also has personal jurisdiction over Defendants because they reside in or have their principal places of business in California.

<b><u>PARTIES</u></b>

14.     Plaintiff Daniel Ocampo is an individual and a resident of the State of California.  Plaintiff made purchases of ICP tokens shortly after the opening of the Genesis Launch on May 10, 2021 through June 25, 2021 on the U.S.-based cryptocurrency exchange Coinbase, and suffered losses on those investments as a result of the scheme alleged herein.  Leading up and following his initial purchase of ICP, Plaintiff saw promotions from the Foundation on YouTube, as well as those on the Dfinity website.  Plaintiff also signed up through the Dfinity website to receive updates and further information regarding the Internet Computer Project and ICP tokens.  The Foundation sent out email blast promotions to Plaintiff during the Relevant Period, and the email address URLs for these solicitations were all from "dfinity.org"

15.     Defendant Dfinity USA Research LLC is a Delaware corporation with its principal place of business at 411 Acacia Avenue, Palo Alto, California 94306.  Dfinity operates as one of the so-called "research centers" of the Dfinity Foundation and exists to allow the latter to operate within the United States.

16.     Defendant Dfinity Foundation is a Zurich-based not-for-profit organization or "stiftung," and is the true corporate entity behind all of ICP's operations.  The Foundation further elaborates on its structure in the "about" section for the recruiting page on its website: "The DFINITY Foundation operates globally with research centers in Zurich and San Francisco as well as team members working remotely across North America, Europe and Asia."[2]  The Foundation, with the aid of its employees working remotely and/or within

---

[2]     *Join the Movement*, DFINITY, https://dfinity.org/about#jobs (last visited Feb. 9, 2023).

3

THIRD AMENDED CLASS ACTION COMPLAINT<br>Case No. 21-CIV-03843

California at its research center, Dfinity USA Research, created ICP and, at all relevant times, solicited purchases of ICP by Plaintiff and the Class for its own benefit and the benefit of its executives and owners.

17.    Defendant Dominic Williams is the Founder, the President, a member of the Board of Directors, and the Chief Scientist of Dfinity and Internet Computer Project and has been since October 2016. Williams is a resident of Santa Clara County.  Williams exercised control over Dfinity and directed and/or authorized, directly or indirectly, the sale and/or solicitation of ICP to the public.

18.    Defendant AH Capital Management is a private venture capital firm founded in 2009. Andreessen is a California company with its headquarters in Menlo Park, California in this County. Andreessen exercised control over Dfinity and directed and/or authorized, directly or indirectly, the sale and/or solicitation of ICP to the public.  Andreesen is also known by "AH Capital Management, LLC."

19.    Defendant Polychain Capital is a cryptocurrency investment firm managing portfolios of digital assets and has been since 2016.  Polychain is headquartered in San Francisco, California.  Polychain exercised control over Dfinity and directed and/or authorized, directly or indirectly, the sale and/or solicitation of ICP to the public.

20.    The defendants referred to in ¶¶17-19 are referred to as the "Controlling Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.    Background of Cryptocurrency

21.    A cryptocurrency is a digital asset designed to work as a medium of exchange or a store of value or both.  Cryptocurrencies use various cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

22.    Created in 2009, Bitcoin was the world's first decentralized cryptocurrency.

23.    With a market capitalization of approximately $1.4 trillion, Bitcoin is also at the top of the cryptocurrency market by a wide margin.

24.    Bitcoin functions as a ledger that tracks the ownership and transfer of every Bitcoin in existence.  This ledger is called a blockchain.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

25.     Blockchains act as the central technical commonality across most cryptocurrencies.  While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

26.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making a blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted Bitcoin.  This process is colloquially referred to as "mining."  Mining is one method by which an individual can acquire cryptocurrencies like Bitcoin.  A second and more common manner is to obtain cryptocurrencies from someone else.  This is often accomplished by acquiring it through an online "cryptocurrency exchange."

27.     Online cryptocurrency exchanges are one place to purchase Bitcoin and other cryptocurrencies.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

28.     In April 2013, there were only seven cryptocurrencies listed on coinmarketcap.com, a popular website that tracks the cryptocurrency markets.  As of this filing, the site monitors more than 8,000 cryptocurrencies.

29.     Another popular cryptocurrency, Ethereum, was designed to enable "smart contract" functionality unlike Bitcoin's blockchain.

30.     A smart contract is a program that verifies and enforces the negotiation or performance of a contract.  Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.  By way of example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

31.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

32.     By the end of 2016, interest in cryptocurrencies like Bitcoin, Ethereum, and other "alt coins" began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, Bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.   Approximately one year later, it was trading at over $1,400 per ether – a return of approximately 17,000% over that period.

33.     Seeking to capitalize on the growing enthusiasm for cryptocurrencies, many entrepreneurs sought to raise funds through ICOs.

34.     Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these ICOs was registered with the SEC.

35.     These ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO and promoted the sale of the tokens.  They typically advertised the creation of a "new blockchain architecture."

36.     The whitepapers contained vastly less information than would have been included in an SEC registration statement.  For example, whitepapers (just like the ICP whitepaper[3]) typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

37.     As a result of the lack of information, trading of tokens on exchanges such as Coinbase and Binance was rife for manipulation.

---

[3]     *See* Timo Hanke, Mahnush Movahedi & Dominic Williams, *DFINITY Technology Overview Series Consensus System*, DFINITY (Jan. 23, 2018), https://dfinity.org/pdf-viewer/pdfs/viewer?file=../library/dfinity-consensus.pdf.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

38.     For example, the Tezos Foundation had an ICO in 2017, which raised $232 million for the company and insiders.  This ICO, however, resulted in a class action lawsuit that settled for $25 million.[4] Commentators viewed this settlement as a means to avoid a possible future enforcement action by the SEC for the sale of an unregistered security.[5]  According to Quentin Herbrecht, Chief Executive Officer ("CEO") of blockchain marketing platform Markchain, the plaintiffs in that action "think that Tezos agreed to settle this fine to prevent the SEC from re-characterizing their ICO as illegal securities offering, and this could have been a fatal blow to the project."[6]

39.     Similarly, in 2018, Block.One held an ICO for the EOS blockchain.  After a year-long offering, Block.One raised a staggering $4.1 billion for the company and insiders.[7]  Shortly after the ICO was completed, on September 30, 2019, the SEC completed an investigation and found that one issuer, Block.one, had violated the Securities Act by selling the digital token EOS, an unregistered security, to the public.  As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[8]

40.     The founder of another cryptocurrency exchange (Bibox), Aries Wanlin Wang, previously noted that the secondary market for digital assets can be "rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated."[9]

---

[4]     Lucas Cacioli, *Tezos Settles Class-Action Lawsuit Over 2017 $232 Million ICO to the Tune of $25 Million*, BLOCKCHAIN.NEWS (Sept. 2, 2020), https://blockchain.news/news/tezos-settles-class-action-lawsuit-over-2017-XTZ-232-million-25-million.

[5]     Osato Avan-Nomayo, *Tezos Likely Avoiding SEC Action With $25M Class-Action Lawsuit Settlement*, COINTELEGRAPH (June 28, 2020), https://cointelegraph.com/news/tezos-likely-avoiding-sec-action-with-25m-class-action-lawsuit-settlement.

[6]     *Id.*

[7]     Brady Dale, *The First Yearlong ICO for EOS Raised $4 Billion. The Second? Just $2.8 Million*, COINDESK (Sept. 17, 2019), https://www.coindesk.com/the-first-yearlong-ico-for-eos-raised-4-billion-the-second-just-2-8-million.

[8]     Press Release, U.S. Securities and Exchange Commission, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; SEC Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

[9]     Aries Wanlin Wang, C*rypto Economy: How Blockchain, Cryptocurrency, and Token-Economy Are Disrupting the Financial World* (2018).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

41.     According to Mr. Wang, "[t]hese tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."[10]

42.     Mr. Wang also candidly acknowledged that:

> The problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago.  When a market lacks certain regulations and oversights, predictable things happen.  ***Pump and dumps are very common in the secondary market of cryptocurrency***, just as they were on the US stock exchange so many years ago.  Fraudsters spreading false news about new crypto in a chat room have a great deal in common with con artists who sent false telegrams with information that might impact a stock in 1919.  In any traditional financial market, the practice of market manipulation is illegal.  And it should be.  The lack of regulation that lets some people make a quick dollar hurts everyone else because it hurts our faith in the system.

[Emphasis added.]

43.     Notably, Bibox was one of only four cryptocurrency exchanges that have excluded ICP from trading.

**B.     The Background of ICP**

44.     Dfinity's so-called "Internet Computer" project purports to be a decentralized version of the internet itself.  In essence, it is a smart contract platform designed to power blockchain versions of the internet's most popular applications – decentralized alternatives to WhatsApp, LinkedIn, eBay, TikTok, etc. – which would displace the need to use centralized, gatekeeping hosting services like Amazon Web Services.[11]

45.     The purported native cryptocurrency for Dfinity's Internet Computer Project is the ICP token.  Thus, ICP is both an investment in the Company (as sales are used to fund Company operations with the expectation that such investments in the Company will increase the value of ICP) and an investment in itself (with the expectation that the value of ICP will increase), as well as a means of exchange and governance promoted by Dfinity.

46.     Unlike cryptocurrencies such as Bitcoin and Ethereum, which are mined by computer hardware validating transactions on their networks, all 469,212, 166.84 ICP tokens in existence were simply created by Dfinity in May 2021 as a part of the Company's functional equivalent of an ICO (the "Genesis

---

[10]     *Id.*

[11]     Mike Butcher & Ingrid Lunden, *DFINITY raises $102M from a16z and Polychain for a decentralized 'Internet Computer' to rival AWS*, TECHCRUNCH (Aug. 29, 2018), https://techcrunch.com/2018/08/29/dfinity/.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

Launch"). As discussed more thoroughly below a significant amount of the total ICP supply was given to the Controlling Defendants, with the remaining amount left retained by Dfinity.

47. Dfinity's plan was to publicly offer the ICP tokens it created and retained for sale to retail investors when the tokens were listed on various cryptocurrency exchanges. Dfinity would then use the proceeds to fund the Foundation's operations, including, but not limited to, the Internet Computer Project or "ICP."

48. The Controlling Defendants have financially benefitted from their ICP being merchandized and enabled the large-scale launch through their connection to the largest cryptocurrency exchanges that made ICP widely available to the public.

49. Defendants have control over how many ICP tokens are in the market.

50. No registration statement has been filed for ICP with the SEC and no registration statement is in effect for ICP.

**C. Polychain and Andreessen Horowitz Are Significant Stakeholders of ICP**

51. In February 2017, Dfinity held a "Seed" fundraising round for the Company to use for its operations and investments in projects developed using ICP technology, receiving approximately $40 million in fiat cash and digital assets "primarily from enthusiasts who followed the project."[12]

52. Dfinity initially promised the "Seed Contributors" that the Company would run a "Main" fundraising round, akin to an ICO, at which time the seed contributors could cash out.[13]

53. "However," as noted in a May 21, 2021 ICP analyst report, "after the 2017 boom, the project realized its valuation target was set too low" and the Company believed that "running an ICO fundraiser could have *placed it in a grey legal territory where securities law was concerned*."[14]

54. Upon information and belief, Polychain and Andreessen were among those initial "enthusiasts" who were the Seed Contributors to ICP.

---

[12] Dominic Williams, *Announcing DFINITY Fundraising Plans, and a Massive Welcome to Polychain Capital and Andreessen Horowitz*, MEDIUM (Feb. 7, 2018), https://medium.com/dfinity/announcing-dfinity-fundraising-plans-and-a-massive-welcome-to-polychain-capital-and-andreessen-2ceb34769cd3.

[13] *See id.*

[14] Mira Christanto & Wilson Withiam, *An Introduction to Dfinity and the Internet Computer*, MESSARI (May 10, 2021), https://messari.io/article/an-introduction-to-dfinity-and-the-internet-computer (emphasis added).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

55.     The single "Main" round of Dfinity's funding model was subsequently changed to a two-part model.  First, Dfinity would hold "Strategic" and "Private Presale" fundraising rounds.  Second, Dfinity would hold what for all intents and purposes was the very same type of ICO-style fundraiser Defendant Williams claimed might run afoul of securities laws.

56.     Defendant Williams conceded that Dfinity needed to change the original model because the Foundation's initial promise would have capped the Seed Contributors' returns with a "figure that we later realized was far too low – *this would hardly satisfy a single large player now*, and it's clear our years in the crypto trenches had left us completely unprepared for the explosion in scale of the crypto industry."[15]

57.     In response, Defendant Williams and Dfinity designed this two-part funding model so that it would "ensure the position of Seed participants will receive 24.72% of the network tokens that will exist at Genesis . . . however much future funding is now raised."[16]

58.     Sometime around January or February 2018, Dfinity ultimately held the "Strategic" fundraising round.

59.     Andreessen and Polychain participated in this fundraising round as well, jointly contributing another $61 million.[17]

60.     The "Strategic Round" investors were entitled to receive 7% of the initial supply of ICP tokens.[18]

61.     As described in Defendant Williams's February 7, 2018 blog post "Announcing DFINITY Fundraising Plans, and a Massive Welcome to Polychain Capital and Andreessen Horowitz":

> [Dfinity] also decided that before going any further, we would raise a "Strategic" fundraising round that would bring in key partners who could help accelerate progress of our project.  Polychain Capital – a successful and now famous crypto hedge fund backed by Andreessen Horowitz, Sequoia, USV, Founders Fund and many other notable LPs – contacted us during the summer of 2017, while we were still only an "aficionado's" project not many people knew about, and we found we worked extremely well with them.  They

---

[15]    *See supra*, n.12.

[16]    *Id.*

[17]    *See* Gertrude Chavez-Dreyfuss, *Blockchain project raises $61 million from Andreessen Horowitz, U.S. hedge fund*, REUTERS (Feb. 7, 2018), https://www.reuters.com/article/us-blockchain-investment-andreessen/blockchain-project-raises-61-million-from-andreessen-horowitz-u-s-hedge-fund-idUSKBN1FR1IX.

[18]    *See supra*, n.14.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

are distinguished by bullish optimism about what our industry can achieve balanced by realism and operational smarts.

It was decided that Polychain would lead a relatively small round, and also help establish a substantial "DFINITY Ecosystem Venture Fund" that will now fund projects building on the DFINITY Internet Computer or otherwise supporting it.  Andreessen Horowitz, one of Silicon Valley's preeminent venture capital funds joined the round too, who are also well known for their forward thinking and the support they provide to investee projects.  Today it was announced that, with the DFINITY Ecosystem Venture Fund, total funding for our project will exceed $100M.  With this, you can expect DFINITY to begin to emerge from the dark.

62.     Later in August 2018, Dfinity held its "Private Presale," wherein Polychain and Andreessen (among others), contributed $97 million, which was enough to make them eligible to receive 4.96% of the initial supply of ICP tokens.[19]

63.     On August 29, 2018, Defendant Williams (via his blog) announced the successful completion of the Strategic and Private Presale funding round.  According to Defendant Williams, this round was led by "returning investors" Andreesen and Polychain, who raised approximately $111 million in total for Dfinity's "operations."[20]

64.     Ryan Zurrer, venture partner of Polychain, described the investment in Dfinity as Polychain's "largest-ever capital deployment."[21]

---

[19]     *Id.*

[20]     Dominic Williams, *Announcing the Completion of DFINITY's Presale Round*, MEDIUM (Aug. 29, 2018), https://medium.com/dfinity/dfinitys-presale-round-completed-238da6b42fa1.

[21]     *See supra*, n.17.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

65.     The following chart from Messari, shows the total token distribution in the Genesis allocation as of May 10, 2021:

| | Genesis Initial State Allocations | % | Number of Participants |
|---|---|---|---|
| Early Contributors | 44,575,228 | 9.50% | <50 |
| Seed | 115,986,694 | 24.72% | 370 |
| Strategic Partnerships | 32,845,140 | 7.00% | <50 |
| Presale | 23,295,828 | 4.96% | 110 |
| Strategic Partnerships | 17,795,770 | 3.79% | <50 |
| Community Airdrop | 3,763,448 | 0.80% | 50,000+ |
| Initial Community and Developer | 2,242,179 | 0.48% | <50 |
| Node Operators | 1,050,000 | 0.22% | 57 |
| Internet Computer Association | 20,000,000 | 4.26% | 1 |
| Team Members | 84,480,829 | 18.00% | 200 |
| Advisors and Other Third-parties | 11,239,705 | 2.40% | <50 |
| DFINITY Foundation | 111,938,888 | 23.86% | 1 |
| **Total** | **469,213,709** | **100.0%** | |

**MESSARI**
**Genesis Token Allocation**
Total token distribution on May 10 2021

Data as of: May 10, 2021
Source: Dfinity, Messari

66.     Notably, 24.72% of available ICP tokens went to "Seed Investors."  Another 23.9% went to the Company itself.  7% and 4.96% went to Strategic and Private Presale Investors, respectively.  Thus, in total, as much as 60% of the ICP tokens available at the Genesis Launch were held by Dfinity and insiders like the Controlling Defendants.[22]

67.     Upon information and belief, Polychain and Andreessen together supplied a significant portion of the capital that Dfinity had received during the Seed, Strategic, and Private Presale fundraising rounds.  In particular, as Seed Contributors, "enthusiasts" like Polychain and Andreessen were likely entitled to a significant portion of the 24.72% seed contributor allotment of available ICP tokens.

68.     Polychain and Andreessen's contribution in the Strategic funding round was at least 50% higher than their collective contribution to Dfinity during the Seed funding round.

69.     As significant stakeholders with corporate governance rights provided by their Seed and Strategic contributor allotments of ICP tokens, Polychain and Andreessen stood to gain a significant amount if the price of, and interest in, ICP was pumped up as high as possible prior to the token's listing on open exchanges.

---

[22]     *See supra*, n.14.

70.     As one analyst observed, the token distribution given to early investors like Polychain and Andreessen "amounts to a windfall for early backers of the Dfinity project . . . who will be able to hold on to the tokens or sell them on a secondary market"[23] like Coinbase and others.

71.     In particular, seed investors received the ICP token allotment at a price of $0.03.  Strategic investors' allotment price was $0.62 per token.  And Private Presale investors received ICP tokens for $4.16.  Thus, at the $731 peak of ICP's token price on opening day of the Genesis launch – when massive selling pressure caused the ICP price to drop exponentially – Polychain and Andreessen saw a staggering return on investment of approximately 2,436,566%, 117,803%, and 17,472% on the seed, strategic, and private presale investments, respectively.

72.     At the time of the initial filing, the price was approximately $36, and thus, Polychain and Andreessen's seed, strategic, and private presale investments were still up over 119,000%, 5,700%, and 765%, respectively.

### D.     Defendants Solicit ICP Sales

73.     From 2016 to the present, Defendants and their affiliates have been engaged in an ongoing scheme to promote the Internet Computer project and sell ICP tokens to the general public in order to further their financial benefits.

74.     Indeed, Dfinity dedicated an entire section of its website to providing advice on "How to Access 'Seed' and 'Airdrop' ICP Tokens and Participate in the Internet Computer Network."  This section also stresses that "it is very important that the flow of liquid ICP tokens around the network is released on a schedule for the safety and security of ICP holders, the network, and its users while the underlying technology is betting fettled and its ecosystem is being established."

75.     Defendant Williams initiated a public relations campaign to convince potential investors of the merits of ICP over others developing blockchain technology projects.  Notably, Defendant Williams repeatedly extolled Dfinity's virtues and insisted that the Company was not seeking a quick cash grab-style ICO.

---

[23]     Jeff John Roberts, *Exclusive: Dfinity Announces $35M 'Air Dro' for Blockchain-Based Cloud*, FORTUNE (May 29, 2018), https://fortune.com/2018/05/29/blockchain-dfinity-air-drop/.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

76.     For example, in an August 2017 blog post, Defendant Williams used the ICO's of Tezos and EOS as a foil to Dfinity's supposedly altruistic approach to fundraising. Defendant Williams suggested that "those a who have just run ICOs" like Tezos and EOS were just "wishing to earn bounties."[24]

77.     Defendant Williams further criticized the Tezos and EOS ICOs, suggesting that those companies were "chasing ICO money and press coverage" while ICP was putting together a "stellar team and science first."[25] Defendant Williams further touted the depth of Dfinity's "team," bragging that the Company had "many more HUGE hires in the pipeline that will rock the tech world. Superstars are now joining us in droves because of our authentic novel science and the team we already have."[26]

78.     In a further effort to distance Dfinity from "unscrupulous projects . . . some whose primary aim was in fact simply to collect monies from people seeking a quick buck or to launch a dubious token that speculators would send to the moon so that the founders could cash out," Defendant Williams explained that:

> The state of the ICO market creates some challenges for DFINITY. The lack of discrimination between good and bad projects means there is very poor price discovery and, if we run a traditional ICO we might also become guilty by association in many eyes. Furthermore, we fear that a legal and regulatory hornets' nest has been created, and we don't want to have our project – which has an important purpose and involves a distinguished team of senior researchers and engineers – distracted by legal problems.[27]

79.     Dfinity announced that instead of having a traditional ICO, the Company would proceed with two funding rounds. The first was a "Presale" round with select investors. And despite Defendant Williams ardent criticisms against opportunistic ICOs, Dfinity announced it would also have a second ICO-style round of fundraising from ICP's public listing on exchanges.

80.     On February 7, 2018, Defendant Williams personally advised potential investors: "The second round may or may not happen, and will be termed the 'ICO,'" which would be "run by regulated traditional exchanges at the moment the network goes live, setting a new milestone in the sale of utility

---

[24]     Dominic Williams, *On Accelerating Blockchain Evolution Using Different Funding and Team Models*, MEDIUM (Aug. 25, 2017), https://medium.com/dfinity/on-accelerating-blockchain-evolution-using-different-funding-and-team-models-1c04c3d0893a.

[25]     *Id.*

[26]     *Id.*

[27]     *See supra*, n.12.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

tokens powering decentralized networks."  Defendant Williams offered that Dfinity was eager to "begin preparing our early community for the [ICP] token Presale," and told potential investors: "If you are interested in getting involved, stay tuned!"[28]

81.     Concurrently, Defendant Williams boasted to potential investors: "It will be extraordinarily easy to build on Dfinity . . . Developers building on the Internet Computer will have super powers.  The word will get around that these guys are building with all these amazing benefits.  And uptake will be pretty rapid once the word gets out."[29]

82.     On January 23, 2020, Defendant Williams continued touting ICP's blockchain technology at the Davos Summit hosted by the World Economic Forum, arguing that its prototype of an "open" social network "LinkedUp" was superior to existing social networks like LinkedIn because it would give users a "deeper understanding of how the proprietary algorithms work" and make them "more empowered to fight against monopolistic trends in the existing internet infrastructure."[30]

83.     On June 25, 2020, the official Dfinity Twitter account issued a tweet that stated that "Billions of dollars are waiting to invest in the open web" and highlighted an event with Polychain founder Olaf Carlson-Wee.

84.     On July 9, 2020, Dfinity published an article on Medium.com authored by Polychain founder Olaf Carlson-Wee entitled "Investing in the Open Web: A New Thesis."  In this article, Carlson-Wee, on behalf of Dfinity, promoted investment in the Internet Computer and highlighted investors' expectations of profit.  The article stated that "Financial backers see tremendous upside in the open web's ability to create financial opportunities for innovation that previously didn't exist."  The article further stated that "venture capitalists ["VCs"] with billions in assets under management are eyeing decentralized infrastructure that will make it easier for developers to innovate and scale-out their internet services to billions of users" and that "VCs are eager to deploy billions in capital to foster the decentralized web."

---

[28]     Mo Marshall, *Dfinity raises $61 million for blockchain-based cloud*, VENTUREBEAT (Feb. 7, 2018), https://venturebeat.com/2018/02/07/dfinity-raises-61-million-for-blockchain-based-cloud/.

[29]     *Id*.

[30]     Michael Nunez, *This Startup Thinks Blockchain Is The Only Thing That Can Save Social Media*, FORBES (Jan. 23, 2020), https://www.forbes.com/sites/mnunez/2020/01/23/this-startup-thinks-blockchain-is-the-only-thing-that-can-save-social-media/?sh=250f85ec5097.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

85.     On February 18, 2021, Dfinity held a virtual event in conjunction with Forbes called "Trillion Dollar Opportunity: How a New Internet Will Completely Reimagine Your Business Model."[31]  The event "convened top investors and entrepreneurs" to discuss "how businesses can seize this opportunity to reset, rethink and reinvest in how they interact with the internet."

86.     Leading up to the Genesis Launch, and in the days following its opening, Defendants relentlessly marketed ICP in an effort to ensure ICP's favorable listing on the various exchanges, which, in turn, would serve to inflate ICP's opening price.  Part of this strategy was to have Defendant Williams launch a press tour continued to promote ICP.

87.     On May 6, 2021, Defendant Williams promoted the Internet Computer and solicited sales of ICP tokens during an interview with Bettina Warburg at the 2021 Ethereal Virtual Summit. In particular, Williams stated that the Internet Computer was taking a "giant leap for blockchain" technology and would serve as the next generation of the blockchain.  Williams claimed that Dfinity built "blockchain's biggest R&D operation" that is "200 people strong" in order to support Dfinity's "research and development effort on an unprecedented scale."  Williams specifically promoted the Internet Computer's "Internet Identity" technology that was built by the Dfinity team as being "far more secure" than traditional identification formats.  Williams further suggested to investors that "tokenization" strategies would be employed in new decentralized versions of social media apps in the future, and that the Internet Computer was poised to both build and capture that market.  Williams further told investors that the Internet Computer would create "growth flywheels" that would increase demand for ICP tokens.  When asked about his vision for the future, Williams assured investors that he was "focused on the long term" for the Internet Computer.  Williams boasted that "this [*i.e.*, the Genesis Launch] isn't the end, it's just the beginning . . . . We are already the biggest R&D in the blockchain by far and we are going to continue to ramp that up."

88.     Defendant Williams went on a press tour to solicit investment in the Internet Computer and ICP tokens.  For example, in a May 7, 2021 interview Defendant Williams ahead of the ICP launch,

---

[31]     *See Trillion-Dollar Opportunity: How A New Internet Will Completely Reimagine Your Business Model*, FORBES, https://www.forbes.com/sites/forbesinnovationteam/2021/01/20/trillion-dollar-opportunity-how-a-new-internet-will-completely-reimagine-your-business-model/?sh=7292d9d361d8 (last visited Feb. 9. 2023).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

Defendant Williams proclaimed ICP will be "humanity's primary compute platform for building software" in 20 years.[32]  During the same Genesis Launch event that Williams made these statements, Dfinity employee Liz Yang (who is based in the San Francisco Bay Area) advised investors that they could "begin acquiring the ICP utility token through approved channels such as exchanges very soon."  Dfinity employee Michael Hunte (also based in the San Francisco Bay Area) described the launch of Dfinity network as "the dawn of the new open and free internet."

89.    As discussed further below, that same day (May 7, 2021) numerous employees from Dfinity USA Research and the Dfinity Foundation jointly participated in a virtual roadshow called the Mercury Genesis Launch Event to promote the Internet Computer and solicit sales of ICP tokens. Each one of these employees made statements on behalf of Dfinity USA Research, the Foundation, and/or the Dfinity enterprise as a whole.  None of them made any distinction about which corporate entity in particular he or she was speaking on behalf of; they all referred to it as a single enterprise: Dfinity.  Each of the Dfinity employees was given an ICP token allocation at the Genesis Launch (Dfinity "Team Members" received 18% of the total ICP tokens minted) and, as such, the employees all had the financial motivation to solicit sales at inflated prices.  This would benefit the employees personally and the Dfinity enterprise generally since, as Williams noted, the sale of ICP tokens would be used to fund Dfinity's operations (including, *inter alia*, paying the salaries to its 200 employees).

90.    On May 8, 2021, in an live-streamed interview with Bloomberg, Defendant Williams boasted how on ICP "you can build things on a blockchain now that . . . [you] never would have imagined would have been possible."[33]  Defendant Williams further suggested that ICP users could create disruptive social media networks that could displace rivals like Facebook and innovate "tokenized social media."[34]  Williams

---

[32]    Ariana Hamacher, *Get Set For 'a Wild Ride': Dfinity's Dom Williams on the Launch of the Internet Computer*, DECRYPT (May 7, 2021), https://decrypt.co/70175/get-set-for-a-wild-ride-dfinitys-dom-williams-on-the-launch-of-the-internet-computer.

[33]    *Internet Computer Works Differently Than Any Other Blockchain: Dominic Williams*, BLOOMBERG (May 8, 2021), https://www.bloomberg.com/news/videos/2021-05-08/internet-computer-works-differently-than-any-other-blockchain-dominic-williams-video; *see also* Nicolas Pongratz, *Internet Computer (ICP) Market Value Reaches $45B Two Days after Launch,* YAHOO! FINANCE (May 12, 2021), https://finance.yahoo.com/news/internet-computer-icp-market-value-110516675.html?guccounter=1.

[34]    *Internet Computer Works Differently Than Any Other Blockchain: Dominic Williams*, BLOOMBERG (May 8, 2021), https://www.bloomberg.com/news/videos/2021-05-08/internet-computer-works-differently-than-any-other-blockchain-dominic-williams-video.

also promoted the Internet Computer as being the "product of years of R&D" and suggested to investors that the Internet Computer had "new software" that was poised for mass adoption, leading investors to believe that the Internet Computer and ICP tokens were good investments with high growth potential.  Williams told investors that they could "leverage the features of the blockchain like tokenization.  And we think we are going to see an explosion of things like tokenized social media."  Williams also confirmed that Dfinity had "big backing" from AH Capital Management and other venture capitalists who "saw value" in the Internet Computer, in an effort to gain credibility with (and sales from) investors by suggesting that sophisticated venture capitalists were investing in the Internet Computer.

91.     Williams likewise told Business Insider that mainstream venture capital firms are sitting on "billions and billions of dollars" that they are ready to invest in crypto and so-called "open internet" startups.[35]  The purpose of these statements was two-fold: (1) Williams again sought to gain credibility for the Internet Computer by virtue of its financial association with well-known, successful investment firms, and (2) Williams sought to solicit sales of the ICP tokens by suggesting to investors that there was massive growth potential for ICP's blockchain technology.

92.     On May 10, 2021, ICP was listed on multiple cryptocurrency exchanges like Coinbase, Binance, Huobi, OKEx, and others.  By way of the internet, including Dfinity's website, Defendant Williams's blog, Twitter, and the over 25 cryptocurrency exchanges that trade ICP, interstate means are used in connection with the offer and sale of ICP.

93.     Through Defendant Williams's bombastic solicitations, and the out of nowhere top-10 debut that was enabled by the Controlling Defendants, ICP capitalized on investors' "fear of missing out" on the next big thing.

---

[35]     Shalini Nagarajan, *Internet Computer is already one of the top 10 cryptocurrencies with a market cap of $45 billion – just two days after launching*, BUSINESS INSIDER (May 12, 2021), https://markets.businessinsider.com/currencies/news/internet-computer-dfinity-top-digital-assets-market-cap-dominic-williams-2021-5.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

94.     Despite having less than $200 million total from its Seed and Strategic fundraising rounds as capital and being relatively unknown at its debut (notwithstanding the Controlling Defendants' marketing efforts), ICP catapulted to the eighth largest token in terms of market capitalization.[36]

95.     ICP debuted at a price of $731 on its first day and its valuation rose to more than $45 billion.[37]

96.     Immediately after being listed on the most popular exchanges, however, ICP's price plummeted.  As reported on the crypto-related online forum, Coinspeaker.com:

> Internet Computer (ICP) made a debut with an incredible display of $45 billion market value.  However, the moment was short-lived as the price took a nosedive from $731 debut price to $146 within a few minutes.[38]

97.     As crypto journalist, Samuel Wan, observed in a NewsBTC article, *Internet Computer (ICP) Drops From Nowhere To Storm The Top Ten*, "it's not often that a relatively unknown token enters the top 10.  This has many wondering if ICP is a legit project."[39]

98.     Wen further reported that "ICP enter[ed] the top ten on CoinMarketCap following its exchange debut.  ICP was sitting as high as the fourth spot, but following heavy sell pressure, it's since dropped to the seventh position."[40]

99.     The price of ICP continued to drop in the following weeks.  Throughout this time, however, Defendants continued to promote the ICP and its potential for success.

100.    On May 12, 2021, Defendant Williams repeated the claim that ICP was the "third major innovation in blockchain," following Bitcoin and Ethereum.[41]

---

[36]    Brenden Rearick, *Internet Computer (ICP) Crypto: 10 Things to Know as ICP Snags No. 8 Spot*, INVESTOR PLACE (May 12, 2021), https://investorplace.com/2021/05/internet-computer-icp-crypto-10-things-to-know-as-icp-snags-no-8-spot/.

[37]    Matthew Leising and Olga Kharif, *Overnight Crypto Sensation Sets Out to Undo Internet's Failings*, BLOOMBERG (May 12, 2021), https://www.bloomberg.com/news/articles/2021-05-12/crypto-s-overnight-sensation-is-taking-on-the-web-as-we-know-it.

[38]    John K. Kumi, *Internet Computer (ICP) Falls Heavily from Debut Price Despite Dfinity's Plans to Launch Endorphin*, COINSPEAKER (May 16, 2021), https://www.coinspeaker.com/internet-computer-falls-price-endorphin/.

[39]    Samuel Wan, *Internet Computer (ICP) Drops From Nowhere To Storm The Top Ten*, NEWSBTC https://www.newsbtc.com/news/internet-computer-icp-drops-from-nowhere-to-storm-the-top-ten/   (last visited Feb. 9, 2023).

[40]    *Id.*

[41]    *See supra*, n.36.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

101.    Defendant Williams also appeared on a segment on Bloomberg on May 12, 2021, where he was interviewed about the Internet Computer and its Genesis Launch.  The program was titled "Overnight Crypto Sensation Sets Out to Undo Internet's Failings."  According to the geolocation pop-up on the video, Williams gave this interview in Palo Alto, California.  Williams claimed that the Internet Computer utilized "profoundly new" technology that would allow the Internet Computer to replace the internet as we currently understand it.

102.    That same day, the founder of Polychain, Olaf Carlson-Wee, echoed that statement in an interview with Bloomberg: "Dfinity is the most important technology launched since Ethereum."[42]  Carlson-Wee even personally endorsed Dfinity's prospects of displacing Ethereum, saying:

> People like me in the crypto world recognize the magnitude of the technology breakthroughs Dfinity represents. . . .  Even with the changes Ethereum is going through to improve its speed and performance it won't be able to compete with what the Internet Computer will enable . . . Dfinity will enable novel types of apps that aren't possible to build on any other blockchain.[43]

103.    Simultaneously, Defendants leveraged their relationships with various exchanges to further boost sales of ICP.

104.    For example, besides being a large investor in ICP, Andreessen also happens to be the biggest outside investor in one of the largest crypto exchanges, Coinbase.  Andreessen's stake in Coinbase is worth approximately $9.7 billion.[44]

105.    Furthermore, according to filings with the SEC, Marc Andreessen personally owns 5,516,037 Class A shares and 23,961,498 Class B shares of Coinbase stock and is the largest individual shareholder behind Coinbase's CEO and co-founder Brian Armstrong.

106.    Andreessen's co-founders and general partners, Marc Andreessen and Kathryn Haun also both serve as members of Coinbase's board of directors.[45]

---

[42]    *See supra*, n.37.

[43]    *Id*.

[44]    Ari Levy, *Here's who just got rich from the Coinbase debut*, CNBC (Apr. 14, 2021), https://www.cnbc.com/2021/04/14/coinbase-who-gets-rich.html.

[45]    Board of Directors, COINBASE, https://investor.coinbase.com/governance/board-of-directors/default.aspx (last visited Feb. 9, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

107.    Andreessen used its relationship with Coinbase to secure a favorable listing and price of ICP during its debut on Coinbase.

108.    Indeed, Coinbase's opening listing price for ICP was one of the highest of all crypto exchanges participating in ICP's Genesis event.

109.    Crypto analysts covering ICP noted that, compared to other decentralized ecosystem projects like Polkadot and Terra, it appeared that "ICP is priced above peers."[46]

110.    Additionally, as crypto journalist Samuel Wen observed: "The sudden appearance of ICP in the top ten has caused a stir in that ICP has achieved a lot in a relatively short time.  For example, ICP is already listed on Coinbase Pro, whereas ADA, which has been around since late 2017, only achieved this in March this year."[47]

111.    Another example of Dfinity having leverage to gain a favorable listing price can be seen between Dfinity and the cryptocurrency and derivatives exchange OKEx.  On May 12, 2021, OKEx announced the public listing of ICP on the exchange.  That same announcement also disclosed that Dfinity had previously agreed to help collaborate and fund OKEx's "Blockdream Ventures fund," jointly providing $10 million in special funding.[48]  OPEx CEO, Jay Hao, personally endorsed the ICP's public listing in the announcement:

> We are pleased to support the launch of the Internet Computer as a Day 1 partner and be a part of this global movement to reinvent the internet as we gradually move toward a decentralized future.  We hope that this will be the first big step in allowing entrepreneurs, developers or enterprises to host secure software systems built on top of computer science, and really just backing the long-term evolution of the internet.[49]

112.    Defendant Williams was quoted in the OPEx press release stating in a press release for the listing of ICP on the OKEx exchange, that "The Internet Computer represents the third major innovation in blockchain after Bitcoin and Ethereum. . . .  It represents the product of an unprecedented multi-year R&D

---

[46]    *See supra*, n.14.

[47]    *See supra*, n.39.

[48]    Press Release, OKEx, *OKEx Lists DFINITY's Internet Computer Token, ICP* (May 12, 2021), https://www.prnewswire.com/news-releases/okex-lists-dfinitys-internet-computer-token-icp-301290037.html.

[49]    *Id.*

1  effort, orchestrated by the DFINITY Foundation from research and development centers in Zurich, Palo

2  Alto, San Francisco and Tokyo."[50]

3      113.    These efforts were not enough to stem the increasing losses as ICP's token price continued

4  to fall since its debut.  In response, Defendant Williams made another announcement this time about a new

5  program being launched by Dfinity: "Endorphin."

6      114.    On May 14, 2021, Defendant Williams and Dfinity announced the Company's plan for

7  Endorphin, a decentralized operating system for phones, laptops, and other user devices.[51]  Defendant

8  Williams claimed that Dfinity was "looking for ways to accelerate the program, and I'm hopeful

9  announcement will be made shortly."  The message that some analysts in the cryptocurrency sector received

10  was that the launch of Endorphin would "create huge demand which will in response have an impact on the

11  price of ICP."[52]

12      115.    This announcement, however, did not have the desired effect.  As of May 16, 2021, ICP had

13  lost 60% of its debut price and was valued at only $32 billion.[53]

14      116.    On May 17, 2021, the Coinspeaker website reported that "[d]espite the coin's price falling

15  from its debut price of $731 to $258 over the past weekend, the networks digital currency has continued to

16  nosedive. . . . At the time of writing, Internet Computer is trading at a price of $209.15, down 16.43% in the

17  past 24 hours and by 70% from its all-time high (ATH) of $737.20 according to CoinMarketCap."[54]

18      117.    The report noted that ICP holders had "enjoyed a robust and well-acclaimed debut," but that

19  they are now looking towards "disruptive use cases to bounce back to its winning ways."[55]

20      118.    As of May 22, 2021, the price of ICP had crated to $134 a token.

21

22  [50]     *Id.*

23  [51]     Dominic Williams, *Plans for "Endorphin," a Free and Open Crypto OS for Smartphones and Other End-User Devices*, MEDIUM (May 14, 2021), https://medium.com/dfinity/plans-for-endorphin-a-free-and-open-crypto-os-for-smartphones-and-other-end-user-devices-9ebb763a711e.

24  [52]     *See supra*, n.38.

25  [53]     *Id.*

26  [54]     Benjamin Godfrey, *Dfinity's Internet Computer (ICP) Continues on Its Price Decline amid Ongoing Market Correction*, COINSPEAKER (May 17, 2021), https://www.coinspeaker.com/internet-computer-icp-correction/.

27

28  [55]     *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

119.    As noted in a May 22, 2021 video by the popular cryptocurrency YouTube channel, Coin Bureau, the current drop in ICP's price chart "looks more in line [a] downward price trend, which I believe will continue for some time.  This is because there seems to be much more sell pressure than buy pressure for the ICP token."[56]

120.    As Assistant Dean at University of California, Berkeley's Haas School of Business Linda Kreitzman who helps oversee the Berkeley Haas Blockchain Initiative noted, the "timing" of ICP's listing and its "cool" name "created the perfect situation for an explosive debut" for the Dfinity's ownership token.[57]

121.    Defendants took advantage of this carefully timed ICO to sell their ICP holdings both when the cryptocurrency market was generally reaching all-time highs amidst the 2021 "crypto bull run" and when the ICP tokens, in particular, were exponentially inflated during the debut.  The ICO was also conducted shortly after Coinbase's Direct Listing, which brought Coinbase shares to the NASDAQ stock exchange.

122.    On June 14, 2021, Defendant Williams posted a thread on the Dfinity's page on Reddit titled "An ICP Tokenomics NNS Proposal is in the works – Dominic Williams," which made the following admission:

> It is arguably the case that many ECT/Seed holders don't care much about the fair price for ICP because they have achieved extraordinary gains.  Even at $60, they are still 1800X up.  Of course, experience crypto holders want to maximize their gains . . . . *[T]here has been a lot of sell volume so far, mainly from ECT/Seed and ex and early employees and affiliates that lucked out*.  The latter group will exhaust their reserved rather quickly [in my opinion] which will be no bad thing.  *ECT/Seed not so quickly*.  With healthier future volumes and demand, that should not be an issue, but anyway . . . .
>
> I am working on a tokenomics proposal to address the situation, which I'm hoping will be proposed to the NNS in about 2-3 weeks.  The IC is fully adaptive, and that means that it can constantly improve the protocol *and* the tokenomics.  *Advanced cryptoeconomics can be used to weaken the "prisoner's dilemma" dynamic that has arisen*.[58]

---

[56]    Coin Bureau, *Internet Computer (ICP): BIGGEST Launch of 2021??*, YOUTUBE (May 22, 2021), https://www.youtube.com/watch? v=YGrFj3pav_A.

[57]    Danielle Abril, *What is Internet Computer? A guide to the latest buzzy cryptocurrency*, FORTUNE (May 12, 2021), https://fortune.com/2021/05/12/what-is-internet-computer-cryptocurrency-digital-currency/#:~:text=Dfinity%20is%20backed%20by%20investors,Aspect%20Ventures%2C%20and%20Eterna%20Capital.

[58]    *See Rebuild on World Computer*, REDDIT, https://www.reddit.com/r/dfinity/comments/nz715r/an_icp_tokenomics_nns_proposal_is_in_ the_works/ (last visited Feb. 9, 2023) (emphasis added).

23

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

123.     On June 28, 2021, Arkham Intelligence released a report on the "Internet Computer Token" (the "Arkham Report").[59]  Summing up the ICP story to that point, the Arkham Report stated:

> As of this writing, the Internet Computer token (ICP) has lost 95% of its value from its launch event in May, dropping from $730 to $30, and wiping out over $300 billion dollars of value based on ICP's total supply.  These are astounding numbers in the crypto world and financial world overall, even with the current market's volatile prices and soaring valuations.  At its peak, ICP was the third most valuable crypto-asset, behind Bitcoin and Ethereum, and was worth as much by market cap as Mastercard, Bank of America, and PayPal.  In its first month ICP's price decreased more than any other top 100 token by a good margin.  Altogether retail investors who bought ICP on Coinbase or other major crypto exchanges have lost millions if not billions of dollars.

124.     The Arkham Report found that the Dfinity Treasury and project insiders deposited billions of dollars' worth of ICP to exchanges at the time of the Genesis listing and the following weeks.  By analyzing the transactions made by various exchanges, the Arkham Report noted that deposits made by the Dfinity Treasury provided initial liquidity on exchanges.  In addition to the Dfinity Treasury itself, the Arkham Report found that the Dfinity Treasury also sent 34.1 million ICP tokens to 34 suspected insider addresses.  These addresses have deposited 10.7 million ICP tokens to exchanges (very likely for sale) during the Genesis listing and intermittently in the weeks following the Genesis listing.  The Arkham Report identified a fundamental pattern of activity of many suspected insiders: a large transfer from the Treasury before listing day, followed by intermittent exchange deposits post-listing.  These transfers were very likely for sale and the exceptional decrease in the price of ICP since its listing is indicative of massive selling.

125.     In addition, the Arkham Report found that Dfinity did not follow industry practices meant to demonstrate good faith and assure investors that project insiders would not trigger a price collapse through massive selling.  The Arkham Report called into question the lack of transparency from Dfinity on Token allocation and unlocking schedules, and determined, based on a review of Dfinity's public materials, there was no widely distributed public statement that included the allocation and unlocking schedules.

126.     Indeed, there was no clear and detailed breakdown of token allocation and unlocking schedules, only the total supply of tokens and different categories of holders.  By failing to provide such critical information, retail investors were caught in a "rug pull," "team dump," or "VC dump" as Defendants collapsed the ICP price by offloading large amounts of ICP tokens.

---

[59]     *Report on the Internet Computer Token*, ARKHAM (June 28, 2021), https://arkhamintelligence.com/icp/report.pdf.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

### E.    Dfinity Is One Entity

127.    The Dfinity Foundation was founded by Defendant Williams as a spin-off project from a previous (and now dead) crypto venture, String Labs.  Notably, String Labs was headquartered at 904 Ramona Street, Palo Alto, California 94301.  Members of the String Labs team, including but not limited to Williams, were merged into the Foundation at its inception.

128.    In the Foundation's own words: "The DFINITY Foundation operates globally with research centers in Zurich and San Francisco as well as team members working remotely across North America, Europe and Asia."[60]  Dfinity USA Research, as its name indicates, is the corporate structure that allows Williams to operate his "research center" within the United States.

129.    Former employee reviews of their time working for Williams shed further light on how the Dfinity organization as a whole was structured under his leadership.  As one former "Senior Engineering Manager" described as a "[c]on[]" of working for the Dfinity entity: "The 'center of gravity' is in Switzerland and all the decisions are made there. . . .  The CEO/ chief architect takes a very central position."[61]  Another former employee at the Foundation gave a list of cons as part of a review on Glassdoor.com, which included the complaints that Williams "Doesn't adhere to legal or marketing communication strategies when Tweeting, putting the org in legal jeopardy" and that "[a]lthough he is anti-corporate culture, his top down approach makes it feel like a corporation, just poorly managed."[62]   Another former employee echoed the complaint regarding the Dfinity organization's centralized management style as follows: "It was hard to engage with leadership which seemed to be dictatorial and out of touch."[63]  A "Senior Software Engineer" candidly offered a further glimpse into how Williams managed the Dfinity organization as whole in his dual roles as Foundation Founder and Dfinity USA Research CEO:

---

[60]    *See supra*, n.2.

[61]    *DFINITY Reviews*, GLASSDOOR, https://www.glassdoor.com/Reviews/DFINITY-Reviews-E2946049.htm (last visited Feb. 9, 2023).

[62]    *Id.*

[63]    *DFINITY Reviews*, GLASSDOOR, http://www.glassdoor.com/Reviews/Employee-Review-DFINITY-RVW68571853.htm (last visited Feb. 9, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

Dom (founder/CEO) is a smart guy, but is out of control and out of touch.  I'm thankful that as an [Individual Contributor] I do not have to deal with him directly; many higher level managers have alluded to his 'tantrums.'   His rants during company wide meetings are at times frankly unhinged.  It makes me doubt the future of the company and project . . . .[64]

130.    In reality, Dfinity USA Research is an entity that was established just so the Foundation could conduct business operations in California in order to effectuate the Genesis listing and sell ICP to Plaintiff and the Class.

131.    On August 4, 2017, Dfinity USA Research was formed as an LLC in the State of Delaware.

132.    On October 10, 2017, Dfinity USA Research filed an Application to Register a Foreign Limited Liability Company with the California Secretary of State.  Dominic Williams signed the application.

133.    On October 24, 2018, Dfinity USA filed a Statement of Information with the California Secretary of State.  The filing notes that Dominic Williams is the CEO.

134.    On September 13, 2019, Dfinity USA Research filed another Statement of Information with the California Secretary of State.  The filing notes that Dominic Williams is the CEO of Dfinity USA Research in Palo Alto.

135.    Defendant Williams maintained actual control over the entire Dfinity entity by simultaneously serving as the Founder and Chief Scientist of the Foundation and the CEO of Dfinity Research USA.  Williams himself makes no distinction between the various subsections of his business when making public solicitations to investors, describing it as a "non-profit organization headquartered in Switzerland, which runs research development centers in Zurich, Palo Alto, San Francisco, and Tokyo."[65]

---

[64]    *See supra*, n.61.

[65]    DFINITY, *Internet Computer Genesis Launch Event*, YOUTUBE (May 7, 2021), https://youtu.be/xiupEw4MfxY.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

136.   Artia Moghbel is also listed as a "Manager[] or Member[]" on the two aforementioned Statements of Information forms for Dfinity USA Research.[66]  In addition to being the "Manager[] or Member[]" of Dfinity USA Research, Moghbel's LinkedIn page confirmed that he served overlapping dual roles for the Dfinity entities.  The LinkedIn page notes that he served as Dfinity's: (i) Head of Ops from October 2017 to September 2018; (ii) Chief Operating Officer ("COO") from October 2018 to February 2020; and (iii) Strategic Projects Manager from May 2020 to June 2021 working in San Francisco, Zurich, and Palo Alto.[67]  Moghbel is another example of how there was no separation between the various branches of the Dfinity organization that Williams created.  Indeed, as the self-described Manager/Member of Dfinity USA Research, Moghbel was working in Zurich (upon information and belief at the Foundation itself) on "Strategic Projects" around the same time as the Genesis Launch.

137.   The September 13, 2019 Statement of Information for Dfinity USA Research is also signed by Juliana Che who was the ***Director of Legal Operations for the Foundation*** at the time. Specifically, Juliana Che's LinkedIn account previously noted that Che served as Director of Legal Operations for the Foundation from June 2019 to September 2021 and Head of Legal Operations from at least September 2021 to November 2021.  Che's LinkedIn likewise confirms that she served as legal counsel for both the Foundation and Dfinity USA Research simultaneously.  According to Che, she: (i) designed the tokens distribution program encompassing the general and administrative operational requirements; (ii) led efforts on corporate governance initiatives to support an internal system of controls and best practices; (iii) managed a cross-departmental task-force to support main net launch readiness; (iv) spearheaded an entity structure management program; (v) partnered closely with Finance and Legal to create strategic goals for intellectual property and inter-company services; and (vi) oversaw board meeting management.

138.   A "Senior Counsel" for the Foundation, Sheela Tabrizi, was also based in California out of the former String Labs headquarters address in Palo Alto, and she filed Trademark/Service

---

[66]     *See, e.g.*, DFINITY USA RESEARCH, LLC (California Secretary of State Statement of Information) (Sept. 13, 2019).

[67]     Artia Moghbel, LINKEDIN, https://www.linkedin.com/in/artiam/ (last visited Feb. 9, 2023).

Mark Application with the U.S. Patent and Trademark Office for the "Internet Computer Protocol" on behalf of the Foundation.

139.   Dfinity's former general counsel, Jennifer Sum, was also based in San Francisco.  Her former public address on the California State Bar was the same building in San Francisco that served as the official headquarters of Polychain and the Polychain Dfinity Ecosystem Fund.  On April 14, 2021, on behalf of Dfinity, Sum participated in a virtual event entitled "DeFi Regulation in Enterprise."

140.   With varying positions on the legal team for both the Foundation and Dfinity USA Research, Che, Sum, and Tabrizi each exercised control over the Dfinity enterprise as a whole, as evidenced by their signing of legal documents on behalf of both the Foundation and Dfinity USA Research and having decision-making power over the organization's operations, legal decisions, and solicitations of ICP token sales.

141.   Similarly, it is virtually impossible to distinguish between when the California-based employees are wearing the Foundation hat versus the Dfinity USA Research one.  For example, Anna Escher worked as the Head of Audience Development for the Foundation in San Francisco.  Escher led content strategy for the main-net launch of the Internet Computer and led campaigns to drive 200,000 registrations to the virtual network launch event.  Similarly, Escher managed all of Dfinity's social channels and grew Dfinity's Twitter follower count from 30,000 to 650,000.  Escher promoted the Foundation and the Genesis Launch on the Company's social media.  For example, on May 13, 2021, Escher hosted a video interview segment at the TechCrunch Event and uploaded the promotion onto Dfinity's YouTube channel.  Escher specifically promoted the Internet Computer Project as having disruptive technology with the potential to "completely upend the architecture of the internet."[68]  The panelists in this promotion included Defendant Williams, along with Polychain's General Partner, Tekin Salimi and its founder Olaf Carlson-Wee.  The background for Williams's portion of the video is identical to that of Escher, indicating that Williams is operating out of the same recording studio as Escher in California.

[68]   DFINITY, *TechCrunch Event Recap: Exploring Entrepreneurship in the Open Internet Boom (Anna Escher)*, YOUTUBE (May 13, 2021), https://www.youtube.com/watch?v=381_ynUUWOg.

142.   Upon information and belief, as an executive responsible for audience development and driving up investor interest, Escher had control over the substance of the solicitations that went out to the email list that Plaintiff was included in after signing up through the website.  These solicitations, along with the promotions from the Foundation on YouTube and its website, successfully induced the sale of the unregistered securities to Plaintiff.  And Escher, like every Dfinity "team member," including Williams, that received an allotment of ICP tokens, was motivated to make these solicitations to further financial interests of the team.

143.   Lomesh Dutta is listed as the Foundation's Vice President of Growth who works out of the San Francisco Bay Area.  Josh Drake is the COO of Dfinity and Ryan Newman is Dfinity's Director of Recruiting.  Both Drake and Newman operate out of the San Francisco Bay Area and have been with the Foundation since March 2019.  Stanley Jones served as the Director of Engineering, Developer Experience at Dfinity, as well as the Engineering Manager, SDK, and Api at the Foundation, while also operating out of San Francisco Bay Area.  Similarly, Dfinity's Senior Software Engineer on the SDK team, Kyle Peacock operated out of the San Francisco Bay Area.  And Taylor Ham operated out of Los Angeles as the Foundation's Front End Software Engineer, Developer Experience.

144.   None of these Foundation employees appears to have ever worked in Zurich.  By all accounts they only ever worked in California.

145.   Brendan Foley, based out of San Jose, California, served as Dfinity's Vice President of Product from February 2021 through June 2021, overseeing product management and user experience for the Internet Computer.  According to his LinkedIn profile, Foley's "key accomplishments" included the following:

Identified need and led developer and competitive research to inform product strategy. In parallel, ***engaged hands-on with engineering and go-to-market in multiple efforts for platform launch***.

Defined proposal for product strategy, covering target developers, 12-month end-state and metrics, key value streams, and roadmap initiatives to achieve target end-state.  Aligned go-to-market and engineering executives on proposed strategy.[69]

---

[69]   Brendan Foley, LINKEDIN, https://www.linkedin.com/in/bafoley/ (last visited Feb. 9, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

[Emphasis added.]

146.    Foley also promoted the Internet Computer during his tenure as a California-only Foundation employee.  For example, Foley participated in a podcast on April 28, 2021, as "DFINITY Product VP" on "The Key Product Trends of the Future," extolling the virtues of interconnected technology like Dfinity's Internet Computer and its blockchain technology.

147.    On May 7, 2021, Williams and various Dfinity employees participated in a virtual road show on YouTube (the "Mercury Genesis Launch Event") to promote the Internet Computer and solicit sales of the ICP tokens at the Genesis Launch taking place in a few days.  Notably, the video lists the following as employees from Dfinity USA Research:  Foley, Stanley Jones, Kyle Peacock, Taylor Ham, Anna Escher, and Andrew Wylde (Senior Software Engineer, operating out of Palo Alto, California).  However, the LinkedIn pages for Jones, Peacock, Ham, Escher, and Wylde all describe them respectively as having solely worked remotely for the Foundation while in California and provide the link to their former employer, *which redirects to the Foundation's official page*.  Upon information and belief, the Foundation listed their employees as being under the Dfinity USA Research banner in this promotional video in order to conceal the identity of those with responsible ownership and financial interest in the Foundation and ICP token allocations.

148.    The other Foundation employees that participated were Dominic Williams, Jan Camenisch (Chief Technology Officer, Vice President of Research and Crypto), Manu Drijvers (Researcher), David Millar-Durrant (Head of Financial Integrations), Jens Groth (Director of Research), Bjorn Tackmann (Director of Research), Matt Grogan (Software Engineer), Hamish Peebles (Software Engineer), Andreas Rossberg (Principal Engineer and Researcher), Joachim Breitner (Researcher), and Lara Schmid (Senior Researcher).

149.    Each of one of these Dfinity organization employees (regardless of whether he or she was labeled in this video as representing the Foundation or Dfinity USA Research) promoted the purportedly revolutionary blockchain technology available on the Internet Computer and the value and "utility" of the ICP token.  Each was authorized to speak on behalf of the Foundation and the Internet Computer and had control over the contents of his or her respective statements.

150.    For example, Foley and Wylde participated in the Mercury Genesis Launch Event to promote the Internet Computer in a segment titled "CanCan: Exploring Tokenization in an Open Internet Service."   In particular, Foley's demonstration explored how tokenization in decentralized applications built on the Internet Computer platform purportedly created a "growth flywheel for developers and entrepreneurs" that could "illustrate[] how builders can use tokens to attract, incentivize, and retain users for their innovative app ideas."

151.    Stanley Jones, in a segment titled "Developer Onboarding," promoted the different "uses" for ICP tokens for developers that allowed them to convert ICP tokens into Cycles (another token in the Internet Computer ecosystem) that can produce more demand for ICP tokens.

152.    Williams personally had several panels at this Mercury Genesis Launch Event.   In particular, Williams gave the "Welcome to the Internet Computer Mercury Genesis Launch Event" opening remarks "at the advent of the Genesis unlock."   Williams stated: "I can confirm that the network will switch on full liquidity at 9am pacific time this Monday the 10th.  This means that in a very short time from now the Internet Computer will transition into a new fully public mode."

153.    In the segment titled "An Overview of the Internet Computer," Williams explained the structure of Dfinity: a non-profit organization headquartered in Switzerland, which runs research development centers in Zurich, Palo Alto, San Francisco, and Tokyo.  Together with remote teams in locations like Germany and the U.K., "Williams bragged that Dfinity hired "the best from academia, crypto, and the world's leading technology organizations."   Williams also promoted the Interest Computer as "the third great innovation in blockchain."   The Internet Computer, Williams explained, is created by the "ICP Protocol," which operates via its governance token, the ICP token.  Williams's message to investors being that purchasing ICP tokens would fuel the success of the "third great innovation in blockchain," the Internet Computer.

154.    In a segment titled "Internet Identify: The End of Usernames and Passwords," Williams was joined by Joachim Breitner.  Notably, the video indicates that Williams was broadcasting out of Palo Alto, California in what appears to be the Dfinity USA Research office space.  In this segment, Williams and Breitner promoted the Internet Computer's digital, cryptographic identification

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

1  application as being "the future" of usernames and passwords, suggesting to investors that the

2  technology being built on the Internet Computer was "revolutionary" and poised for future growth.

3          155.    Williams also had a segment titled "Internet Computer: Tokenomics," wherein he

4  touted the Internet Computer and the ICP token's ability to "maintain value."  He informed investors

5  that 469,213,710 ICP tokens (approximately 32% of the circulating supply) "won't be available until

6  Genesis."  He also told investors that there were "several aspects to generate demand in ICP," namely

7  forcing developers on the Internet Computer to purchase ICP tokens in order to build on the

8  blockchain and using ICP tokens in decentralized finance exchanges.  He bragged that "this is the first

9  time that blockchain has used computation to create tokens with constant value."  He also claims that

10  demand for ICP tokens would be created through staking the ICP tokens for a period of time.

11          156.    Williams was also joined by David Millar-Durrant in a segment titled: "Network

12  Nervous System: Tens of Thousands of People Governing the Internet Computer."   Williams

13  promoted the ICP tokens as giving investors "voting rights" over the Internet Computer and a "long

14  term investment."

15          157.    As noted above, Anne Escher held a Q&A at the TechCrunch Event (which was

16  reposted during the Genesis Launch Event).  One of the interviewees was Dominic Williams who

17  stated that the "success of Internet Computer" could be achieved by creating demand for and selling

18  the governance token ICP, which would, in turn, fund additional applications being built on the

19  Internet Computer blockchain.  During his segment, Williams stated that he hoped more talented

20  developers around the world would participate in the development of internet services because "for

21  the most part it is people *located here in Silicon Valley*."  Williams admitted that "You can do it in

22  Europe, but it's much harder."

23          158.    Williams, as the Founder and Chief Scientist of the Dfinity Foundation and the CEO of

24  Dfinity USA Research, was financially motivated to use both entities to solicit sales of ICP tokens.

25  By virtue of being a founding member of Dfinity, Williams, upon information and belief, received a

26  significant portion of the ICP token allocation for the Dfinity team.  Notably, "Team Members"

27  received approximately 18% of the Genesis Token Allocation.  The sale of his portion of the ICP

28

1  token float would garner Williams hundreds of millions of dollars.  Upon information and belief, all
2  of the presenters at the Mercury Genesis Launch Event were members of the Dfinity team that
3  received pre-launch allocations of ICP tokens.  The token allocation for "Team Members" lists the
4  number of participants as "200."  According to Dfinity's promotional materials from the Mercury
5  Genesis Launch Event, Dfinity has approximately 200 employees (including its California based-
6  employees and the original members from String Labs that operated side-by-side with Foundation
7  employees in Palo Alto headquarters location) leading to the reasonable inference that each Dfinity
8  employee received at least some percentage of the ICP tokens allocated to Dfinity team members at
9  the Genesis Launch.  The Dfinity team members who received ICP token allocations had a similar
10 financial motivation as Williams to promote the Internet Computer and solicited sales of ICP tokens.
11 This financial motivation is what prompted the Dfinity USA Research/Foundation employees at the
12 Mercury Genesis Launch Event (and other events) to actively solicit sales of the ICP tokens and
13 marketed the Internet Computer's future growth and scalability potential.  Collectively, the employees
14 of Dfinity USA Research/Foundation solicited sales on behalf of the Dfinity enterprise as a whole.
15 Moreover, as Williams concedes, the sale of ICP tokens funds the Internet Computer.  Consequently,
16 Williams and the other executives at Dfinity USA Research and the Foundation were financially
17 motivated to solicit sales of ICP tokens in order to keep Dfinity's business up and running and
18 eventually cash out their own ICP token allocations at inflated prices.

19      159.    In other legal proceedings, Dfinity USA Research refers to itself simply as "Dfinity."
20 Dfinity USA Research sued its former Senior Director of Data Center Services, Eric Bravick, for
21 allegedly failing to return equipment.  Bravick was employed to set up the data centers which make
22 up the infrastructure of the Internet Computer and Dfinity's overall business operations.

23      160.    Bravick was hired in May 2020 to help establish data centers around the world on behalf
24 of Dfinity.  In August 2020, Bravick had been promoted to interim Vice President of Engineering.  In
25 connection with the Bravick dispute with Dfinity USA Research, executives with Dfinity worked to
26 resolve the dispute, including Engineering Manager Luis Mompo Handen, then-Vice President of
27 Operations Josh Drake, Data Center Coordinator Chris Tarpley, and Program Manager Katie Peters.
28

1  Bravick confirms that the "Dfinity project was built around an initial coin offering, which is, for a

2  cryptocurrency company, the rough equivalent of taking a company public."

3  161.  As evidenced by the employment agreement attached to the Bravick complaint, when

4  Dfinity USA Research enters into contracts with employees, portions of those agreements must be

5  approved by Dfinity USA Research's so-called "Foundation Council." ***Significantly, the employment***

6  ***agreement is signed by Diana Sutter, the Foundation's Vice President of People, who operates out***

7  ***of the Palo Alto location***.

8  162.  Dfinity USA Research is a Delaware LLC, and the identities of Delaware LLC members

9  are not available on the public record by default.  *See* 6 Del. Code §18-201 (certificate of formation

10  for a Delaware LLC does not require identification of members).  A Dun & Bradstreet Credit report

11  on Dfinity USA Research filed in the Bravick lawsuit shows seven individuals with a status of "MNG

12  MBR" which indicates a status of Manager/Member for the LLC.  The report lists seven individuals

13  as Manager/Members:  Dominic Williams, Gian Bochsler, Jan Camenisch, Josh Drake, Lomesh Dutta,

14  Michael Lee, and Paul Meeusen.  Each of these manager/members of the Dfinity USA Research also

15  has an executive leadership role within the Foundation:

16  - Dominic Williams – Founder, Chief Scientist;

17  - Gian Bochsler – Counsel Member;

18  - Jan Camenish – Chief Technology Officer, Vice President of Research and

19    Crypto;

20  - Josh Drake – Chief Operating Officer;

21  - Lomesh Dutta – Vice President of Growth;

22  - Michael Lee – Vice President of Communications; and

23  - Paul Meeusen – Vice President of Finance.

24  163.  Dfinity USA Research was used to hire employees and contractors located in Silicon

25  Valley and the San Francisco Bay Area to make possible Dfinity's Genesis listing of ICP and the

26  creation of the Internet Computer blockchain.  Indeed, Dfinity, operating through Dfinity USA

27  Research's California business license, has employed software engineers, networks engineers,

28

developers, legal counsel, human resources, information technology, marketing staff, and other business executives, in the United States and California to work on the Internet Computer and to assist in the Dfinity's goal of creating the ICP token selling it to class members.  The Foundation used its California connections via Dfinity USA Research to conduct marketing operations to hype up the Genesis listing and promote it to investors in the United States and California.  The California employees exercised control over the day-to-day operations of both the Foundation and its research centers, as well control over the marketing and solicitation of ICP token sales.

164.    Only by establishing Dfinity USA Research and registering it to do business in the state of California could the Foundation have conducted the significant California-based commercial activities that were necessary to effectuate the Genesis listing.  Through this registration, and the overlapping dual roles that Dfinity executives held, the Dfinity USA Research acted as the U.S. arm of the Foundation's crypto business.  Indeed, when exercising control over the entire Dfinity enterprise, it is indistinguishable when Dominic Williams is acting in his role as the CEO of the Dfinity USA Research entity or in his role as founder/member of the Foundation.  Likewise, when other managing members and executives promoted the Internet Computer at the Genesis Launch Event, it is indistinguishable whether they were acting on behalf of Dfinity USA Research or the Foundation.  Even the Dfinity enterprise itself does not distinguish between its locations in California and Zurich (or the corporate structure associated with each).  Dfinity USA Research employees used email addresses with the URL "@dfinity.org" to conduct business on behalf of the Foundation while located in California.  Concurrently, employees for the Dfinity Foundation operating out of Switzerland and the United States also use the same "@dfinity.org" email address URL.  In short, anyone working at the Dfinity organization anywhere in the world was treated as a Foundation employee with a "dfinity.org" email address.

165.    After the Genesis listing was conducted and Dfinity USA Research served its purpose, Dfinity is apparently allowing Dfinity USA Research's California registration to lapse.  Indeed, only a few months after the Genesis listing, on November 2, 2021, Dfinity USA Research received a Statement of Information delinquency by the California Secretary of State.  On January 4, 2022,

1    Dfinity USA Research was issued a Penalty Certification by the California Secretary of State.  Ten

2    months later, on October 21, 2022 (well after this action was commenced), Dfinity USA Research

3    filed a Statement of Information with the State of California.  Notably, Dfinity USA Research removed

4    Moghbel as the only Manager or Member.  Instead, ***the Foundation is now listed as the sole***

5    ***manager/member of Dfinity USA Research***.

6         166.   The Foundation used Dfinity USA Research as a mere shell, instrument, and/or conduit

7    for the single venture of the Internet Computer Project and the related sale of ICP tokens.  Since the

8    inception of Dfinity USA Research, the Foundation and Williams, as described above, have repeatedly

9    disregarded corporate formalities and failed to maintain arm's length relationships between the related

10   Foundation and Dfinity USA Research entities.

11        **F.    Investors Would Not Reasonably Have Understood that ICP Tokens Were**

12        **Securities**

13        167.   In connection with the Genesis launch, Dfinity and Defendant Williams made

14   statements that reasonably led Plaintiffs and Class members to conclude that the ICP tokens were not

15   securities.

16        168.   As a threshold matter, Dfinity refused to register ICP tokens with the SEC, which

17   indicated to investors that these were not securities.  No such valid exemption from registration

18   requirements exists for ICP.

19        169.   Additionally, Dfinity repeatedly asserted that ICP tokens were "utility tokens," rather

20   than "security tokens" (which would be securities that would have to be registered with the SEC).  For

21   example, a May 6, 2021 blog post titled "Understanding the Internet Computer's Network Nervous

22   System, Neurons, and ICP Utility Tokens" – as the name indicates – refers to ICP as "native utility

23   tokens."[70]

24

25

26

---

[70]    *Understanding the Internet Computer's Network Nervous System, Neurons, and ICP Utility Tokens*,
MEDIUM   (May   6,   2021),   https://medium.com/dfinity/understanding-the-internet-computers-network-
nervous-system-neurons-and-icp-utility-tokens-730dab65cae8.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

170.   Similarly, another Dfinity blog post four days later echoes the statement that "ICP are native utility tokens."[71]

171.   That same day, May 10, 2021, Dfinity published a second blog post titled "How to Access 'Seed' and 'Airdrop' ICP Tokens and Participate in the Internet Computer Network," which again referred to ICP as "utility tokens."[72]

172.   Defendants also misleadingly compared ICP to Bitcoin and Ethereum, which are commodities.  Defendant Williams, for example, wrote in August 2020 that the Internet Computer "fits" on a "continuum" that included Bitcoin and Ethereum.[73]  In particular, Williams stated the following:

> On this spectrum is Bitcoin, which is a pure cryptocurrency designed as a digital gold, through Ethereum, which is a highly programmable cryptocurrency capable of supporting sophisticated DeFi, through to the Internet Computer, which can run mainstream enterprise systems and hyperscale internet services.  All three are blockchains, but they provide different things.

173.   In that same blog, Defendant Williams further stated that the Internet Computer's software canisters were "tamperproof just like Ethereum smart contracts."[74]

174.   In an October 7, 2020 blog post "A Closer Look at Software Canisters, an Evolution of Smart Contract," the Foundation stated software canisters were a "key concept" for ICP, and noted how, among other things, an Ethereum developer may associate these canisters with smart contracts.[75]  Dfinity went on to endorse this comparison as "correct."

175.   At the time of the Genesis launch, Dfinity took advantage of the market's lack of understanding and awareness concerning how this particular investment contract worked.  In the face of

---

[71]    Dfinity, *Getting Started Using the ICP Wallet and Network Nervous System Dapp on the Internet Computer*, MEDIUM (May 10, 2021), https://medium.com/dfinity/getting-started-on-the-internet-computers-network-nervous-system-app-wallet-61ecf111ea11.

[72]    Dfinity, *How to Access 'Seed' and 'Airdrop' ICP Tokens and Participate in the Internet Computer Network*, MEDIUM (May 10, 2021), https://medium.com/dfinity/how-to-access-seed-and-airdrop-icp-tokens-and-participate-in-the-internet-computer-network-e6cd663a0c3c.

[73]    Dominic Williams, *How Ethereum Could Be Supercharged by the Internet Computer Network*, MEDIUM (Aug. 28, 2020), https://medium.com/dfinity/how-ethereum-could-be-supercharged-by-the-internet-computer-network-afc513bf15e1.

[74]    *Id.*

[75]    Dfinity, *A Closer Look at Software Canisters, an Evolution of Smart Contract*, MEDIUM (Oct. 7, 2020), https://medium.com/dfinity/software-canisters-an-evolution-of-smart-contracts-internet-computer-f1f92f1bfffb.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

1  promises that ICP would be similar to Bitcoin and Ethereum, and considering the new technology at issue

2  and Dfinity's other statements, many investors were understandably unaware that ICP tokens had

3  fundamentally different features compare to other cryptocurrencies, which the SEC has determined are not

4  securities.

5  176.   Moreover, the Internet Computer project was advertised as being an improvement on

6  Bitcoin, Ethereum, and other cryptocurrencies.  For example, on August 28, 2020, Defendant Williams

7  published an article on the Dfinity blog titled "How Ethereum Could Be Supercharged by the Internet

8  Computer Network" that made several statements proclaiming the benefits of ICP over "traditional

9  blockchains."[76]  In particular, Williams offered that:

> The Internet Computer works differently than traditional blockchains, and this enables
> Ethereum developers to incorporate its capabilities into their dapps with relative ease.  For
> example, whereas Ethereum requires users to submit some amount of ETH with every
> transaction to pay for the gas that fuels the computation resulting from smart contract code
> being invoked, on the Internet Computer canisters (a form of smart contracts) are pre-
> charged with "cycles" (the equivalent of gas) and pay for computation themselves.[77]

14  177.   Defendant Williams further touted advantages of the Internet Computer over Ethereum:

15       a)   "Ethereum dapps can use [ICP's] software canisters to expand their capabilities in a

16  multitude of exciting ways, including scaling data storage and processing, and serving Web experiences."

17       b)   "To store 1GB of data inside a smart contract on the Ethereum network would cost

18  millions of dollars, which can make it prohibitively expensive to maintain anything beyond fiduciary data.

19  By contrast, the cost of storing 1GB of data inside a canister on the Internet Computer over some substantial

20  period of time can cost as little as a few cents, providing an incredible solution for Ethereum dapps that need

21  to maintain and process large data sets."; and

22       c)   "The Internet Computer's protocols also apply far more advanced cryptography and

23  computer science [than Ethereum], making it more difficult for community developers to drive R&D

24  alone."[78]

25

---

26  [76]   *See supra*, n.73.

27  [77]   *Id.*

28  [78]   *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

178.    In addition to claiming ICP's technical superiority over other cryptocurrencies, Dfinity also indicated that it would benefit financially and use the funds raised through the Genesis Launch to continue to enhance the ICP software and support the growth of the project.

179.    At the time of the Genesis Launch, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that ICP would be better than other cryptocurrencies like Ethereum, many individuals were unaware that ICP tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ICP tokens were issued by the Foundation at creation at very little economic cost – and enormous potential upside – to Defendants.

180.    The creation of ICP tokens at the direction of Dfinity occurred through a centralized process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ICP was something other than a security, when it was a security.

181.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the ICP tokens were securities under the law, and a reasonable investor would not have believed they were securities.

**G.    ICP Is a Security**

182.    Under §2(a)(1) of the Securities Act, a "security" is defined to include an "investment contract."  15 U.S.C. §77b(a)(1).  An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of

1  compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our

2  commercial world fall within the ordinary concept of a security.'"  *W.J. Howey Co.*, 328 U.S. at 299.

3  Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and

4  the emphasis should be "on economic realities underlying a transaction, and not on the name appended

5  thereto."  *Forman*, 421 U.S. at 849.

6      183.  Investors who bought ICP tokens invested money or other valuable consideration in a

7  common enterprise: namely Dfinity.  Investors had a reasonable expectation of profit based upon the efforts

8  of the Defendants, including, among other things, Defendant obtaining favorable listings of their ICP

9  tokens on cryptocurrency exchanges such as Coinbase and Binance.

10                      **1.      ICP Investors Invested Money**

11      184.  Plaintiff and the Class invested fiat, including U.S. dollars, and digital currencies, such as

12  Bitcoin and Ethereum, to purchase ICP tokens.

13      185.  The ICP tokens were listed on cryptocurrency exchanges like Coinbase and Binance, which

14  allowed retail investors to purchase ICP tokens with traditional and other digital currencies.

15      186.  Defendants sold ICP tokens to the general public through global, online cryptocurrency

16  exchanges during its so-called "Genesis" listing.  ICP can be bought or sold on over 25 exchanges.

17      187.  Every purchase of ICP by a member of the public is an investment contract.

18                      **2.      ICP Investors Were Intertwined in a Common Enterprise with Defendants**

19      188.  Additionally, investors were passive participants in the ICP tokens' Genesis Launch, and

20  the profits of each Plaintiff and the Class were intertwined with those of Defendants and of other investors.

21  Dfinity concedes that it uses ICP to fund its operations and promote projects on the Internet Computer,

22  even criticizing other blockchain technology developers for not using their proceeds from previous

23  ICOs to hire more quantity and quality employees.[79]

24      189.  Defendants also were responsible for supporting the ICP tokens, pooled investors' assets,

25  and controlled those assets.

26

27

28  [79]   *See supra*, n.24.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

190.    Further, Defendants hold a significant stake in the ICP tokens, and thus shared in the profits and risk of the project.

191.    For example, Defendant Williams himself explained the objectives of Dfinity's investing rounds and Genesis Launch was to fund the Dfinity Foundation's operations and investments.

### 3.    Investors Purchased the ICP Tokens with a Reasonable Expectation of Profit from Owning Them

192.    Investors in the ICP tokens, including Plaintiffs and the Class, made their investments with reasonable expectations of profits.  The ICP tokens were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used.  For pre-functional tokens, such as the ICP tokens, the primary purpose for purchasing ICP tokens was to make a profit or secure governance rights, rather than to utilize the ICP tokens themselves for a task.

### 4.    Investors Expected Profits from the ICP Tokens to Be Derived from the Managerial Efforts of Defendants

193.    Investors' profits in the ICP tokens were to be derived from the managerial efforts of others – specifically the Foundation, the Company, and Defendant Williams.  ICP investors relied on the managerial and entrepreneurial efforts of the Foundation, and its executive and development teams (which included Defendant Williams) to manage, oversee, and/or develop the projects funded by the Genesis launch.

194.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.

195.    Each of the ICP tokens was a security at issuance because profit from the ICP tokens would be derived primarily from the managerial efforts of Dfinity's teams developing the associated networks on which the ICP tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

196.     Investors in ICP relied on the managerial and entrepreneurial efforts of Dfinity and its executive and development team to manage and develop the NNS system and Internet Computer Project.

197.     Dfinity's executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the ICP tokens reasonably expected Dfinity' development teams to provide significant managerial efforts after the ICP tokens' launch.

198.     For example, Defendant Williams boisterously touted the "superstars" that would "rock the world" whom Dfinity was able to recruit to the "stellar team" working on the Internet Computer project.[80] Dfinity praised that team as being integral to the success of Internet Computer project.

199.     Defendant Williams also bragged that ICP is "backed by a large team of full-time engineers and cryptographers who are currently distributed across four dedicated international research centers, as well as remote teams."[81]

200.     Investors in ICP thus reasonably expected Dfinity, co-founder Defendant Williams, and Dfinity's development team to provide significant managerial efforts after the Genesis Launch.

201.     This dependency, however, on the managerial efforts of Dfinity and Defendant Williams was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these ICP tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the ICP tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the tokens he or she had acquired were securities.  It was only after certain revelations that provided more information about Defendants' intent, Dfinity's token economics, and how the governance structure of ICP tokens would resulting in the centralization in Dfinity, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

---

[80]     *See supra*, n.24.

[81]     *See supra*, n.73.

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

5.      **Guidance from the SEC**

a.      **The SEC's 2019 Framework**

202.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

203.    The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

204.    In particular, the Framework provides that the

> inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]?  Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?

205.    The Framework further notes that the "stronger the[] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"

206.    The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

207.    At the time of the Genesis Launch, Defendants actively market the Genesis Launch and the Internet Computer Project, thereby necessitating the continued managerial efforts of Dfinity and Defendant Williams.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

208.    Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities."

209.    As noted above (*see supra*, ¶¶132-133), all of the ICP tokens in circulation were created at the direction of Dfinity and Defendant Williams.  Additionally, Dfinity and Defendant Williams also created the protocols by which the ICP tokens are burned in the software canisters.

210.    The Framework also looks to whether the AP "plays a lead or central role in deciding governance issues . . . that occur with respect to the digital asset."

211.    As noted above, the ICP tokens provide various governance rights over the Internet Computer Project, and the tokens' economics structure (that was designed and implemented by Dfinity) results in the centralization of those rights within Defendants.

212.    The Framework further states that "[a]n AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents."

213.    Here, Dfinity and Defendant Williams have discussed the long-term prospects on decade-long time frames, continually noting how the Internet Computer will "evolve" in the future.

214.    For example, when discussing "WebAssembly specification" in Dfinity noted it would be "adding support for new features as they become mature enough."  Similarly, Dfinity remarked that "Over a longer time horizon, we expect to see end-to-end formally verified WebAssembly execution environments, for additional security."[82]

215.    The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."

216.    Here, Dfinity's website admits that the control of the "flow of liquid ICP tokens around the network" was "very important" to ICP's success.[83]  Consequently, Dfinity scheduled the ICP tokens' released "for the safety and security of ICP holders, the network, and its users while the underlying technology is be[ing] fettled and its ecosystem is being established."[84]

---

[82]      *See supra*, n.75.

[83]      *See supra*, n.72.

[84]      *Id.*

217.    Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."

218.    Here, Dfinity, along with the Controlling Defendants, are the arbiters of funding for the Internet Computer Project.  For example, in September 2020, Dfinity and the Controlling Defendants created the "Beacon Fund," which provided $14 million in funding to support those building software on the Internet Computer.[85]

219.    Dfinity also announced that the Foundation has provided over $225 million in "non-dilutive financing in the form of developer grants to teams building on the Internet Computer" as a part of Dfinity's Developer Ecosystem Program.[86]

220.    Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

221.    The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset."  According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."

222.    Here, Defendants retain a significant interest in the Internet Computer Project even after selling off many ICP tokens at the height of the Genesis Launch (*see supra*).

**b.      SEC's Previous Statements and Findings**

223.    On May 7, 2021, on CNBC's "Squawk Box" television program, Chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this moment – ***are***

---

[85]    Dfinity, *DFINITY Announces CHF 200 Million Program to Support the Internet Computer Developer Ecosystem*, Mᴇᴅɪᴜᴍ (May 25, 2021), https://medium.com/dfinity/dfinity-announces-chf-200-million-program-to-support-the-internet-computer-developer-ecosystem-c65aa290548c.

[86]    *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

*indeed securities*."[87]  In addition to being the Chairman of the SEC, Mr. Gensler is also a world renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[88]

224.    In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website,[89] the following observations were made on "when a digital transaction may no longer represent a security offering":

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.
>
> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

225.    A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[90]

226.    As discussed above, the structure of the ICP token's governance structure is far from decentralized.

227.    Finally, the SEC also already concluded that another virtual currency (*i.e.*, DAO tokens) that is substantially similar to ICP is a "security[] and therefore subject to the federal securities laws."  As

---

[87]    Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[88]    Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[89]    William Hinman, Director, Division of Corporation Finance, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 (emphasis added).

[90]    *Id.* (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[91]

### 6.     Crypto Community Sentiment

228.    The cryptocurrency community has been "wary" of the Internet Computer Project since it burst onto the market with the Genesis Launch seemingly from out of nowhere.  One of the key complaints raised concerns the governance structure of the ICP token economics.

229.    As discussed above, ICP token holders are given various governance and voting rights over the Internet Computer Project.  Put another way, ICP is a "governance token, meaning holders of ICP having voting power on Internet Computer proposals."[92]

230.    However, "Dfinity's grandiose vision for the ICP has been greeted with a mixed reaction among many in the crypto community, with questions raised over how decentralized the project's governance actually is."[93]   As reported in CoinTelegraph.com's May 26, 2021 article "$223M fund for Internet Computer builders – but community is wary":

> In an illustrative thread on the "r/dfinity" subreddit on May 25, user "u/Additional_Plant" noted "I don't doubt that it is a powerful, game changing project.  But that doesn't mean it's good for us common folks," adding that: "There are too many red flags.  For all intents and purposes, Dfinity have total control through the NNS.  Is it really a crypto?  Not really. Is it actually decentralized?  Far from it."[94]

231.    Coin Bureau reported that the governance issue with ICP was a "nightmarish scenario" where "what the Dfinity Foundation is trying to do with the internet computer is not eliminate the tyranny of today's tech giants, but instead crown themselves as rulers of the internet."  The video further elaborated on the "huge problem" this issue presented, noting that:

> While the amount of ICP tokens allocated to the Dfinity Foundation and its affiliates is not greater than 50%, they are likely the only entities who are willing to lock their tokens for that eight-year [maturation] period.  The longer you lock your ICP in NNS, the more voting power and the more ICP rewards you have and the more ICP you earn from inflation. These can then be compounded back into governance.  ***What this means is the Dfinity***

---

[91]    Press Release, U.S. Securities and Exchange Commission, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (July 25, 2017), https://www.sec.gov/news/press-release/2017-131.

[92]    *See supra*, n.36.

[93]    *See supra*, n.56.

[94]    *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

*Foundation has total control over the internet computer.  It can probably vote on whatever proposals it wants and this voting power will only increase over time if its tokens stay locked.*[95]

232.   As Coin Bureau observed in its ICP video: "That doesn't sound at all like a cryptocurrency."[96]

233.   In sum, Defendant marketed and sold ICP as a security under the guise of it being a cryptocurrency.  And Dfinity promoted the Internet Computer as being decentralized when its token governance and economics scheme would inevitably result in control over the Internet Computer becoming centralized in Defendants.  Due to Defendants' conduct as alleged herein, investors have suffered massive damages as the price of ICP has fallen from highs of $731 to a low of $20.08 on June 14, 2021.  As of the date of filing, the price of ICP is approximately $5.09.

## H.    Dfinity Directly Passed Title to ICP Investors

234.   According to the transaction history publicly available on the Internet Computer blockchain, which is corroborated by the findings in the Arkham Report, Dfinity deposited approximately 3.1 million ICP tokens, worth around $744 million at the time, on various exchanges on opening day of the Genesis Launch on May 10, 2021.  The majority of those deposits were made onto the Coinbase exchange where Plaintiff Ocampo made his purchases.  In particular, Dfinity deposited approximately two million ICP tokens (valued at approximately $480 million) to three Coinbase custodial wallet addresses.

235.   During the creation of the ICP Tokens on May 6, 2021, a total of 469,212,166 ICP tokens were minted.  One particular wallet, Wallet Address 125013e95bd5e008bd6d26f86f5ddd a2b16c382372b3067672505c1f11418817 (the "Dfinity Wallet"), received 107,024,038 ICP tokens.  This was roughly 23% of all ICP Tokens minted.  This percentage of the float tracks closely to both the number of ICP Tokens and related percentage amounts of all minted ICP Tokens that the Dfinity Foundation received prior to the Genesis Launch.  The Dfinity Wallet is directly owned and controlled by the Dfinity Foundation.  The Foundation here is controlled by members and executives that serve dual overlapping

---

[95]    *Id.* (emphasis added).

[96]    *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

1    roles with Dfinity USA Research, including Defendant Williams, who is the CEO of Dfinity USA

2    Research.

3         236.   The Internet Computer blockchain demonstrates that the Dfinity Wallet used several

4    pass-through wallets to transfer ICP Tokens onto various cryptocurrency exchanges, including

5    Coinbase.

6         237.   In particular, the Dfinity Wallet made a total of nine deposits of ICP Tokens that

7    supplied the trading liquidity to Coinbase on opening day.  Nine pass-through wallet addresses

8    received those deposits and, in turn, transferred the ICP tokens to three custodial wallet addresses that

9    provided the trading liquidity for Coinbase on May 10, 2021.  These nine deposits by Dfinity provided

10    all of the liquidity for ICP trading on Coinbase on the first day of the Genesis Launch.

11         238.   Upon information and belief, each of the pass-through wallet addresses and the

12    custodial wallets on Coinbase are owned and/or controlled by Dfinity.  The pass-through wallets are

13    used by Dfinity to obscure the origin of ICP token transfers.  Meanwhile, the custodial wallets are the

14    wallet addresses used by Dfinity to transfer the initial liquidity of ICP tokens on Coinbase.  The

15    specific wallet addresses are as follows:

16    *Pass-Through Wallets*

17          •   87e57a268b99be0568254159f85279321abb7b2b391ef96f35ae03ef82cd03ac

18            ("Pass-Through Wallet 1")

19          •   e4aee62593ec8a660066df4c15dd704d91ecdd082fe19c0fb6d77e50f99c9922

20            ("Pass-Through Wallet 2")

21          •   7b8c0a103851d344b09f278fd52533b16a887f7d3a8cd0c20f999fbfbf262056

22            ("Pass-Through Wallet 3")

23          •   0032a91f86c8aa3982bdc7ce0899d47c072b11bd3a805dd8e69d1f35004465ea

24            ("Pass-Through Wallet 4")

25          •   cb749bf3c884df6bf0a4738f0c106446710e269166e3c9955208697502f096ba

26            ("Pass-Through Wallet 5")

27

28

THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 21-CIV-03843

- 05ad474665f1eec0714c1a4ec941c3a395c703e14bb43100bd946d80b87828af ("Pass-Through Wallet 6")

- 27d17170508492a35f5b0a5cd62ba7fefb43a24.e09daa41239b6d5c9c67a613f ("Pass-Through Wallet 7")

- 00504a7e1190451cb96bd51d059ba2f9f415a5dc955203c5d132cb1a86a282bb ("Pass-Through Wallet 8")

- 000a1f0436e925af8ae9ca45786f0ae85bd66f357fb0d19c9d3320e180710cf1 ("Pass-Through Wallet 9")

*Custodial Wallets*

- dd15f3040edab88d2e277f9d2fa5cc11616ebf1442279092e37924ab7cce8a74 ("Coinbase Wallet 1")

- 660b1680dafeedaa68c1f1f4cf8af42ed1dfb8564646efe935a2b9a48528b605 ("Coinbase Wallet 2")

- a6ed987d89796f921c8a49d275ec7c9aa04e75a8fc8cd2dbaa5da799f0215ab0m ("Coinbase Wallet 3")

239.    An examination of the transactions in these wallet addresses shows how Dfinity was able to sell its ICP tokens directly to investors on Coinbase, including to Plaintiff who received title from Dfinity to the ICP tokens he purchased shortly after the opening of the Genesis Launch.[97]

240.    For example, on May 10, 2021, a few hours prior to the time of the Genesis Launch, the Dfinity Wallet, over the course of three transactions, transferred 200,001 total tokens to Pass-Through Wallet 5.  Within minutes of receipt, Pass-Through Wallet 5 sent 200,000 ICP Tokens (valued at $48M) to Coinbase Wallet 1.

---

[97]    This examination covers transactions occurring prior to the actual moment the ICP tokens were publicly launched on exchanges, including Coinbase.  Notably, according to the Internet Computer blockchain, the same pass-through wallets and Coinbase custodial wallets discussed herein continued to pass title to retail investors in a similar fashion to what transpired leading up to the Genesis Launch. Moreover, the Internet Computer blockchain also shows that the same pass-through wallets similarly supplied liquidity to other cryptocurrency exchanges like Huobi, OKEx, and Binance.  Thus, while Dfinity alone provided all of the liquidity available on Coinbase at the open of listing day and, thus, passed title to Plaintiff who purchased ICP tokens shortly after the launch began, the Internet Computer blockchain transactions publicly available show that Dfinity continued to pass title in a similar fashion to Plaintiff and other Class members after opening day by continuing to supply ICP tokens to satisfy the high demand.

241.   Similarly, Pass-Through Wallet 8 received its ICP tokens directly from the Dfinity Wallet and two minutes later sent those 40,000 ICP tokens (valued at $9.6M) to Coinbase Wallet 1.

242.   Pass-Through Wallet 9 likewise sent 626,515 ICP Tokens (valued at $156.3M) to Coinbase Wallet 1 within two minutes after receiving them from the Dfinity Wallet.

243.   Pass-Through Wallet 1 received 1,000,000 ICP Tokens from Wallet Address 32c46b6795b0993b9f2edf1845f52eebce172ff2db5e1a76b6af08163955937d ("Top Level Pass-Through Wallet"), which, had received those ICP Tokens directly from the Dfinity Wallet.  Shortly thereafter, Pass-Through Wallet 1 transferred 100,000 of those ICP Tokens (valued at $24M) to Coinbase Wallet 1.

244.   A similar series of transfers can be tracked based on the transaction history of Coinbase Wallet 2.  Within three hours of the Genesis Launch, the Dfinity Wallet transferred 200,000 ICP Tokens (valued at $48M) to Wallet Address 7.  Two minutes later Pass-Through Wallet 7 sent those ICP tokens to Coinbase Wallet 2.

245.   Coinbase Wallet 3 shows this same pattern of transactions.  Pass-Through Wallet 3 received ICP tokens directly from the Dfinity Wallet.  Minutes later, Pass-Through Wallet 3 sent 75,000 ICP tokens (valued at $18M) to Coinbase Wallet 3.

246.   The transaction histories of Coinbase Wallets 1-3 shows that these wallets each have more than 10,000 transactions.  The sheer volume of transactions indicates that these are not an individual investor's wallets but rather that they belong to an exchange that is facilitating trading on its platform.  Upon information and belief, Coinbase Wallets 1-3 are the custodial wallets owned and directly controlled by Dfinity.

247.   Coinbase's own terms of service demonstrate that it was Dfinity, and not an intermediary, that directly passed title to Plaintiff and Class members who purchased ICP tokens on Coinbase beginning on May 10, 2021, during the opening of the Genesis Launch.  According to the Coinbase User Agreement's relevant sections on title and ownership of digital assets (like ICP):

> **2.6. Digital Asset Custody and Title**.  All Supported Digital Assets held in your Digital Asset Wallet are custodial assets held by Coinbase for your benefit, as described in further detail below.
>
> **2.6.1 Ownership.  *Title to Supported Digital Assets shall at all times remain with you and shall not transfer to Coinbase.*** As the owner of Supported Digital Assets in

your Digital Asset Wallet, you shall bear all risk of loss of such Supported Digital Assets. Coinbase shall have no liability for Supported Digital Asset fluctuations or loss. ***None of the Supported Digital Assets in your Digital Asset Wallet are the property of, or shall or may be loaned to, Coinbase; Coinbase does not represent or treat assets in User's Digital Asset Wallets as belonging to Coinbase.*** Coinbase may not grant a security interest in the Supported Digital Assets held in your Digital Asset Wallet. Except as required by law, or except as provided herein, Coinbase will not sell, transfer, loan, hypothecate, or otherwise alienate Supported Digital Assets in your Digital Asset Wallet unless instructed by you.

**2.6.2. Control**. You control the Supported Digital Assets held in your Digital Asset Wallet.

\*        \*        \*

**2.8.Coinbase Vault**. You may elect to hold Supported Digital Assets in Coinbase Vault. Coinbase Vault allows you to create conditions around transfer of your Supported Digital Assets, which may include adding third-parties to approve withdrawals ("Approvers"). ***For the avoidance of doubt, title to Supported Digital Assets in Coinbase Vault at all times remain with you, and Approvers shall have no ownership interest in such Supported Digital Assets.***

248.    Coinbase's terms of service explicitly foreclose the possibility that, as an exchange facilitating the trading of ICP, Coinbase took possession of the title to the ICP Tokens that were passed to investors who purchased ICP Tokens on Coinbase. Instead, Coinbase has positioned itself as a mechanism for sellers like Dfinity to pass title of digital assets directly to buyers like Plaintiff and the class members.

249.    Additionally, Defendant Williams's statements confirm that Dfinity could have, but purposefully chose not to, lock-up their portion of the ICP token allocation. On May 26, 2021, Defendant Williams made a statement on Twitter regarding the vesting schedule for Dfinity's 23% allocation of all minted ICP Tokens. In particular, Williams revealed that Dfinity (*i.e*., the Dfinity Wallet) "didn't vest itself." In other words, Williams revealed two weeks after the Dfinity Launch (and subsequent price collapse) that Dfinity refused to put any restrictions in place to stop itself from selling its portion of the float on opening day. This decision was made by Dfinity and Williams for the purpose of allowing Dfinity to sell its ICP token allocation on popular exchanges like Coinbase at an inflated premium on listing day of the Genesis Launch.

250.    The Arkham Report corroborates these findings from the Internet Computer blockchain, stating that "[T]his overall pattern for listing day deposits suggest that they were *for the purpose of providing initial liquidity on exchanges*."

## CLASS ACTION ALLEGATIONS

251.    This suit is brought as a class action pursuant to §382 of the California Code of Civil Procedure, on behalf of a Class of all persons or entities who purchased ICP from May 10, 2021 through the present.  Excluded from the Class are Defendants and the officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

252.    Plaintiff reserves the right to amend the Class definition if further investigation and/or discovery indicate that the Class definition should be modified.

253.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by the Company and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

254.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

255.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

256.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

          (a)      whether ICP are securities under the Securities Act;

          (b)      whether the sale of ICP violates the registration requirements of the Securities Act; and

(c)   to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

257.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Unregistered Offering and Sale of Securities in Violation of §§5 and 12(a)(1) of the Securities Act (Against All Defendants)

258.   Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

259.   Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

260.   ICP are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

261.   Plaintiff and members of the Class purchased ICP securities.

262.   No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.  No exemption to the registration requirement applies.

263.   SEC Rule 159A provides that, for purposes of §12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.  17 C.F.R. §230.159A(a).  The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  Dfinity is an issuer of ICP.

264.    The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 & 647 (1988); *accord*, *e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001). That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.  *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  Dfinity and the Controlling Defendants are all statutory sellers.

265.    By reason of the foregoing, each of the Defendants has violated §§5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

266.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their ICP purchases.

## SECOND CAUSE OF ACTION

### Violation of §15 of the Securities Act
### (Against Dfinity USA and the Controlling Defendants)

267.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference, each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

268.    This Count is asserted against Defendants Dfinity USA and the Controlling Defendants (collectively, the "Control Person Defendants") under §15 of the Securities Act, 15 U.S.C. §77o.

269.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act.  The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of ICP securities as described herein.

270.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Dfinity, through ownership of voting securities, by contract, subscription agreement, or otherwise.

271.    The Control Person Defendants also have the power to direct or cause the direction of the management and policies of Dfinity.

272.    The Control Person Defendants, separately or together, have sufficient influence to have caused ICP and/or Dfinity to submit a registration statement.

273.    The Control Person Defendants, separately or together, jointly participated in Dfinity's and/or ICP's failure to register ICP.

274.    By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as Class representative;

B.    Declaring that Defendants offered and sold unregistered securities in violation of §§5(a), 12(a), and 15 of the Securities Act;

C.    Awarding Plaintiff and the other members of the Class rescission of their ICP purchases;

D.    Awarding Plaintiff and the other members of the Class compensatory damages;

E.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

F.    Requiring an accounting of all remaining assets and funds raised by Defendants through the sale of ICP;

G.    Imposing a constructive trust over the assets and funds raised by Defendants through the sale of ICP;

1    H.    Enjoining and restraining Defendants from violating the securities laws through the

2  continued unregistered sale of ICP; and

3    I.    Awarding Plaintiff and the other members of the Class such other and further relief as the

4  Court may deem just and proper.

5  DATED:  February 9, 2023                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

6
                                          _____

7                                          John T. Jasnoch (CA 281605)
                                          600 W. Broadway, Suite 3300

8                                          San Diego, CA 92101
                                          Telephone: 619-233-4565

9                                          Facsimile:  619-233-0508
                                          jjasnoch@scott-scott.com

10
                                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

11                                          Sean T. Masson (*pro hac vice*)
                                          The Helmsley Building

12                                          230 Park Avenue, 17th Floor
                                          New York, NY 10169

13                                          Telephone: 212-223-6444
                                          Facsimile:  212-223-6334

14                                          smasson@scott-scott.com

15                                          *Counsel for Plaintiff Daniel Ocampo*

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B
Williams v Williams, 21CV384865,
Order on Demurrer and Motion to Strike



**SUPERIOR COURT, STATE OF CALIFORNIA**
**COUNTY OF SANTA CLARA**
**DEPARTMENT 20**

**161 North First Street, San Jose, CA 95113**
408.882.2320  ·  408.882.2296 (fax)
*smanoukian@scscourt.org*
*http://www.scscourt.org*

FILED

MAR 0 2 2023

Clerk of the Court
Superior Court of County of Santa Clara
BY_____ DEPUTY

CASE NO.:  21CV384865                                    Sacha Williams v. Dominic Williams, et al.
DATE: 20 December 2022                TIME: 9:00 am                LINE NUMBER: 01, 02

Order on Submitted Matter.

---oooOooo---

**Orders On Defendant Dominic Williams':**
**(1) Demurrer To Plaintiff's Complaint; and**
**(2) Motion To Strike Portions Of Plaintiff's Complaint.**

I.        **Statement of Facts.**

In 2015, defendant Dominic Williams ("Dominic")[1] began working to develop a new cryptocurrency, originally called "dfinities" or "DFN" tokens, and an accompanying decentralized computing platform, initially called the "DFINITY Project," but later known as the "Internet Computer." (Complaint, ¶16.)

Defendant Dominic formed the DFINITY Stiftung (a Swiss foundation; hereinafter, "DFINITY Foundation") in mid-2016 and DFINITY USA Research, LLC in August 2017 to continue developing the project. (Complaint, ¶18.) In 2017, the DFINITY Foundation made various allocations of "dfinities" or "DFN" tokens to defendant Dominic as compensation for his services as President, Council Member, and Chief Scientist. (Complaint, ¶19.)

On 18 December 2017, defendant Dominic transferred a [redacted] number of his tokens to plaintiff Sacha Williams ("Sacha") and made identical transfers to each of his other three children. (Complaint, ¶20.) The transfer to plaintiff Sacha was documented in a Token Transfer Agreement ("Agreement") made, entered into, and effective as of 18 December 2017. (Complaint, ¶¶21 – 22 and Exh. A [redacted].)

Shortly after signing the Agreement and identical agreements with each of his three other children, defendant Dominic placed all four agreements in an envelope on which defendant Dominic wrote, "Dylan, Charlie, Sacha, Theo Token Assignment Agreements" and gave the envelope to his oldest son, Dominic, to take to plaintiff Sacha and other siblings who resided with their mother, Melissa Williams ("Melissa"), as defendant Dominic and Melissa were separated. (Complaint, ¶26.)

Defendant Dominic also included documents containing notarization keys which would enable each child to prove ownership of the tokens and take custody of them when the cryptocurrency went live. (*Id.*) Defendant Dominic explained to Melissa that he transferred the tokens to their children as gifts and entered into the agreements for tax efficiency and planning reasons. (Complaint, ¶27.)

Since December 2017, defendant Dominic and plaintiff Sacha became largely estranged from each other. (Complaint, ¶28.) In the years following the aforementioned transfers of tokens to his children, defendant Dominic repeatedly mentioned to his children the transfer of these tokens and called them gifts. (Complaint, ¶29.)

---

[1] "For the sake of clarity, we refer to the [parties] by their first names. We mean no disrespect in doing so." (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 551, fn. 2.)

20 December 2022              Orders On Defendant Dominic Williams's:              Page 1 of 9
(1) Demurrer To Plaintiff's Complaint; and
(2) Motion To Strike Portions Of Plaintiff's Complaint.

In subsequent divorce proceedings between Melissa and defendant Dominic, defendant Dominic confirmed the aforementioned transfers of tokens to plaintiff Sacha and the other children from the marital estate and labeled them gifts of tokens to the Williams's children. (Complaint, ¶30.)

In January 2021, defendant Dominic and the DFINITY Foundation announced the Internet Computer would be fully launched in the spring of 2021 and the cryptocurrency tokens underlying the Internet Computer would be known as "ICP" tokens rather than "DFN" tokens. (Complaint, ¶31.) These tokens were already being traded in limited volumes on multiple cryptocurrency exchanges and after defendant Dominic's announcement, the value of the tokens gradually increased from approximately $10-15 per token in December 2020 to over $200 per token in early May 2021. (Complaint, ¶32.)

As full launch of the Internet Computer approached, defendant Dominic and the DFINITY Foundation provided owners of the ICP tokens with instructions on how to claim, take custody of, and sell their ICP tokens upon launch. (Complaint, ¶33.) Defendant Dominic provided plaintiff Sacha with no such instructions despite requests by Melissa and plaintiff Sacha. (Complaint, ¶¶33 and 35.) Instead, in or about late 2020 or early 2021, defendant Dominic and/or the DFINITY Foundation, at defendant Dominic's direction, took steps to disable the notarization keys previously provided to defendant Dominic's children for their tokens. (Complaint, ¶34.)

In the spring of 2021, defendant Dominic told his children for the first time that, rather than transferring the tokens to them as gifts in accordance with the agreements in 2017, defendant Dominic placed the tokens in trust for their benefit in 2017, with defendant Dominic as trustee. (Complaint, ¶36.) Defendant Dominic later admitted to his children that this was false. (*Id.*) Defendant Dominic then told his children he wanted to put their tokens into a trust and asked if they would agree, but plaintiff Sacha and some of the other children refused. (Complaint, ¶37.)

The Internet Computer was fully launched on 7 May 2021. (Complaint, ¶39.) ICP tokens became fully tradable on public cryptocurrency exchanges around that same date and became fully tradable on Coinbase, the largest cryptocurrency exchange in the United States, on 10 May 2021. (Complaint, ¶40.) The value of ICP tokens quickly increased hitting a high of $750 per token on 9 May 2021 and fluctuating between $225-400 per token during the following week. (Complaint, ¶41.) During that week, defendant Dominic asked Melissa and his children if they would authorize him to sell a percentage of each child's tokens. (Complaint, ¶42.) Plaintiff Sacha agreed on the condition that defendant Dominic immediately transfer the proceeds from sales to plaintiff Sacha. (*Id.*)

Defendant Dominic agreed to this condition and sold his children's tokens for [a redacted amount, one fourth belonging to plaintiff Sacha.] (Complaint, ¶43.) However, defendant Dominic refused to transfer the proceeds to plaintiff Sacha or any of the other children. (Complaint, ¶44.) Instead, defendant Dominic claims he deposited the proceeds from these sales into a bank account defendant Dominic opened in his own name, without plaintiff Sacha's consent and in express violation of plaintiff Sacha's instructions. (Complaint, ¶45.)

While defendant Dominic refused to transfer control of plaintiff Sacha's ICP tokens to him, the value of these tokens gradually declined to approximately $40 per token. (Complaint, ¶46.) As a result of defendant Dominic's misconduct, most of plaintiff Sacha's net worth is tied up in a single volatile asset which has decreased in value by over 95%. (Complaint, ¶47.)[2]

Recently, defendant Dominic returned to the false claim that he did not give the tokens to plaintiff Sacha and his other children in December 2017, but actually put the tokens into trust for the children's benefit with defendant Dominic as trustee, despite previously admitting this was untrue. (Complaint, ¶52.) Defendant Dominic now also falsely claims he never gave the Token Transfer Agreements to anyone nor did he inform plaintiff Sacha about the transfers or gifts of tokens. (Complaint, ¶53.) Defendant Dominic falsely claims plaintiff Sacha or someone acting for plaintiff Sacha stole plaintiff Sacha's Agreement from defendant Dominic. (*Id.*)

---

[2] "The value has continued to decline from the $40 per token when the Complaint was filed, to just $4-5 per token now." (Opposition to Defendant's Motion to Strike Portions of Plaintiff's Complaint, page 4, footnote 2.)

20 December 2022     Orders On Defendant Dominic Williams's:     Page 2 of 9
(1) Demurrer To Plaintiff's Complaint; and
(2) Motion To Strike Portions Of Plaintiff's Complaint.

On 28 June 2021[3], plaintiff Sacha filed a complaint against defendant Dominic asserting causes of action for:

(1)  Conversion

(2)  Breach of Contract

(3)  Breach of Fiduciary Duty[4]

On 26 October 2021, the Court issued an order granting plaintiff Sacha's motion to seal [redact] portions of the complaint and the Agreement.

On 4 November 2021, plaintiff Sacha filed a redacted complaint.

On 13 September 2022, defendant Dominic filed the three motions now before the court: (1) a demurrer to plaintiff Sacha's complaint; (2) a motion to strike portions of plaintiff Sacha's complaint; and (3) a motion to seal portions of the demurrer to plaintiff's complaint and motion to strike portions of plaintiff's complaint.

## II.    Demurrers and Motions To Strike.

### A.    Demurrers.

A complaint must contain substantive factual allegations sufficiently apprising the defendant of the issues to be addressed.  (See *Williams v. Beechnut Nutrition Corp.* (1986) 185 Cal.App.3d 135, 139, fn. 2.)

A demurrer tests the legal sufficiency of a complaint.  It is properly sustained where the complaint or an individual cause of action fails to "state facts sufficient to constitute a cause of action."  (*Code of Civil Procedure*, § 430.10, subd. (e).)  "[C]onclusionary allegations . . . without facts to support them" are insufficient on demurrer. (*Ankeny v. Lockheed Missiles and Space Co.* (1979) 88 Cal.App.3d 531, 537.)  "It is fundamental that a demurrer is an attack against the complaint on its face, it should not be sustained unless the complaint shows that the action may not be pursued."  (*Yolo County Dept. of Social Services v. Municipal Court* (1980) 107 Cal.App.3d 842, 846-847.)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct.  A demurrer tests only the legal sufficiency of the pleading." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213.)  "It 'admits the truth of all material factual allegations in the complaint . . .; the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court.' [Citation.]" (*Id.* at pp. 213-214; see *Cook v. De La Guerra* (1864) 24 Cal. 237, 239: "[I]t is not the office of a demurrer to state facts, but to raise an issue of law upon the facts stated in the pleading demurred to.")

### B.    Motions to Strike.

"The court may, upon a motion made pursuant to [*Code of Civil Procedure*, § 435, or at any time in its discretion, and upon terms it deems proper: (a) Strike out any irrelevant, false, or improper matter inserted in any pleading. (b) Strike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court."  *(Code of Civil Procedure*, § 436.)

"A notice of motion to strike must be given within the time allowed to plead, and if a demurrer is interposed, concurrently therewith, and must be noticed for hearing and heard at the same time as the demurrer."  (*Rules of Court*, rule 3.1322(b).)

---

[3] This Department intends to comply with the time requirements of the Trial Court Delay Reduction Act (**Government Code**, §§ 68600–68620). The California Rules of Court state that the goal of each trial court should be to manage limited and unlimited civil cases from filing so that 100 percent are disposed of within 24 months. (Ca. St. Civil **Rules of Court**, Rule 3.714(b)(1)(C) and (b)(2)(C).)

[4] It seems that at the current time, Dominic is a resident of Switzerland.

20 December 2022          Orders On Defendant Dominic Williams's:          Page 3 of 9
                                    (1) Demurrer To Plaintiff's Complaint; and
                                    (2) Motion To Strike Portions Of Plaintiff's Complaint.

"A notice of motion to strike a portion of a pleading must quote in full the portions sought to be stricken except where the motion is to strike an entire paragraph, cause of action, count, or defense. Specifications in a notice must be numbered consecutively." (*Rules of Court*, rule 3.1322(b).)

Under general rules of civil procedure, a motion to strike may be brought on the following two grounds:

a. Strike out any irrelevant, false, or improper matter inserted in any pleading.

b. Strike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court. (*Code of Civil Procedure*, § 436.)

Irrelevant matter includes "immaterial allegations." (*Code of Civil Procedure*, § 431.10, subd. (c).) "An immaterial allegation in a pleading is any of the following: (1) An allegation that is not essential to the statement of a claim or defense; (2) An allegation that is neither pertinent to nor supported by an otherwise sufficient claim or defense; (3) A demand for judgment requesting relief not supported by the allegations of the complaint or cross-complaint." (*Code of Civil Procedure*, § 431.10, subd. (b).)

"As with demurrers, the grounds for a motion to strike must appear on the face of the pleading under attack, or from matter which the court may judicially notice." (Weil & Brown, et al., California Practice Guide: *Civil Procedure Before Trial* (The Rutter Group 2020) ¶7:168, p. 7(I)-75 citing *Code of Civil Procedure*, § 437.) "Thus, for example, defendant cannot base a motion to strike the complaint on affidavits or declarations containing extrinsic evidence showing that the allegations are 'false' or 'sham.' Such challenges lie only if these defects appear on the face of the complaint, or from matters judicially noticeable." (*Id.* at ¶7:169, pp. 7(I)-75 to 7(I)-76.)

"A motion to strike may be used as a scalpel—to cut out any irrelevant, false, or improper matters inserted therein." (Weil & Brown, California Practice Guide: *Civil Procedure before Trial* (The Rutter Group 2019) §7:177, p. 7-61 citing *Code of Civil Procedure*, § 436(a) (internal punctuation modified.) "This includes allegations not essential to the claim or defense; allegations neither pertinent to nor supported by an otherwise sufficient claim or defense; or a demand for judgment requesting relief not supported by the allegations of the complaint or cross-complaint.'" *Id.* at §7:178 citing *Code of Civil Procedure*, § 431.10(b).) (internal punctuation modified.)

"In passing on the correctness of a ruling on a motion to strike, judges read allegations of a pleading subject to the motion to strike as a whole, all parts in their context, and assume their truth." (*Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253, 1255.) "In ruling on a motion to strike, courts do not read allegations in isolation." (*Clauson*, 67 Cal.App.4th at 1255.)

As there is no legal basis for further amendment, leave to amend is DENIED. (See *Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 401 ["[W]here the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result."].)

## III.   Analysis.

### A.   Defendant Dominic's demurrer to plaintiff Sacha's complaint.

#### 1.   Defendant Dominic's demurrer to the second[5] cause of action [breach of contract] in plaintiff Sacha's complaint is OVERRULED.

"To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186; see also *CACI*, No. 303.)[6]

---

[5] The Court proceeds with the demurrer in the same order adopted by defendant Dominic.

[6] The Agreement contains a New York choice of law provision. Both parties suggest the law is the same regardless of whether New York or California law applies.

| 20 December 2022 | Orders On Defendant Dominic Williams's: | Page 4 of 9 |
| | (1) Demurrer To Plaintiff's Complaint; and | |
| | (2) Motion To Strike Portions Of Plaintiff's Complaint. | |

In demurring to plaintiff Sacha's second cause of action, defendant Dominic contends plaintiff Sacha has not alleged the existence of a valid and enforceable contract because he has not alleged the Agreement is supported by any valid consideration.

"The general rule is that every executory contract requires consideration. [Citation.] Thus, a promise to make a gift (a donative promise) is generally unenforceable. [Citations.] Consideration may be an act, forbearance, change in legal relations, or a promise. [Citations.]" (1 Witkin, *Summary of California Law* (10th ed. 2005) Contracts, §202, p. 236.)

However, consideration need not be pleaded. "A written instrument is presumptive evidence of a consideration." (*Civil Code*, §1614.) "The California courts have given this statute the effect of excusing the pleading of consideration for any written contract." (4 Witkin, *California Procedure* (5th ed. 2022) Pleading, §529 citing *Henke v. Endowment Assn.* (1893) 100 Cal. 429, et al.) "The rule applies even though the complaint does allege the consideration, i.e., the averment as to its existence and nature is surplusage and the complaint cannot be attacked on general demurrer for insufficiency of the consideration pleaded. The result is that the defense of lack of consideration for a written contract must be specially pleaded in the answer." (*Id.* citing *Brooks v. Fidelity Savings & Loan Assn.* (1938) 26 Cal.App.2d 114, 116 (*Brooks*).)

This court notes, however, that in *Brooks* the court recognized, "where a want of consideration for the execution of the instrument is apparent from the averments of the complaint, the fact may be taken advantage of by demurrer, but such is not the present case." (*Brooks*, supra, 26 Cal.App.2d at p. 117.)

Here, defendant Dominic acknowledges plaintiff Sacha's allegation that the "Agreement is a binding contract supported by consideration." (Complaint, ¶63.) However, defendant Dominic points to the actual language of the Agreement as being inconsistent with this allegation.[7] Defendant Dominic directs the Court's attention to section 1.1 of the Agreement which states, in relevant part, "the Assignor [defendant Dominic] hereby transfers to the Assignee [plaintiff Sacha] for total consideration of $6,483.95 and the Assignee hereby accepts from the Assignor *for total consideration of $0* the Transferred Tokens." (Emphasis added.)

Yet, the highlighted provision is preceded by a statement that the transfer is "for total consideration of $6,483.95." The sentence is internally inconsistent. As such, the Court relies on the authorities above, *Brooks* in particular, for the principle that a demurrer does not lie where the want of consideration is not clearly apparent from the averments of the complaint. "Where an ambiguous contract is the basis of an action, it is proper, if not essential, for a plaintiff to allege his own construction of the agreement. So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement." (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239.)

Accordingly, defendant Dominic's demurrer to the second cause of action in plaintiff Sacha's complaint on the ground that the pleading does not state facts sufficient to constitute a cause of action [*Code of Civil Procedure*, § 430.10, subd. (e)] for breach of contract and on the ground that the pleading is uncertain [*Code of Civil Procedure* 430.10, subd. (f)] is OVERRULED.

### 2. Defendant Dominic's demurrer to the first cause of action [conversion] in plaintiff Sacha's complaint is OVERRULED.

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the

---

[7] Facts appearing in exhibits attached to the complaint (part of the "face of the pleading") are given precedence over inconsistent allegations in the complaint. See *Holland v. Morse Diesel Int'l, Inc.* (2001) 86 Cal. App. 4th 1443, 1447. See also *Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal. App. 4th 500, 505 ("[T]o the extent the factual allegations conflict with the content of the exhibits to the complaint, we rely on and accept as true the contents of the exhibits and treat as surplusage the pleader's allegations as to the legal effect of the exhibits.")

20 December 2022     Orders On Defendant Dominic Williams's:     Page 5 of 9
(1) Demurrer To Plaintiff's Complaint; and
(2) Motion To Strike Portions Of Plaintiff's Complaint.

intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial. [Citations.]" (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066 [80 Cal. Rptr. 2d 704].) The basis of a conversion action "'rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are the gist of the action.' [Citations.]" (*Ibid.*)

(*Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal.App.4th 1383, 1387; see also *CACI*, No. 2100.)

In demurring, defendant Dominic contends plaintiff Sacha has not alleged his ownership or right to possession of the tokens. Defendant Dominic acknowledges plaintiff Sacha alleges that his ownership and right to possession of the tokens is based, alternatively, on the alleged validity of the Agreement or the allegation that defendant Dominic transferred the tokens to plaintiff Sacha as a gift.

To the extent plaintiff Sacha's ownership or right to possession of the tokens is based on the Agreement, defendant Dominic refers to his argument above that the Agreement is unenforceable. In light of the Court's ruling above, plaintiff Sacha has adequately alleged his ownership or right to possession of the tokens based upon the Agreement. On that basis alone[8], defendant Dominic's demurrer to the first cause of action in plaintiff Sacha's complaint on the ground that the pleading does not state facts sufficient to constitute a cause of action [*Code of Civil Procedure*, § 430.10, subd. (e)] for conversion and on the ground that the pleading is uncertain [*Code of Civil Procedure*, § 430.10, subd. (f)] is OVERRULED.

### 3. Defendant Dominic's demurrer to the third cause of action [breach of fiduciary duty] in plaintiff Sacha's complaint is OVERRULED.

"The elements of a cause of action for breach of fiduciary duty are: (1) existence of fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." (*Mosier v. Southern California Physicians Insurance Exchange* (1998) 63 Cal.App.4th 1022, 1044; see also *CACI*, No. 605.)

Defendant Dominic apparently contends he did not owe a fiduciary duty to plaintiff Sacha by again asserting that plaintiff Sacha has not alleged his ownership or right to possess the tokens and, consequently, defendant Dominic could not take control of anything belonging to plaintiff Sacha. For the reason discussed above, the court is not persuaded by defendant Dominic's position.

Accordingly, defendant Dominic's demurrer to the third cause of action in plaintiff Sacha's complaint on the ground that the pleading does not state facts sufficient to constitute a cause of action [*Code of Civil Procedure*, § 430.10, subd. (e)] for breach of fiduciary duty and on the ground that the pleading is uncertain [*Code of Civil Procedure*, § 430.10, subd. (f)] is OVERRULED.

### B. Defendant Dominic's motion to strike portions of plaintiff Sacha's complaint is GRANTED, in part, and DENIED, in part.

---

[8] This is so because a defendant cannot demur to a portion of a cause of action. (See *Financial Corp. of America v. Wilburn* (1987) 189 Cal.App.3d 764, 778—"[A] defendant cannot demur generally to part of a cause of action;" see also *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682—"A demurrer does not lie to a portion of a cause of action;" *Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265, 274—" A demurrer challenges a cause of action and cannot be used to attack a portion of a cause of action.")

Defendant Dominic also attacks plaintiff Sacha's allegation that he received the tokens as a gift. "Case law has defined the elements of a gift as follows: (1) competency of the donor to contract; (2) a voluntary intent on the part of the donor to make a gift; (3) delivery, either actual or symbolical; (4) acceptance, actual or imputed; (5) complete divestment of all control by the donor; and (6) lack of consideration for the gift." (*Jaffe v. Carroll* (1973) 35 Cal.App.3d 53, 59 (*Jaffe*).) Defendant Dominic contends plaintiff Sacha has not adequately alleged delivery, acceptance, and complete divestment of all control by the donor. The court need not address defendant Dominic's arguments. Moreover, the court notes, "[whether] a gift is complete and effectual is a question of fact to be determined from all the evidence." (*Jaffe, supra,* 35 Cal.App.3d at p. 61.)

20 December 2022     **Orders On Defendant Dominic Williams's:**     Page 6 of 9
**(1) Demurrer To Plaintiff's Complaint; and**
**(2) Motion To Strike Portions Of Plaintiff's Complaint.**

### 1.   Punitive/ exemplary damages.

Defendant Dominic's motion seeks to strike plaintiff Sacha's allegations regarding punitive/ exemplary damages. Pursuant to *Civil Code*, § 3294, punitive damages may be recovered "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."

In *G.D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22, 26 (*Searle*), the court wrote, "In California the award of damages by way of example or punishment is controlled by *Civil Code* section 3294, which authorizes that kind of award against a tortfeasor who has been guilty of 'oppression, fraud or malice, express or implied.'" "Notwithstanding relaxed pleading criteria, certain tortious injuries demand firm allegations. Vague, conclusory allegations of fraud or falsity may not be rescued by the rule of liberal construction. When the plaintiff alleges an intentional wrong, a prayer for exemplary damage may be supported by pleading that the wrong was committed willfully or with a design to injure. When nondeliberate injury is charged, allegations that the defendant's conduct was wrongful, willful, wanton, reckless or unlawful do not support a claim for exemplary damages; such allegations do not charge malice." (*Id.* at p. 29; internal citations omitted.)

"In determining whether a complaint states facts sufficient to sustain punitive damages, the challenged allegations must be read in context with the other facts alleged in the complaint. Further, even though certain language pleads ultimate facts or conclusions of law, such language when read in context with the facts alleged as to defendants' conduct may adequately plead the evil motive requisite to recovery of punitive damages." (*Monge v. Superior Court* (1986) 176 Cal.App.3d 503 citing *Perkins v. Superior Court* (1981) 117 Cal.App.3d 1, 6 – 7.)

Here, plaintiff Sacha has alleged defendant Dominic "knowingly and intentionally [took] possession of Sacha's tokens and the sales proceeds." (Complaint, ¶56; see also ¶44—"Dominic then refused to transfer the proceeds from these sales to Sacha or any of the other children.") From such allegations, the court can reasonably infer an intent to injure. (Cf. 5 Witkin, *California Procedure* (4th ed. 1997) Pleading, §684, p. 143—"Intent, like knowledge, is a fact. Hence, the averment that the representation was made with the intent to deceive the plaintiff, or any other general allegation with similar purport, is sufficient.")

Accordingly, defendant Dominic's motion to strike plaintiff Sacha's claims for punitive/ exemplary damages is DENIED.

### 2.   Injunctive Relief/ Specific Performance.

The availability of injunctive relief is subject to equitable principles including the inadequacy of a legal remedy. (*Prudential Home Mortgage Co. v. Superior Court* (1998) 66 Cal.App.4th 1236, 1250.) "In ordinary tort actions, injunctive relief is generally available only if legal remedies (e.g., monetary compensation) are inadequate." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 838.) "A complaint for an injunction which alleges only general conclusions, not warranted by any pleading of facts, does not state a cause of action to enjoin the acts complained of." (*E. H. Renzel Co. v. Warehousemen's Union I. L. A. 38-44* (1940) 16 Cal.2d 369, 373.)

"The availability of the remedy of specific performance is premised upon well-established requisites. These requisites include: A showing by plaintiff of (1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract. [Citations.]" (*Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575.)

In moving to strike plaintiff Sacha's claim for injunctive relief and specific performance, defendant Dominic contends there are no allegations which would support a finding that a legal remedy here is inadequate. In opposition, plaintiff Sacha does not squarely address the issue of inadequacy of a legal remedy.

Accordingly, defendant Dominic's motion to strike plaintiff Sacha's claims for injunctive relief and specific performance is GRANTED with 10 days' leave to amend.

## IV.   Tentative Ruling.

20 December 2022          Orders On Defendant Dominic Williams's:          Page 7 of 9
(1) Demurrer To Plaintiff's Complaint; and
(2) Motion To Strike Portions Of Plaintiff's Complaint.

The Tentative Ruling was duly posted and was duly challenged by both parties. At the hearing on the matter, Mr. Steinberg appeared for the plaintiff. Messieurs Khan and Meropia appeared for the defendant. The proceedings were transcribed by Noellia Espinola, CSR #8060.

This case revives a half-century vault of memories of a first-year law school class on the distinction between a gift and a contract. Tiff here will argue that a single transfer transaction can involve both gift elements and monetary consideration such there is no inherent contradiction. In one of the more interesting sessions on this calendar in the recent past, the following topics were discussed:

### A.      Ambiguity in the Contract.

This Court agrees with plaintiff in that the Court is to adopt the meaning ascribed by the plaintiff to an ambiguous contract at the *pleading* stage. (See, e.g., *Southern Pacific Land Company v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 817; *Butterick Pub. Co. v. Frederick Loeser & Co.* (1921) 232 N.Y. 86, 92.)

### B.      Pleading Inconsistent Theories of Relief.

California law permits a party to plead factually and legally inconsistent theories in separate counts. (See 4 Witkin, *California Procedure* (5th ed. 2008) Pleading, § 402, p. 542.) But the right to plead inconsistent theories is not a right to plead facially deficient theories. A plaintiff cannot avoid dismissal of one deficient claim by wedding it to another deficient claim—or for that matter, to a sufficient claim.

*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1402 stands for the proposition that "[w]hen a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations."

Deficiencies in the pleadings do not affect either party's right to conduct discovery and this right (and corresponding obligation to respond is particularly important to a plaintiff who may need discovery to amend its complaint. (See *Budget Finance Plan v. Superior Court* (1973) 34 Cal.App.3d 794, 798; *Union Mutual Life Ins. Co. v. Superior Court* (1978) 80 Cal.App.3d 1, 12; *Mattco Forge, Inc. v. Arthur Young & Co.* (1990) 223 Cal.App.3d 1429, 1436.)

Of course, there is always the possibility that plaintiff will plead himself into a corner and invoke the doctrine of judicial estoppel. But it is too early in this litigation to come to such a conclusion.

### C.      Specific Performance.

Mr. Khan argues that there are no facts alleged which show irreparable harm.

California *Civil Code*, § 3380 states: "Any person having the possession or control of a particular article of personal property, of which he is not the owner, may be compelled specifically to deliver it to the person entitled to its immediate possession."

Plaintiff directs the attention of this Court to the case of *Englert v. IVAC Corp* (1979) 92 Cal.App.3d 178. In the case, plaintiff sought recovery of specific stock owned by him pursuant to an agreement with his employer that the stock would be held by the employer as collateral for his promissory notes. The agreement provided that of plaintiff voluntarily left his employment, the company could repurchase the stock. If he involuntarily left, he had 90 days to pay his promissory notes and the stock would be released. Plaintiff filed suit against the defendant after it refused to release the stock.

The Court of Appeal affirmed the trial court finding that plaintiff was entitled to the stock. *Civil Code*, § 3380 deleted the requirement that there be an inadequate remedy at law and therefore broadened its scope. Plaintiff was not seeking specific performance of an obligation but rather was seeking the stock that was being held as a pledge for a debt. On repayment, he wanted the pledged stock returned, not money damages. "Section 3380 recognizes 'that the right to recover damages is not a full and adequate remedy for deprivation of personal property' (*Steele v. Marlborough Hall Corp.* (1929) 100 Cal.App. 491, 496.)" (*Englert v. IVAC Corp.* (1979) 92 Cal.App.3d 178, 185.)

### D.      Conclusion Following Hearing.

20 December 2022          Orders On Defendant Dominic Williams's:          Page 8 of 9
(1) Demurrer To Plaintiff's Complaint; and
(2) Motion To Strike Portions Of Plaintiff's Complaint.

The ruling will be adopted by this Court with the foregoing additional discussion.

## V.     Case Management.

The Case Management Conference currently set for 04 April 2023 at 10:00 AM in Department 20 will REMAIN AS SET.

## VI.    Order.

Defendant Dominic's demurrer to plaintiff Sacha's complaint on the ground that the pleading does not state facts sufficient to constitute a cause of action [*Code of Civil Procedure*, § 430.10, subd. (e)] and on the ground that the pleading is uncertain [*Code of Civil Procedure*, § 430.10, subd. (f)] is OVERRULED.

Defendant Dominic's motion to strike plaintiff Sacha's claims for punitive/ exemplary damages is DENIED.

Defendant Dominic's motion to strike plaintiff Sacha's claims for injunctive relief and specific performance is DENIED.

Defendant will be given 20 days leave within which to ANSWER the complaint.

02March 2023

_____
DATED:

_____
**HON. SOCRATES PETER MANOUKIAN**
*Judge of the Superior Court*
*County of Santa Clara*

20 December 2022          **Orders On Defendant Dominic Williams's:**          Page 9 of 9
                    **(1) Demurrer To Plaintiff's Complaint; and**
                    **(2) Motion To Strike Portions Of Plaintiff's Complaint.**



# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA CLARA
DOWNTOWN COURTHOUSE
191 NORTH FIRST STREET
SAN JOSÉ, CALIFORNIA 95113
CIVIL DIVISION



FILED
MAR 0 6 2023
Clerk of the Court
Superior Court of By County of Santa Clara
BY_____DEPUTY

RE:        **Sacha Williams vs Dominic Williams**
Case Number:    **21CV384865**

## PROOF OF SERVICE

**ORDERS ON DEFENDANT DOMINIC WILLIAMS': 1) DEMURRER TO PLAINTIFF'S COMPLAINT; AND 2) MOTION TO STRIKE PORTIONS OF PLAINTIFF'S COMPLAINT** was delivered to the parties listed below the above entitled case as set forth in the sworn declaration below.

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line (408) 882-2690 or the Voice/TDD California Relay Service (800) 735-2922.

**DECLARATION OF SERVICE BY MAIL:** I declare that I served this notice by enclosing a true copy in a sealed envelope, addressed to each person whose name is shown below, and by depositing the envelope with postage fully prepaid, in the United States Mail at San Jose, CA on March 06, 2023. CLERK OF THE COURT, by Hientrang Tranthien, Deputy.

cc:    Stephen Cory Steinberg  One Embarcadero Center Suite 800  San Francisco CA  94111
       Amman Ahmed Khan  Withers Bergman LLP  10250 Constellation Boulevard Ste 1400  Los Angeles CA  90067

# EXHIBIT C

Theodorakis v DFINITY, 22CV403734,
Complaint, filed 8/26/2022

E-FILED
8/26/2022 2:46 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
22CV403734
Reviewed By: M. Dominguez

AMIEL L. WADE | SBN 184312
EVAN LIVINGSTONE | SBN 252008
WADE LAW GROUP
A Professional Corporation
262 East Main Street
Los Gatos, CA 95030
Direct Line:(408) 884-4018
Telephone: (408) 842-1688
Facsimile: (408) 549-1612
Email: elivingstone@wadelitigation.com

Attorneys for Plaintiff
Eftychios Theodorakis

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN THE COUNTY OF SANTA CLARA

| | |
|---|---|
| EFTYCHIOS THEODORAKIS, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>DFINITY Stiftung, a-not-for profit foundation, DFINITY USA Research LLC, a Delaware limited liability company and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 22CV403734<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>1. **Breach of Contract**<br>2. **Declaratory Relief**<br>3. **Unfair Competition**<br>4. **Breach of Implied Covenant of Good Faith and Fair Dealing** |

Plaintiff, Eftychios Theodorakis, alleges as follows:

1.      EFTYCHIOS THEODORAKIS ("Plaintiff") is an individual residing in the City and County of San Francisco, State of California.

2.      Defendant DFINITY Stiftung ("Foundation") is a not-for-profit foundation with its principal place of business in Zurich, Switzerland.

3.      Defendant DFINTY USA Research LLC ("DFINITY") is a Delaware limited liability company, and wholly owned subsidiary of Foundation, with its principal place of business in Palo Alto, California, County of Santa Clara.

4.      Plaintiff is unaware of the true names and capacities of defendants DOES 1 through 10, inclusive, and therefore sues said defendants by their fictitious names. Plaintiff will amend to allege the true names and capacities when the same have been ascertained.

5.      Together, all defendants are referred to as "Defendants."

6.     Plaintiff is informed and believe and thereon allege that each of the defendants, including DOES 1 through 10, inclusive, is and was at all times material hereto, the agent, principal, employee, employer, partner, acting in the course and scope of agency or employment, and/or a predecessor or successor in interest, or in some other manner liable and responsible, whether vicariously or otherwise, for the acts, conduct and omissions of the other Defendants.

7.     Plaintiff is informed and believe and thereon allege that the individuals and/or business entities are alter egos in that there exists a unity of interests and injustice will arise if the separateness between them is allowed to continue, and there should be a determination that adherence to the separate existence between them should be disregarded.

## JURISDICTION AND VENUE

8.     Venue is proper in the Santa Clara County Superior Court, pursuant to Code of Civil Procedure Sections 394, 395, and 395.5, because this Court is a court of competent jurisdiction, because one or more instances of wrongful conduct occurred, and continues to occur, in the County of Santa Clara and/or because Defendants conducted, and continue to conduct, business in this County with respect to The Token Agreement.

9.     The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The statute under which this action is brought does not specify any other basis of subject matter jurisdiction.

10.     The California Superior Court has jurisdiction over Defendants based on Plaintiff's information and good faith belief that each defendant is a person, firm, corporation or association that either are citizens of the State of California, have sufficient minimum contacts in the State of California, or otherwise purposefully avail themselves of the California market. Defendants' purposeful availment renders the exercise of personal jurisdiction by California courts consistent with traditional notions of fair play and substantial justice.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

**FACTS COMMON TO ALL CAUSES OF ACTION**

11.     On or about August 27, 2018, Plaintiff became employed by DFINITY, a wholly owned subsidiary of Defendant DFINITY Stiftung, as a Software Engineer in Palo Alto, California. As a condition of employment with DIFINITY, Plaintiff was required to sign a written employment contract and a "Restricted DFN Agreement" with DFINITY Foundation (hereinafter, the "The Token Agreement"). Defendants countersigned the Token Agreement on September 6, 2022. A true and correct copy of the Token Agreement is attached as Exhibit "A"

12.     DFINITY is a decentralized network design whose protocols generate a reliable "virtual blockchain computer" running on top of a peer-to-peer network upon which software can be installed and can operate in a tamperproof mode. Dfinity tokens are a form of digital currency, similar to the more commonly known decentralized digital currency known as bitcoin.

13.     The Token Agreement gave Plaintiff the right to buy a certain quantity of DFINITY tokens ("Tokens") as an employment benefit. Specifically, the Token Agreement provides:

> The Foundation shall allocate to the Recipient, subject to the terms and conditions set forth in this Agreement, 80,000 dfinities, or DFN, (the "Tokens"), in exchange for a non-refundable donation to the Foundation (the "purchase price") of $0.417902 per Token. The aggregate purchase price of the Tokens shall be paid by the Recipient using either (ETH), bitcoin (BTC), United Stated (sic) (USD), or Swiss Francs (CHF) to the Foundation. Upon receipt by the Foundation of the aggregate purchase price for the Tokens, the Foundation shall allocate the Tokens in the smart contract to one or more multi-signature wallet addresses that supports DFN specified by the Foundation. The Recipient agrees to that the Tokens shall be subject to (i) any purchase rights set forth in Sections 3 and 6 of this Agreement and (ii) the restrictions on transfer set forth in Section 5 of this Agreement.

14.     Shortly after beginning employment with Defendants, Plaintiff attempted to make the required nonrefundable donation to the Foundation for the Tokens. However, Defendants failed and/or refused to accept the tender and failed and/or refused to transfer the Tokens due to an asserted: "KYC bank issue."

15.     In or around 2019, Plaintiff demanded that Defendants allocate and deliver the Tokens pursuant to the Token Agreement. However, Defendants did not perform.

16.     In 2020 all of the conditions for the allocation of the Tokens pursuant to the Token Agreement had been met. Plaintiff was entitled to have Defendants "allocate the Tokens in the smart contract to one or more multi-signature wallet addresses that supports DFN specified by the

Foundation," as specified in the Token Agreement.

17.     However, Defendants failed an/or refused to allocate and/or deliver the Tokens to Plaintiff as required by the Token Agreement.

18.     In 2020, while still refusing to allocate the Tokens to Plaintiff, DFINITY declared that Plaintiff's The Token Agreement was "void" for an unspecified reason. When pressed on the issue, DFINITY advised Plaintiff that it "had voided unilaterally (employees') contracts," including Plaintiff's The Token Agreement. Consequently, DFINITY asserted that Plaintiff would need to sign an amendment. DFINITY offered to "allow" Plaintiff to switch to a Restricted Token Unit ("RTU") and "avoid any trouble."

19.     However, Plaintiff's original The Token Agreement specifically states: "This Agreement may be amended or modified only by a written instrument executed by both the Foundation and the Recipient." (See Exhibit "A," Miscellaneous: Amendment, Sec. 9, subpart (i)).

20.     Defendants provided no consideration for the requirement that Plaintiff sign any additional agreements as a condition to receive the Tokens.

21.     In December 2020, when Plaintiff again tendered his donation to Defendants for the Tokens promised by the Token Agreement, Defendants demanded that Plaintiff donate $1.579671 per Token rather than the $0.417902 per token specified in the Token Agreement. Also, Defendants only allowed Plaintiff to donate the funds for 41,666 Tokens, rather than the 80,000 Tokens specified in the Token Agreement.

22.     On April 1, 2021, having fulfilled all conditions of his employment and the terms of the Employment Agreement, Plaintiff left the employment of DFINITY, still having not received the promised Tokens.

23.     As a condition for receiving any tokens at all, Defendants demanded that Plaintiff sign a separation agreement that added additional conditions for the distribution of the balance of the Tokens to which he was already entitled. As a result, Plaintiff was placed under severe duress to undertake action to receive his Tokens, and was forced to agree to terms he did not want to agree to, nor was contractually required to agree to. The wrongful withholding of his Tokens was used as a means to force him to sign additional agreements regarding the allocation and/or delivery of the Tokens to which he

was already contractually and legal entitled.

24.     The separation agreement imposed additional and onerous conditions to the Token Agreement. Using coercion and duress, Defendants forced Plaintiff to sign that agreement which added oppressive terms and conditions on the allocation and/or delivery of the Tokens to which he was already contractually and legally entitled.

25.     On May 10, 2021, after Plaintiff was compelled to sign the separation agreement to obtain his Tokens, Defendants distributed to Plaintiff only 41,666 Tokens, not the 80,000 Tokens which Plaintiff was entitled to under his Token Agreement.

26.     Not only did Defendants fail to perform the terms of Plaintiff's original Token Agreement, by distributing the 80,000 Tokens which he was entitled, Defendant also failed to distribute 12,608 Tokens which Plaintiff was entitled to under the separation agreement, even though at the time all conditions for the full and complete distribution of the Tokens had occurred.

27.     Defendants then demanded that Plaintiff execute a "Side Agreement" in order to obtain the additional Tokens he was entitled to. The side agreement purported to impose additional conditions to the Token Agreement. Using coercion and duress, Defendants tried to force Plaintiff to sign that agreement which added oppressive terms and conditions on the allocation and/or delivery of the Tokens to which he was already contractually and legally entitled.

28.     Plaintiff refused to sign the additional agreement with offered no consideration for entry into that agreement.

29.     Defendants refused and continue to refuse to distribute the Tokens to which Plaintiff is contractually entitled.

## FIRST CAUSE OF ACTION

### (Breach of Written Contract-Against all Defendants)

30.     Plaintiff incorporates the preceding allegations of this pleading into this cause of action as though set forth in full herein.

31.     Plaintiff performed all of the obligations or duties required of him pursuant to the Token Agreement except for those excused by and/or prevented from being performed by Defendants.

32.     Defendants breached the Token Agreement, inter alia, by:

(a)  not transferring the Tokens described in The Token Agreement as stipulated in the Token Agreement;

(b)  by unilaterally declaring the Token Agreement void;

(c)  by requiring Plaintiff to donate $1.579671 per Token rather than the $0.417902 per token specified in the Token Agreement

(d)  by requiring Plaintiff to sign additional agreements which contained conditions for the allocation and delivery of the Tokens, without additional consideration; and

(a)  by failing to compensate Plaintiff for the loss of value in the Tokens that were never allocated and delivered as agreed, or not allocated and delivered within the time frame agreed, or for the amount agreed.

33.     As a result, Plaintiff incurred and continues to incur substantial damages as a result of not having received the Tokens in the time and manner which Defendants agreed to provide them to him.

## SECOND CAUSE OF ACTION

### (Declaratory Relief-Against all Defendants)

34.     Plaintiff incorporates the allegations of the preceding paragraphs of this pleading into this cause of action as though set forth in full herein.

35.     An actual controversy and a dispute have arisen and now exists between Plaintiff and Defendants regarding The Token Agreement.

36.     Defendants claim that The Token Agreement requires Plaintiff to enter into additional contracts or has imposed additional conditions to receive the Tokens promised to be delivered in The Token Agreement.

37.     Plaintiff claims that the additional requirements and conditions constitute material breaches of The Token Agreement.

38.     Accordingly, a judicial declaration is appropriate and necessary at this time in order that the parties may ascertain their legal rights and duties with respect to the Token Agreement.

### THIRD CAUSE OF ACTION

### (Violation of Business and Professions Code §17200-Against all Defendants)

39.   Plaintiff incorporates the allegations of the preceding paragraphs of this pleading into this cause of action as though set forth in full herein.

40.   Business and Professions Code §17200 prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions §§17500 et. seq.

41.   Plaintiff is informed and believe and thereon allege that the acts, conduct or omissions of Defendants are unlawful, unfair or fraudulent business practices in violation of Business and Professions Code §17200 et seq.

42.   Plaintiff is informed and believe and thereon allege that as a result of the acts, conduct or omissions of Defendants, Plaintiff has lost money and or property.

43.   Plaintiff is informed and believe and thereon allege that they are entitled to restitution of any money or property lost as result of such acts, conduct or omission and entitled to injunctive relief.

### FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing-Against all Defendants)

44.   Plaintiff incorporates the allegations of the preceding paragraphs of this pleading into this cause of action as though set forth in full herein.

45.   Defendants entered into the Token Agreement with Plaintiff for the performance by Plaintiff, except for those parts excused by or prevented from being performed by Defendants.

46.   Plaintiff performed all of the parts of The Token Agreement except for those excused or prevented from being performed by Defendants' actions.

47.   All of the conditions required of Plaintiff were performed, however, Plaintiff is informed and believes and, on that basis, alleges that Defendants had no intention of performing its contractual obligation and, thereby, caused Plaintiff damages.

48.   Defendants took actions as alleged above and prevented Plaintiff from receiving the benefits for which they bargained.

7

COMPLAINT FOR DAMAGES AND OTHER RELIEF

49.     Defendants breached the covenant of good faith and fair dealing, by preventing Plaintiff from receiving the benefit of the Token Agreement.

50.     As a result of Defendants' breach, Plaintiff was harmed and damaged in amounts according to proof.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for judgment as follows:

(a)  for general, special, and compensatory damages according to proof, but believed to be in excess of $1,000,000;

(b)  declaratory relief;

(c)  for costs of suit;

(d)  for attorneys' fees to extent provided by the contract and law; and

(e)  for such other relief as the Court may deem just and proper.

Dated: August 26, 2022                                     WADE LAW GROUP

                                          By:    *Evan Livingstone*
                                                 EVAN LIVINGSTONE
                                                 Attorneys for Plaintiff
                                                 Eftychios Theodorakis

# EXHIBIT D
Kobayashi v DFINITY, 23CV415981,
Complaint, filed 5/8/2023

E-FILED
5/8/2023 2:12 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV415981
Reviewed By: P. Newton

1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
4  405 Howard Street
   San Francisco, CA 94105-2669
5  Telephone:    (415) 773-5700

6  TIBOR L. NAGY, JR. (*pro hac vice forthcoming*)
   tibor@dnfllp.com
7  GREGORY N. WOLFE (*pro hac vice forthcoming*)
   greg@dnfllp.com
8  DONTZIN NAGY & FLEISSIG LLP
   980 Madison Avenue
9  New York, NY 10075
   Telephone:    (212) 717-2900

10
   *Attorneys for Plaintiff Satoshi Kobayashi*
11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                   FOR THE COUNTY OF SANTA CLARA

14

15 SATOSHI KOBAYASHI,                     Case No. 23CV415981

16              Plaintiff,                 UNLIMITED JURISDICTION

17       v.                               **COMPLAINT FOR TORTIOUS
                                          INTERFERENCE WITH CONTRACT;**
18 DFINITY USA RESEARCH LLC and           **TORTIOUS INTERFERENCE WITH
   DOMINIC WILLIAMS,                       PROSPECTIVE ECONOMIC**
19                                        **ADVANTAGE; BREACH OF
              Defendants.                  FIDUCIARY DUTY; CONVERSION;**
20                                        **TRESPASS TO CHATTELS; AND
                                          UNFAIR COMPETITION**
21

22                                        **JURY TRIAL DEMANDED**

23

24

25

26

27

28

Plaintiff Satoshi Kobayashi ("Kobayashi") brings this action against Dominic Williams ("Williams") and Dfinity USA Research LLC ("Dfinity USA") and alleges as follows:

**INTRODUCTION**

1.      This action primarily arises from Williams's breaches of fiduciary duty and tortious interference with Kobayashi's rights concerning his investment in a blockchain project known as the Internet Computer Protocol ("ICP" or the "ICP Network").

2.      Williams promoted the ICP Network from his office and home in Palo Alto, California, from 2016 until the Network's launch on May 10, 2021. In doing so, Williams solicited investments globally, including from Kobayashi. Williams served not only as the principal promoter of ICP, but also as (i) the CEO of Dfinity USA, the Palo Alto-based entity principally responsible for the operations of the ICP Network; and (ii) the "Chief Scientist" of the non-party Dfinity Foundation (the "Foundation"), a Swiss nonprofit entity with substantial operations in Palo Alto that has certain administrative responsibilities related to the ICP Network.

3.      In 2017, in ICP's seed round and in response to Williams's promotional efforts, Kobayashi invested 15,000 Ethereum (or "ETH") tokens (currently worth over $25 million), making him ICP's fourth-largest seed investor. Pursuant to the terms of his investment, Kobayashi was entitled to, among other things, the following rights:

- His pro rata share of ICP tokens (the "ICP Tokens" or "Tokens") to be allocated under a formula that would see early investors like himself receive 78% of the total available Tokens when the ICP Network launched.

- Governance of the ICP Network by a decentralized voting process, meaning control of the Network would not be centralized with any one person or group—and certainly not with ICP insiders.

- Receipt of Tokens that would be freely tradeable upon Network launch, which would turn out to be May 10, 2021.

4.      In promoting ICP, Williams assured investors that ICP would not be a pump-and-dump scam. These assurances had teeth given the guarantee of majority ownership by early investors. Williams proudly published his "don't be evil" rules, promising that ICP insiders

would be subject to "vesting incentive packages where tokens are released slowly over years" because "[f]ounders should not be able to cash out early, walk away and start working on competitive projects." Williams was categorical: "We are a long term operation, which is why we did not dump all our tokens."

5.      These assurances were empty. Driven by personal aggrandizement rather than the legitimate governance of the ICP Network, Williams and Dfinity USA tortiously interfered with the rights of ICP's seed investors generally and later targeted Kobayashi specifically:

- Rather than allocating the promised 78% of Tokens to early investors, as required, Defendants induced the Foundation to allocate only 24.7% to them— with the mass of misallocated Tokens going to enrich Defendants.

- Far from decentralized control, the ICP Network is wholly controlled by one person—Williams. Upon Network launch, insiders had control of nearly 100% of the accessible Tokens and Williams dominated the entities with the most Tokens, including the Foundation, under whose charter he has absolute control. Since Network launch, the Foundation has put forth thousands of governance proposals; virtually all have passed by a margin of over 99%. The ICP Network is the very antithesis of decentralization: it is a crypto dictatorship subject to Williams's whims.

- The Tokens of seed investors were not freely tradable at Network launch. Instead, as announced only on the morning of the launch, Defendants caused the Foundation to impose lengthy vesting schedules and lockups on their Tokens, as well as technical roadblocks that effectively prevented seed investors from selling at all. The result was that, at launch, seed investors as a group could access and sell no more than *1,660* Tokens—practically 0% of the Tokens in circulation—while Williams and other Network insiders could access and sell hundreds of millions.

- Indeed, to earn billions of dollars, Defendants caused the Foundation to remove or circumvent vesting restrictions on Williams and other Network

1   insiders—to the extent any existed in the first place. To avoid regulatory

2   restrictions, Williams surreptitiously sold his own Tokens, including by trading

3   Tokens in the name of his children for his own personal account and through a

4   puppet entity, the Internet Computer Association (the "ICA"), that purports to

5   be independent but that he controls. As one ICP investor put it, "in what

6   universe does the team vest before investors?"

7   • Kobayashi did not receive, as was his entitlement, his pro rata share of

8   5,188,487 Tokens at Network launch. And because he dared to complain to

9   Williams about these abuses, Williams maliciously singled him out and

10   punished him by tortiously causing the Foundation to refuse ever to release the

11   promised Tokens.

12   6.    Defendants' misconduct has had a disastrous impact on the value of ICP Tokens

13   and the prospects of ICP. The Tokens traded for hundreds of dollars apiece at Network launch but

14   lost approximately 95% of their value within two months and currently trade, on a very thin

15   volume, at approximately $6 per token. Williams has sought to pin the disaster on a purported

16   sell-off by outside investors—who had access to such a small slice of Tokens that they could not

17   possibly affect the market—and generic market forces. This claim that cannot be squared with the

18   performance of major crypto-assets, as illustrated by the below chart comparing the price of ICP

19   to Bitcoin, Ether, Sol, and Avalanche in the eleven months following Network launch:

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

- 3 -



7.    Instead, ICP's disastrous performance—notwithstanding its support from major crypto-asset investors like Andreesen Horowitz Capital Management LLC ("Andreesen Horowitz"), Polychain Capital ("Polychain," and, together with Andreesen Horowitz, the "Strategic Investors")—is due to the market's severe and swift response to Defendants' tortious conduct and Williams's domineering control of what is supposed to be a decentralized network. The launch of a blockchain project is a critical event that the project's founders are supposed to make transparent, rational, and fair. It is the equivalent of the release of a constitution for the network; a crypto-asset issuer only has one chance to do it right.

8.    As a result of Defendants' tortious conduct, the launch of the ICP Network was none of these things: it was opaque, irrational, and wildly unfair. While Williams promoted the launch as "the most anticipated event in blockchain" history, ICP instead suffered a decline "worse than even the decline in Shiba Inu Coin, a joke token based on the meme crypto-asset Dogecoin, which itself was intended to mock crypto and internet culture." As one investor

observed, Williams has "built a community of bagholders."

9.      Williams's misconduct since ICP's disastrous launch has only gotten worse. Having resided in Palo Alto for the past decade, Williams suddenly fled the United States for Switzerland, in an attempt to avoid investor lawsuits in the United States as well as ICP-related lawsuits from his own children. At the time he fled, Williams, among other contacts with California, (i) had an office in Palo Alto at Dfinity USA's headquarters; (ii) had a California driver's license; (iii) lived in a home that he owned in Palo Alto; (iv) listed his residence as "Palo Alto" in his LinkedIn bio; (v) listed his residence as "Palo Alto" on his bio on the Foundation's website; and (vi) paid taxes in California. In fact, as Williams's son Sacha has pointed out in a lawsuit he recently filed against his father, Williams's flight from this jurisdiction was so hasty and clandestine that his own children did not realize he had left California until August 2021.

10.     Other sudden departures by ICP's key personnel also reflect the disturbing state of affairs at the Foundation and Dfinity USA. ICP's general counsel Sanam Saabar—who, like Williams, had an office in Palo Alto—resigned in December 2020, just a few months before Network launch. In July 2021, just two months after the launch, Nicholas Cooper, the Head of Finance, suddenly resigned. And in August 2021, Saabar's replacement, Jennifer Sum (who also kept an office in Palo Alto) resigned after just eight months on the job. ICP's two general counsels thus both quit within a year.

11.     In addition to highlighting the dramatic and sudden nature of Williams's flight from this State, Sacha Williams's lawsuit against his father has also revealed another troubling fact: Williams entered into a contract with his children in which he promised to pay them substantial sums of ICP Tokens but then decided to keep those Tokens for himself. As Sacha alleges, Williams sold a portion of Sacha's Tokens in the first week of ICP Token trading and is treating the cash proceeds as well as the remaining Tokens as if they are under his control. Williams apparently sold during this period despite repeatedly representing to the market that he had not and could not do so due to regulatory restrictions.

12.     The fact that Williams was secretly promising to pay his family from his personal allocation of ICP Tokens, while simultaneously promising investors he would be subject to a

multiyear lockup so as to "not be evil," reveals the highly personal nature of the motivations that drove Williams to tortiously interfere with the rights of Kobayashi and other seed investors. Williams may seek to cloak his actions as within the ambit of his role as the Chief Scientist of the Foundation, but the reality is that the Foundation has no legitimate business in springing last-minute lockups on seed investors while simultaneously allowing Williams to surreptitiously dispose of his own Tokens (whether for family obligations or otherwise). Indeed, after months of outcry from investors, Williams finally admitted in September 2021 that he had, in fact, "sold" Tokens.

13.     Williams's actions with respect to Kobayashi are even more personal and malicious. After the disclosure of the last-minute trading restrictions on seed investors, Kobayashi complained to Williams about the unfair treatment. Kobayashi was one of the more than 33% of seed investors who had trouble accessing and saving their seed phrases, a 12-word password needed to access the Tokens, due to bugs in the Foundation's software. Williams personally assured Kobayashi "all is fine" and "[d]on't worry about your Tokens" because the Foundation had adopted a mechanism to ensure that seed investors like Kobayashi would receive their Tokens without their seed phrases. Williams even assured Kobayashi that he could get an "official letter from the foundation" reflecting the Foundation's promise that Kobayashi would receive his Tokens irrespective of any seed phrase issue.

14.     In this instance again, however, Williams allowed personal animus to interfere with the Foundation's obligations to investors. Following Network launch, the parties attempted to resolve the issues raised in this Complaint consensually. After negotiations with Kobayashi failed to produce a settlement on his terms, Williams maliciously sought to punish Kobayashi. In November 2021, Williams announced that the Foundation would be adopting a proposal to eliminate the mechanism that would have at last given Kobayashi, one of Williams's earliest and biggest supporters, access to his Tokens later that month. Williams had Dfinity USA design the code and software needed to implement the proposal. Williams left no doubt that this act was aimed personally at Kobayashi: Williams reported that four individuals who had lost their seed phrases but who had played ball by "show[ing] good moral character" and "accept[ing] the

1   process" would still receive their Tokens. The message was clear: Williams runs the ICP Network

2   with an iron fist and punishes those who complain about his actions.

3        15.    And although undisclosed to the public, the four individuals who Williams

4   handpicked to receive their Tokens were Williams's personal friends—indeed, three of the four

5   were former co-workers. This further illustrates that the ICP Network is not decentralized but is

6   instead ruled by Williams. The decision to return the Tokens was simply about Williams helping

7   his friends and had nothing to do with proper Network governance. Indeed, like Kobayashi, all

8   four individuals are highly sophisticated in the crypto-space, understand the import of seed

9   phrases, and could not access their Tokens through no fault of their own, but rather due to the

10  Foundation's buggy software. But, unlike Kobayashi, the four were personal friends with

11  Williams, so they received their Tokens.

12       16.    Williams has employed similar bullying tactics against others to stifle all criticism

13  against his regime. For example, Williams, through https://cryptoleaks.info/ ("Crypto Leak"), has

14  sought to attack competitors, lawyers pursuing claims against him, and reporters investigating his

15  misconduct.  Crypto Leaks purports to be a website run to "expose . . . corruption," but is in

16  reality a poorly disguised front for Williams to advance his own agenda:  the articles on the

17  website transparently try to bolster ICP while at the same time levying highly personal attacks

18  against Williams's perceived enemies, such as reporters at the *New York Times*.

19       17.    Williams has also sought to use the legal system to similar effect.  In June 2022, at

20  Williams's direction, the Foundation brought claims of defamation against the *New York Times*

21  and its reporters Aaron Ross Sorkin and Ephrat Livni, as well as the crypto-asset intelligence

22  service Arkham Intelligence.  Why?  One year earlier, in June 2021, the *New York Times* in an

23  expose and Arkham Intelligence in an independent report had the temerity to expose Williams

24  for, according to the complaint, "orchestrating a crypto scam."

25       18.    Always incoherent on why the price of ICP collapsed, Williams has now sought to

26  shift the blame from generic market forces and a purported selloff by outside investors (*see*

27  paragraph 6, *supra*) to journalism by claiming that a major newspaper's reporting "caused a major

28  price collapse of the ICP token."  He has done so using the Foundation's endless resources—

raised through his crypto scam—to fight a personal vendetta, without community oversight.

Indeed, the suit itself illustrates that ICP is a decentralized farce controlled by Williams.  The suit

is frivolous but is designed to send a signal to the market that reporting the truth about Williams's

misconduct will be punished.

19.     Kobayashi will no longer tolerate Williams's unlawful bullying. By this action,

and through claims of tortious interference with contract and prospective economic advantage,

breach of fiduciary duty, conversion, trespass to chattels, and unfair competition, Kobayashi

seeks monetary damages to compensate him for the harm that Defendants have caused through

their tortious conduct—including the dramatic destruction of value to Kobayashi's investment.

## PARTIES

### I.     Plaintiff

20.     Satoshi Kobayashi is a citizen of Japan and resident of Singapore.

### II.    Defendants

#### A.     Dfinity USA

21.     Dfinity USA Research, LLC is a Delaware company headquartered in Palo Alto,

California. Dfinity USA employs more than fifty individuals in the San Francisco Bay area.

#### B.     Williams

22.     Dominic Williams is a citizen of the United Kingdom and domiciled in California.

Williams was physically located in California for nearly all events described below until he fled

this State for Switzerland to avoid the ever-growing number of suits against him in this State.

23.     At all relevant times, Williams has worn multiple hats, as the Founder and Chief

Scientist of the non-party Foundation and the CEO of Dfinity USA. Williams performed the

tortious acts described herein in his capacity as the CEO of Dfinity USA and/or in his personal

capacity and in furtherance of his own private pecuniary interests in violation of his duties to both

the Foundation and Dfinity USA and/or in violation of applicable law. Williams (i) engaged in

the tortious acts described in this Complaint to capture personal wealth at the expense of Dfinity

USA, the Foundation, and seed investors, such as Kobayashi and (ii) did capture for himself

wealth that, but for his actions, would have benefited Dfinity USA, the Foundation, and seed

1    investors, such as Kobayashi.

2    **III.     RELEVANT NON-PARTIES**

3          **A.     The Dfinity Foundation**

4          24.     The Dfinity Foundation is a Switzerland-based not-for-profit organization, with

5    substantial operations and a significant number of employees based in Palo Alto and San

6    Francisco, California. Although the Foundation is nominally based in Switzerland, its operations

7    are largely located in Palo Alto. Foundation representatives have represented, for example, that

8    the Foundation's "operations are based in Palo Alto (California, USA)" and that the "core team is

9    based in Palo Alto."

10         25.     The Foundation has not hesitated to use the U.S. court system when convenient.

11   For example, on June 27, 2022, the Foundation filed a defamation suit against the New York

12   Times, Mr. Sorkin, Ms. Livni, and Arkham Intelligence, among others, for exposing Williams for

13   "orchestrating a crypto scam." *See Dfinity Foundation v. The New York Times Company et al.*,

14   No. 22-cv-05418 (S.D.N.Y.). As another example, the Foundation has sued Meta Platforms (the

15   purveyor of Facebook) for trademark infringement. *See Dfinity Foundation v. Meta Platforms*,

16   Inc., No. 22-cv-02632 (N.D. Cal.).

17         26.     Williams has absolute control of the Foundation under its charter. The

18   Foundation's Council (that is, its board of directors) has two members and its charter provides

19   that, in the event of a tie vote, Williams "shall decide" the issue.

20         **B.     The Internet Computer Association**

21         27.     Formed in January 2021, the Internet Computer Association ("ICA") purports to

22   be an independent members organization that advocates for the ICP Network. In reality, the ICA

23   is under the control of Williams, who at all relevant times was its president. The ICA assisted

24   Williams, as described below, in selling millions of ICP Tokens in an effort to give the veneer

25   that Foundation insiders had complied with vesting and regulatory restrictions.

26                                  **JURISDICTION**

27         **A.     Dfinity USA Is Subject To Jurisdiction Here**

28         28.     Dfinity USA is subject to personal jurisdiction here because it is headquartered in

- 9 -

California and does business in California, and because Kobayashi's claims arise out of Dfinity USA's transaction of business in California as well as Dfinity USA's acts in California.

29.     Indeed, Dfinity USA and the ICP Network are squarely at home in California, as is the research, technological, and policy development for the ICP Network—it all happens here. Like many technology companies that have generated significant hype before making their shares more widely available to the public, Dfinity USA is based in Silicon Valley and backed by Silicon Valley investors, such as the Strategic Investors. Since its founding, all operations relating to the ICP Network and the ICP Tokens have been centered in Palo Alto, in the heart of Silicon Valley. Williams has stated that the Network's "primary" and "longstanding flagship research center" is in Palo Alto. Another prominent individual that worked on the Network, Cedric Waldburger, likewise referred to the Network's Palo Alto Office as the "main office."

30.     The vast majority of the individuals working on the ICP Network work in Dfinity USA's Palo Alto office and in the surrounding Bay Area. Likewise, publicly available information reviewed in 2021 indicates that the vast majority of employees associated with either Dfinity USA or the non-party Foundation are US-based. H1B records reviewed in 2021 confirm that over 85% of such individuals are in Palo Alto or San Francisco: all eight H1B recipients affiliated with the non-party Foundation or Dfinity USA work in those cities.

31.     Defendants and the Foundation tout their connections with Silicon Valley. The Foundation's LinkedIn page states: "Founded in 2016 by Dominic Williams, DFINITY has offices in Palo Alto, San Francisco, and Zurich, and is backed by top investors including Andreessen Horowitz and Polychain Capital." The Foundation's website likewise references "research centers in Palo Alto, San Francisco, and Zurich." In an April 4, 2018, *Medium* article, Williams stated that he intended to operate ICP like "an agile Silicon Valley startup." Media outlets such as the *Silicon Valley Business Journal* have thus noted that the ICP Network "operates out of Palo Alto."

32.     The ICP Project is backed by prominent Silicon Valley investors that have invested tens of millions, if not hundreds of millions, of dollars. The *New York Times* has referred to investor Andreessen Horowitz as "one of the most prestigious venture capital firms in Silicon

Valley." Williams has likewise touted Andreessen Horowitz as "one of Silicon Valley's preeminent venture capital funds." The *MIT Technology Review* characterized the Strategic Investors as "big players in the Silicon Valley venture capital club."

33.    The ICP Network's locus in Silicon Valley was part of what gave Kobayashi comfort when he invested in ICP in early 2017. Kobayashi believed that he was investing in promising technology developed in Silicon Valley by Silicon Valley engineers. The expectation was reinforced when Kobayashi visited Dfinity USA's Palo Alto headquarters.

34.    And it was just north of Palo Alto, in San Francisco, where Kobayashi should have been able to realize the returns from his purchased ICP Tokens, by selling them on San Francisco-based Coinbase's cryptocurrency exchange. Instead, Defendants interfered with the Foundation's obligations to allow Kobayashi to sell his ICP Tokens and deprived him of the opportunity to consummate the expected sale of those Tokens.

35.    Dfinity USA is also no stranger to litigation in California.  As described *infra*, it is currently defending two securities class actions here.  And it has engaged in employment litigation here, both as a plaintiff and as a defendant.  *See, e.g.*, *Dfinity USA Research LLC v. Bravick*, 22-cv-398321 (Cal. Sup. Ct.); *Theodorakis v. Dfinity USA Research LLC*, 22-cv-403734 (Cal. Sup. Ct.).

**B.    Defendant Williams Is Subject To Jurisdiction Here**

36.    Williams is subject to general jurisdiction here. He is domiciled in and a resident of California. He lived in Palo Alto, California, from 2012 until he apparently fled the State in late 2021 to attempt to avoid liability for his actions in an ever-growing number of suits arising from his misconduct in connection with ICP Tokens.

37.    Williams serves as the CEO of Dfinity USA and during the relevant events worked out of Dfinity USA's Palo Alto office and earned a salary of $300,000 per year from Dfinity USA, before even considering additional consideration in the form of grants of ICP Tokens. In addition, his LinkedIn page indicated that he was located in Palo Alto. Williams signed Dfinity USA's filings with the California secretary of state in his capacity as a CEO. Before fleeing, Williams lived in Palo Alto in a home that he owned. In addition, Williams has a California

1    driver's license and is a resident of California for tax purposes.

2         38.    Williams is also subject to specific jurisdiction here. He was located in California

3    for the vast majority of events described below, and Kobayashi's claims arise out of Williams's

4    transaction of business in California and acts in California. Indeed, as shown further below,

5    Williams's case-related connections to California are extensive. He regularly touted his California

6    connections, including to induce investment from seed investors, like Kobayashi. Williams

7    conceived of and founded both the Foundation and Dfinity USA in Palo Alto.

8         39.    In addition, Williams has repeatedly been involved in litigation in California, as

9    illustrated by the following legal actions in California:

10             (a)  A putative federal class action alleging that Williams, Dfinity USA, and the non-

11                  party Foundation defrauded ICP Token retail investors by, among other things,

12                  engaging in market manipulation, lying to investors, and soliciting the purchase

13                  of ICP for pecuniary benefit in violation of the securities laws. Williams has

14                  filed a motion to dismiss in that case but did not move to dismiss for lack of

15                  personal jurisdiction, effectively conceding that jurisdiction is proper here. *See*

16                  *Valenti et al. v. Dfinity USA et al.*, No. 21-CV-06118-JD (N.D. Cal.).

17             (b)  A putative state class action by retail investors alleging that the Defendants in

18                  this action, among others, wrongfully solicited the purchase of ICP Tokens for

19                  pecuniary benefit in violation of the securities laws. *See Ocampo v. Dfinity USA*

20                  *Research LLC et al.*, No. 21-CV-03843 (Cal. Sup. Ct.).

21             (c)  Civil proceedings brought by Williams's son, Sacha, alleging conversion,

22                  breach of contract, and breach of fiduciary duty related to Williams's theft of his

23                  son's ICP Tokens. *See Williams v. Williams*, No. 21-CV-384865 (Cal. Sup. Ct.).

24                  There are remarkable similarities between this case and that case—for example,

25                  Williams has seized control over his son's ICP Tokens; reneged on agreements

26                  to turn the Tokens over to his son; and threatened to punish his son unless he

27                  agrees that Williams controls the Tokens.  The court has overruled Williams's

28                  demurrer seeking to dismiss his son's claims.  Williams has not asserted a

1   personal jurisdiction defense in the case, effectively conceding that jurisdiction

2   is proper here.

3   (d) According to court filings in the suit with his son Sacha, Williams initiated

4   another, separate action in this court by filing a verified petition in which he

5   falsely claimed he put Sacha's Tokens into a trust for Sacha's benefit, with

6   Williams as trustee. *See In re Trust of Sacha Williams*, 21-PR-190461 (Cal.

7   Sup. Ct.). The petition also claimed that Williams deposited the proceeds from

8   the sale of Sacha's Tokens into an account in Williams's name, again as trustee.

9   Williams, however, *moved to dismiss the verified petition after being served with*

10   *a motion for sanctions accusing him (apparently correctly) of filing the petition*

11   *for an improper purpose and without any legal or evidentiary support.*

12   (e) Divorce proceedings between Williams and his wife in which Williams disputed

13   whether he, among other things, transferred ICP Tokens to his children. *See*

14   *Williams v. Williams*, No. 19-FL-000381 (Cal. Sup. Ct.).

15   (f) Emergency domestic violence proceedings in which Williams's wife

16   successfully obtained an order restraining him from contacting her and their

17   children based on allegations of domestic abuse and cruelty. *See Williams v.*

18   *Williams*, No. 16-DV-020442 (Cal. Sup. Ct.).

19   **VENUE**

20   40.   Venue is proper here because Dfinity USA has offices and operations in this

21   County, and a substantial number of the events giving rise to Kobayashi's claims occurred in this

22   County.

23   **FACTUAL ALLEGATIONS**

24   **I.   Crypto-Assets In General**

25   41.   By way of background, a crypto-asset is a digital asset designed to work as a

26   medium of exchange or a store of value or both. Crypto-assets leverage several cryptographic

27   principles to secure transactions, control the creation of new units, and verify the transfer of the

28   digital assets. Crypto-asset transactions are typically recorded on electronic ledgers known as

- 13 -

blockchains. Investors in crypto-assets may be able to vote on matters known as "governance proposals" that may affect the nature, character, and value of the asset. Often, holding more of a particular crypto-asset gives the holder greater voting power.

42.     Concentration of token ownership among holders—especially insiders—can allow them to jam through proposals that favor their interests over the interests of others—especially outside investors. In particular, concentration of ownership can make a token susceptible to "pumping-and-dumping"—a scheme in which an insider pumps up the value of a crypto-asset based on inside knowledge only to sell off at the high point, leaving outsiders holding the bag.

43.     Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most popular crypto-asset, with a market capitalization of over $850 billion. Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of approximately $2 trillion.

44.     There are several ways to acquire crypto-assets. One way is through private sales. Another is through online crypto-asset exchanges.

45.     Ethereum is the second-most popular crypto-asset, with a market capitalization of over $240 billion. Ethereum was designed to enable "smart contract" functionality. A smart contract is a program that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting. A smart contract enables two people to submit ETH to a secure destination and automatically distribute it at a specified time without any third-party action. The smart contract self-executes with instructions written in its code, which are executed when specified conditions are met.

46.     Since Ethereum introduced the concept of smart contracts, many other companies have sought to create crypto-assets that improve on and compete with Ethereum.

47.     By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a historically unprecedented rate. Over the course of 2017, Bitcoin's price increased from approximately $1,000 to approximately $20,000. Ethereum's growth was even more startling. On January 1, 2017, Ethereum was trading at approximately $8 per ETH.

Approximately one year later, it was trading at over $1,400 per ETH—a return of approximately 17,000 percent over that period.

48.     Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through initial coin offerings ("ICOs"). An ICO is an event in which crypto-assets are sold to third parties. The *New York Times* has characterized an ICO as "the crypto equivalent to a company going public and listing shares for investors to buy."

**II.     Defendants' Pre-ICO Solicitation And Sale Of ICP Tokens**

**A.     The 2017 Seed Round And Williams's Solicitation Of Kobayashi's Investment**

49.     In 2016, Williams had big ambitions to make it rich. He devised a plan to lure early seed investors by marketing ICP Tokens as the next big thing—a novel crypto-asset that would build upon the success of Ethereum. According to Williams, ICP Tokens would be decentralized (under the control of investors, as opposed to insiders), which would supposedly prevent pump-and-dump and similar schemes that crypto-asset insiders have used in other coin offerings to prioritize their own interests to the detriment of outside purchasers. The reality would prove to be far different than the marketing.

50.     Williams first began courting Kobayashi for an investment in 2016. Following a dinner in April 2016 during which Williams pitched Kobayashi on various business ideas, Williams described to Kobayashi, in an email with the subject line "Business ideas," his initial concept for the ICP Network:

> Below are some ideas for synergies between us . If Ethereum fails to implement scalability correctly, then we may wish to create a separate chain using algorithms e.g. at http://dfinity.io. When we remember that Google wasn't the first search engine, and Facebook wasn't the first social network, we realize the potential is large. Perhaps this could be crowdfunded separately . . . .

51.     By early 2017, Williams's plan for the ICP Network had crystalized. On February 1, 2017, from Palo Alto, Williams drafted and posted an article on his *Medium* page titled "DFINITY Stiftung and the Upcoming Fundraising" in which he organized a small "crowdsale" to raise money for the development of the ICP Network.

52.     Emphasizing the decentralized nature of Dfinity, Williams explained that the name

- 15 -

for "Dfinity" is derived by combining the words "Decentralized" and "Infinity." Williams touted the novel nature of ICP, explaining that "DFINITY aims to create a scalable 'decentralized cloud' where smart contract software can run and is conceived as a sister network for Ethereum." He claimed that the "project introduces new technology including network protocols and cryptographic constructions focused on extreme performance, scalability and enterprise requirements, much of which might hopefully also be used by Ethereum or Enterprise Ethereum derivatives too." According to Williams, "DFINITY is not an Ethereum competitor," and its implementation of "an omnipotent distributed intelligence called the 'Blockchain Nervous System'" rendered it "a very different kind of proposition" from existing crypto-assets.

53. Williams was clear that ICP Tokens—which did not yet exist and may never exist—represented an investment opportunity that could "gain value." The ICP Tokens would eventually be created as tokens that "mediate access to the resources of the virtual computer produced by DFINITY's decentralized network protocols." If the Network "fail[ed] completely," ICP Tokens could become "valueless."

54. Williams explained the Foundation would collect investments in "seed" and "main" rounds and promised that 78% of the total ICP Tokes in existence when the Network subsequently launched would be "allocated to those contributing" in those rounds. By contrast, only 12.5% of Tokens would be reserved for the Foundation. According to Williams, ICP Token ownership would thus be decentralized precisely because the majority of ownership would be spread across investors who occupied a level playing field.

55. Investors in the seed round would, once Tokens were created, "receive 30 [ICP] for each [CHF]" invested. Public investors in the subsequent main round would receive between 12 and 12.5 ICP per CHF invested. The greater return for seed round investors was intended to reflect that such investors had "a greater risk of later finding that" they invested in a "failed project."

56. Reflecting the unique opportunity of the seed round, Williams explained that the seed round would have a "soft cap" of 1,000,000 CHF, whereas the main round would have a "soft cap" of 20,000,000 CHF. He elaborated that, if these caps were reached, investors would

1    have twenty-four hours to invest additional funds.

2          57.     Investors in the seed round would receive their Tokens when the ICP Network

3    launched and the Tokens were created—an event that may never occur. To participate in the seed

4    round, seed investors were instructed to download a Google Chrome extension that generated a

5    seed phrase, a twelve-word password that could subsequently be used to retrieve ICP Tokens

6    once they were allocated. (Google Chrome is an Internet browser; an extension in this context is a

7    program that operates on Google Chrome.)

8          58.     Nowhere did Williams indicate that, once allocated to seed investors, the ICP

9    Tokens would be subject to any alienability restraints—let alone lengthy lockup or vesting

10   periods—or that anyone had the right to impose alienability restrictions on seed investors. The

11   presence of such restrictions would have been a material consideration for any investor: it is the

12   norm in the industry that seed investors are not subject to vesting or other restrictions on token

13   alienability. By contrast, insiders are generally subject to such restrictions.

14         59.     The seed round was a success. In the years that followed, Williams would

15   repeatedly tout the success of the seed round. In a February 7, 2018, *Medium* article, for example,

16   Williams explained that many seed investors invested in the ICP Network using crypto-assets like

17   Bitcoin and Ethereum, and because those assets appreciated, the Foundation had netted

18   approximately $40 million from the seed round, which it and Dfinity USA used to grow and

19   expand their operations.

20         **B.     Williams Successfully Solicits Kobayashi's Investment, Inducing Him To
              Enter Into The ICP Agreement**
21

22         60.     On February 14, 2017, as a result of Williams's solicitations, Kobayashi entered

23   into the ICP Purchase Agreement (the "ICP Agreement" or the "Agreement") with the non-party

24   Foundation. The ICP Agreement is an adhesion contract that, upon information and belief, the

25   Foundation imposed on all seed investors.

26         61.     The ICP Agreement provides that, when the ICP Network publicly launched, its

27   initial state would be known as the "Genesis State" and would "include allocations of [ICP

28   Tokens]." ICP Agreement ¶ 3. The Agreement further provides that the vast majority of ICP

Tokens must be to outside investment, a term crucial to ensuring that the Network would be decentralized. Specifically, the Agreement provides for the following allocations based on investor class:

> (a) Pool A: 78% of the 'Total [ICP] Amount' allocated by the Genesis State *shall* be allocated to Donors who made Donations to [the Foundation] during the Donation Rounds (the Seed Round and the Main Round).
>
> (b) Pool B: 12.5% of the Total [ICP] Amount *shall* be reserved for an allocation (an endowment) to be used at the complete discretion of [the Foundation]. *E.g.* for funding operations, disbursement of grants to developers and partners, and so on.
>
> (c) Pool C: 9.5% of the Total [ICP] Amount *shall* be allocated in return for Donations from special persons, organizations and partners who made early financial, development or management contributions.

ICP Agreement ¶ 33 (emphasis added).

62.     Kobayashi sent 15,000 ETH to the Foundation, which entitled him, as a Pool A investor, to his pro rata share of Tokens once the ICP Network launched. *See* Agreement ¶¶ 27–34.  Nowhere does the Agreement speak to any lockup or vesting restrictions for Pool A investors.

63.     The Agreement is cloaked in terms designed to give an air of decentralization and to evade regulatory scrutiny. As an example of the first point, the Agreement characterizes the allocations of ICP at Genesis State as "recommendations" by the Foundation to be voted on by the "community"—that is, all Token investors. Notwithstanding the semantics, the plain terms of the Agreement are clear that the Foundation is obligated to make allocations as set forth in the Agreement. In any event, as subsequent events would prove, the Foundation at all relevant times held complete control over how to allocate ICP upon the launch of the ICP Network.

64.     As an example of the second point, the Agreement describes the investments of Kobayashi and other investors as "donations." The plain terms of the Agreement, however, make clear that both sides understood that Kobayashi sought a return on his investment.

65.     So too do Williams's communications with Kobayashi. In a text exchange on July 12, 2017, for example, Williams stated: "DFINITY team and technology insane." Kobayashi responded: "Nice I look forward to get higher return than having ETH!" Williams replied: "Re return, I believe Seed will provide better return than current ETH, but we'll have to see." Later that year, Williams texted Kobayashi: "Of course, your seed investment worth a lot now."

66.     Kobayashi's initial investment of 15,000 ETH has a current market value of over $25 million. This is ETH that, on information and belief, is in Dfinity USA's possession, or else in the possession of the Foundation. Yet Kobayashi, as a result of Defendants' unlawful conduct, currently is unable to access any of his ICP Tokens.

**C.     Rather Than Hold A Main Round Open To The Public, Williams Raises Money For The ICP Network From The Strategic Investors**

67.     In a July 17, 2017, article posted on *Medium* titled "The Dfinity Main Round: Preconditions and Our 'Don't Be Evil Rules,'" Williams noted that the Foundation expected to run the main fundraising round in "late summer or early fall." He added that he wanted to relay "important principles" about fundraising that "take the form of *what we will not do*"—the "don't be evil" rules.

68.     The Foundation would ensure, for example, that founders and key personnel were tied to "*vesting* incentive packages where tokens are released slowly over years" because "[f]ounders should not be able to cash out early, walk away and start working on competitive projects." The Foundation would not engage in "Robbery" by "award[ing] millions of dollars" to "founders" as a "bonus … or other such nonsense" because "we believe founders should stand with participants, not cash out before they've proven anything with their works." The Foundation also would not be a "Snake oil" salesman by overselling the capability of its technology. Finally, the Foundation would not engage in "Deception" by "[q]uietly sell[ing] deeply discounted tokens to venture capitalists in a pre-round, then have them pump the forthcoming fundraising by publicly and loudly declaring their participation in the press."

69.     In time, Williams would show that he had no intention of adhering to any of his "don't be evil" rules. Indeed, less than a year later, in a February 7, 2018, article posted on

*Medium*, Williams acknowledged that the Foundation had "promised Seed participants" that, following the seed round, the Foundation "would soon after run a subsequent 'Main' fundraising round" that would "more closely resemble an ICO." Williams, however, announced that the Foundation would no longer be holding a main round.

70.     Instead, Williams disclosed that the Foundation had conducted what he called the "Strategic Round," in which it raised tens of millions of dollars from venture capitalists, namely, the Strategic Investors. Williams promoted the investments, calling "Andreessen Horowitz one of Silicon Valley's preeminent venture capital funds" and stating that "you can expect DFINITY to begin to emerge from the dark."

71.     Williams also laid out plans for further fundraising. He noted that the Foundation intended to conduct a "Presale Round" to raise money by selling ICP Tokens to private investors. He stated that the Foundation may thereafter hold an ICO to be "run by regulated traditional exchanges at the moment that the [Dfinity] network goes live"—that is, "genesis."

72.     In a follow-up April 4, 2018, *Medium* article, Williams explained that the Foundation had explored the "possibility of running an ICO," but had decided that, due to the "regulatory environment," doing so would be "impractical."

**D.     Williams Announces A Plan To Alter The ICP Allocation**

73.     Having secured large investments from the Strategic Investors, Williams disclosed in the April 4, 2018, *Medium* article that the ICP allocations required under the ICP Agreement would not be honored when Dfinity USA launched the ICP Network.

74.     Specifically, although Williams had previously assured Kobayashi that seed and main round investors would receive 78% of ICP Tokens on a level playing field, and insiders only 12.5%, he now revealed a plan under which over 50% of ICP Tokens would be allocated to insiders. He further boasted that these "endowment tokens [were] expected to fund aggressive operations for years in the mode of an agile Silicon Valley startup (which is the best way to make [its product] the Internet Computer a mass market phenomenon)."

75.     In sum, if the revised plan were to come to fruition, then the ICP Tokens would be allocated as follows:

(a) *First*, approximately 53% would go to insiders.

(b) *Second*, approximately 25% would go to the seed investors.

(c) *Third*, approximately 9% would go to "early contributors" in "respect of earlier works and investments made before the foundation was formed."

(d) *Fourth*, approximately 7% would go to the Strategic Investors.

(e) *Fifth*, approximately 5% would go to the "presale" investors described below.

(f) *Finally*, approximately 1% would go to the "airdrop" investors described below.

76.     By August 2018, Williams announced the completion of sales to presale investors. He announced in an August 29, 2018, *Medium* article that an additional 102 CHF (roughly $100M) had been raised from the Strategic Investors, as well as from other "specialist funds and accredited community members." He also informed investors that, in June 2018, the Foundation had allocated 35 million CHF "worth of [ICP] tokens" to the "airdrop investors," namely, some of the Foundation's "earliest community members."

77.     Andreessen Horowitz widely promoted its investment in the press, stating it "was excited to back" the ICP Network, which it characterized as "the world's next generation of software and services."

78.     In touting and promising adherence to the "don't be evil" rules, Williams had said that he would not use venture capitalist participation to pump up ICP. Less than a year later, that was exactly what he was doing.

**E.      Williams Repeatedly Represents That The ICP Tokens Of Defendants And Other Insiders Would Be Subject To Industry Standard Multi-Year Vesting Periods**

79.     As he raised funds and primed the market for an ICO open to the public, Williams made public representations to the effect that the ICO Tokens of Defendants and other insiders would be subject to lengthy, multi-year, industry standard vesting schedules that would prevent pump-and-dump and similar schemes.

80.     On February 7, 2018, for example, to address investor concerns about the introduction of the Strategic Investors into the mix, Williams wrote on the online forum Reddit:

Anyone imagining that [the Strategic Investors] are whales looking to flip their positions for a quick profit should consider this: tokens granted in exchange for 'strategic' round contributions come with a 3 year vesting schedule. *Just like team members whose incentive tokens are bound by even longer vesting schedules*, they too are laser focused on building the future. (Emphasis added.)

81.     Williams reinforced the point later that day, stating that "the idea of doing whale/insider sweetheart deals simply to benefit friends and associates is an anathema to us."

82.     On April 6, 2018, in response to concerns on Reddit regarding the anticipated reallocation of ICP from outsiders to insiders, Williams claimed:

Hey just to be clear, the team does not own the endowment. We have salaries, officers, lawyers, acquisitions etc to pay down for years. We have employee incentive plans but currently minority. Decisions were made with respect to helping the [F]oundation achieve its goals rather than personal desires for more tokens i.e. it's not like a startup where founders often own outsized chunks. We are a long term operation, which is why we did not dump all our tokens. (Emphasis added).

83.     Accordingly, Williams represented that team members' Tokens were subject to vesting periods that exceeded three years, that the Foundation would not engage in conduct "simply to benefit" insiders, and that Network insiders would not be allowed to "dump" their Tokens.

**F.     Williams Pumps Up The Tokens In Advance Of An ICO**

84.     Williams undertook enormous efforts, from 2019 to 2021, to pump up outside investor interest in the launch of the ICP Network and an anticipated ICO. As a *New York Times* article dated June 28, 2021, aptly observed, "[t]he project, years in the works, generated a lot of buzz ahead of its [ICO]."

85.     In a May 10, 2019, *Medium* article, for example, Williams gushed about the ICP Network's prospects, characterizing the "speed, capacity, and efficiency gains" the ICP Network would provide as "incredible" and "reimagin[g] software."

86.     In a December 13, 2019, *Medium* article, Williams stated that the ICP Network aimed to create a "NASA for decentralization" and described the team as "brilliant and rapidly growing."

87.     In the summer of 2020, the Twitter account for the ICP Network emphasized: "Billions of dollars are waiting to invest in the open web." A follow-on article promoted investment in the ICP Network, noting: "Financial backers see tremendous upside in the open web's ability to create financial opportunities for innovation that previously didn't exist. VCs are eager to deploy billions in capital to foster the decentralized web[.]"

88.     On August 28, 2020, in a *Medium* article titled "How Ethereum Could Be Supercharged by the Internet Computer Network," Williams stated that the ICP Network was "enter[ing] the final stretch before the launch of the public network." He added that these were "exciting times for project supporters and the Ethereum community, which provided initial funding in early 2017."

89.     In an April 19, 2021, tweet, Williams promoted the ICP Genesis Event as "the most anticipated launch in blockchain" history.

90.     On May 7, 2021, Williams led the "Genesis Event," an hours-long, road-show type presentation for the ICP Network. He claimed that, in 20 years, the ICP Network will be "humanity's primary compute platform for building software." Another San Francisco-based representative for the ICP Network, Michael Hunte, described the launch of the Network as "the dawn of the new open and free internet."

91.     Various media sources picked up on the hype. Business Insider and the Financial Times published stories on the ICP Network. A crypto-asset media outlet, The Block, declared that "[a]fter years of hype and anticipation," the ICP Network was "finally going live." It noted that the ICP Network's "developers and promoters claim that the new network can be the basis of a new, decentralized internet." The article further quoted Williams as claiming, "In 10 years, the wider tech community will realize that the Internet Computer is on a trajectory to one day become humanity's primary compute platform for building software, and the 'Open Internet' will predominate over Big Tech's closed proprietary system." The same quote appeared in a *Mashable* article about the ICP Network, and a similar quote from Williams appeared in a *Decrypt* article, which characterized the ICP Network as "much-anticipated."

92.     Seeking to capitalize on the hype, Williams ensured, in advance of the Network's

launch, that ICP Tokens would be available on the largest crypto-asset exchanges. In early May, Coinbase announced that ICP would be available on its exchange starting on May 10, 2021. Coinbase is the largest crypto-asset exchange in the United States. Based in San Francisco and incorporated in Delaware, it has more than 50 million users. In its announcement, Coinbase included promotional statements from Williams, including that ICP "represents the third major innovation in blockchain after Bitcoin and Ethereum."

93.     The ICP Tokens would also be listed on multiple other crypto-asset exchanges, including (among others) Binance, Huobi, OKEx, Kucoin, CoinList, CoinEx, and FTX. As one Twitter observer commented, "Major exchanges listing $ICP all at once, never happened before." The crypto-asset press reported that listing on multiple exchanges "reflected a carefully structured strategy by Dfinity that landed ICP tokens right into the conscience of everyday traders."

94.     These promotional efforts, as discussed further below, paid off handsomely for Defendants. On May 10, 2021, the price of ICP Tokens skyrocketed to above $700 per token, and the market capitalization of the Tokens surpassed $45 billion—in the same neighborhood as Mastercard, Bank of America, and PayPal, and among the highest of any crypto-asset. But while Defendants and other favored insiders reaped the benefits, earning billions of dollars for themselves, they prevented Kobayashi and other seed investors who had supported the ICP Network since the beginning from selling, thus excluding them from the market with catastrophic results because the high was short-lived and the bottom was very far down.

### III.     Defendants' Successful Interference With The Distribution Of Kobayashi's ICP Tokens At The Time Of Network Launch Prevents Him From Accessing or Selling Any Tokens

95.     Upon Network launch on May 10, 2021, Defendants caused the Foundation to completely restrict Kobayashi from accessing and selling his Tokens (and almost completely restricted any other seed investor from doing the same). To do so, Defendants caused the Foundation to breach its contractual obligations to Kobayashi in several ways, as detailed below. After the launch, Defendants caused another contractual breach by inducing the Foundation to eliminate Kobayashi's forthcoming access to his ICP Tokens. In these ways, Defendants also breached the fiduciary duties they owed Kobayashi as promoters and tortiously interfered with

Kobayashi's reasonable commercial expectations.

96.     On information and belief, part of what motivated Williams to induce the Foundation's following breaches was his desire to benefit himself in anticipation of incurring substantial liabilities under the terms of a token-transfer agreement with his children (the subject of the suit brought against Williams by his son) and in divorce proceedings with his wife.

**A.      Defendants Cause The Foundation To Misallocate Tokens In Favor Of Themselves In Breach Of The ICP Agreement**

97.     Upon launch of the ICP Network on May 10, 2021, the Foundation allocated approximately 469,213,710 ICP Tokens, according to a report released by Messari[1] that was later retweeted by a representative for the ICP Network. Most of the Tokens were not immediately accessible or tradeable—as discussed below, insiders were the only group that could effectively trade any Tokens upon launch. Setting aside salability, the total Token allocations among investor classes are set forth in the following table:

## ▶◀ MESSARI
### Genesis Token Allocation
Total token distribution on May 10 2021

| | Genesis Initial State Allocations | % | Number of Participants |
|---|---|---|---|
| Early Contributors | 44,575,228 | 9.50% | <50 |
| Seed | 115,986,694 | 24.72% | 370 |
| Strategic Partnerships | 32,845,140 | 7.00% | <50 |
| Presale | 23,295,828 | 4.96% | 110 |
| Strategic Partnerships | 17,795,770 | 3.79% | <50 |
| Community Airdrop | 3,763,448 | 0.80% | 50,000+ |
| Initial Community and Developer | 2,242,179 | 0.48% | <50 |
| Node Operators | 1,050,000 | 0.22% | 57 |
| Internet Computer Association | 20,000,000 | 4.26% | 1 |
| Team Members | 84,480,829 | 18.00% | 200 |
| Advisors and Other Third-parties | 11,239,705 | 2.40% | <50 |
| DFINITY Foundation | 111,938,888 | 23.86% | 1 |
| **Total** | **469,213,709** | **100.0%** | |

Data as of: May 10, 2021
Source: Dfinity, Messari

98.     As Messari reported, the Foundation itself was allocated nearly 25% of ICP Tokens, "team members" were allocated 18%, and advisors were allocated 2.4%. The ICA, a

---

[1] As described by the crypto-asset news site *Coindesk*: "Messari is an online database for the crypto industry that provides data insights, and research on crypto-assets through an open-source library of information. It seeks to be the crypto industry's equivalent of Crunchbase and the US Security and Exchange Commission's EDGAR database, which contains company registration statements and reports among other documents, all of which are publicly available."

company controlled by Williams, was allocated another 4.26%. This meant that ICP Network insiders were allocated, *at a minimum*, over 48% of the Tokens upon ICP Network launch. The percentage allocated to Network insiders may be substantially higher, as certain other categories, such as "Node Operators," likely include ICP Network insiders.

99.     The allocations by the Foundation constituted a plain breach of the ICP Agreement, which required that 78% of the ICP Tokens go to outside investors and capped the Foundation's allocation at 12.5%. The following charts illustrate the stark difference between what the Foundation was obligated to do and what happened at ICP's launch (all figures in the charts are approximate):

## TOKEN ALLOCATION:  2017 VS. 2021

|  | PROMISED ALLOCATION | ACTUAL ALLOCATION |
|---|---|---|
| Early Contributors | 9.5% | 9.5% |
| Seed/Main | 78% LOSER | 24.7% |
| Foundation's Endowment | 12.5% WINNER | 49.22% |
|  |  | 23.86% Foundation |
|  |  | 18% Team Members |
|  |  | 4.26% ICA |
|  |  | 3.1% Advisors, etc. |
| Venture Capital | | 10.8% |
| Presale | | 5% |
| Airdrop, etc. | | 1.4% |

//
//
//
//
//




100.    Despite being fully aware of the terms of the ICP Agreement, Defendants caused the Foundation to allocate the ICP Tokens in a manner that benefitted them greatly, giving them far more market power and opportunities to profit.

101.    By contrast, the wrongful allocation harmed Kobayashi and other seed investors who reasonably expected, based on the representations of Williams at the time of his investment and the express terms of the ICP Agreement, that the substantial majority of ICP Token holders would be from early investors who would be on a level playing field. Indeed, as detailed in Section IV, *infra*, the change in allocation allowed Defendants to effect a pump-and-dump scheme and earn tremendous returns on their investments.

**B.    Defendants Cause The Foundation To Impose Long-Term Vesting Periods On Kobayashi And The Other Seed Investors In Breach Of The ICP Agreement**

102.    Prior to the launch of the ICP Network on May 10, 2021, the expectation based on the plain terms of the Agreement was that, unlike insiders, who were supposed to be subject to vesting restrictions, outside investors would not be subject to vesting restrictions.

103.    Public representations were express on this point. In April 2018, one representative for the ICP Network, Dukakis Tejada, publicly stated that the Tokens "are not lokced [sic]" and could be used as any seed investor "please[d]" upon ICP Network launch. Another representative,

- 27 -

Moritz Fuller, echoed the sentiment, stating that the "Seed round tokens will be unlocked" when the ICP Network "launches[.] There is no locking/vesting for them."

104.    Mr. Fuller reiterated the point several times. For example, in May 2018, he stated it would "not be fair to set a lockup for them" given that seed investors had "been waiting more than a year for their tokens." And in December 2018, he stated "seed round investors aren't vested, so they can sell as soon as the network goes live."

105.    Accordingly, as of May 10, 2021, Kobayashi, like other seed investors, anticipated that he would gain access to *all* of his ICP Tokens free and clear of any alienability restrictions.

106.    As the ICP launch date approached, seed investors repeatedly requested further information on how to access and trade their Tokens. One seed investor inquired: "I haven't seen any further details or instructions about how us early participants will be able to access our ICP on Genesis. Please share." No less than five seed investors echoed the point.

107.    It was not until the morning of the launch date, on May 10, 2021, in a *Medium* article titled "How to Access 'Seed' and 'Airdrop' ICP Tokens and Participate in the Internet Computer Network," that Williams informed Kobayashi and the other seed investors that they would only be able to access approximately 2% of their Tokens at launch. Williams announced that seed investors

> will receive all of their ICP tokens at Genesis Unlock, but these will be staked inside 49 voting neurons within the NNS. Each neuron that is delivered will have a different "dissolve delay" configured by the NNS. This configures the minimum period required to unlock the ICP tokens staked inside. One of their neurons will have a dissolve delay of 0 days, allowing the staked ICP tokens to be unlocked immediately, if desired (subject to applicable AML/KYC verification). Another will have a dissolve delay of approximately 30 days, another of 60 days, another of 90 days, and so on. (Note: Configured dissolve delays may have some small random number of days added or subtracted by the NNS)

Accordingly, Kobayashi and the other seed investors learned for the first time on May 10, 2021—the day that ICP Tokens first became salable on exchanges—that they would only be able to sell 1/49th (approximately 2%) of their allocated Tokens at Network launch, and another 1/49th each month thereafter.

108.    The Foundation has conceded that Kobayashi, like the other seed investors, had no

- 28 -

1    notice of any vesting period, let alone a four-year period. On June 4, 2021, following Network

2    launch, Kobayashi asked high-level Foundation employee Timo Hanke: "Can you remind me

3    when and how the seed investors were informed of the 48 month lock up period?" Hanke, in an

4    email copying Williams, responded: "Seed participants were informed of the 48 month staggered

5    release only at launch, on May 10."

6         109.    This surprise restriction was an egregious breach of the Foundation's obligations

7    to Kobayashi and other seed investors, and was caused entirely by Defendants, who stood to

8    benefit greatly by limiting who could sell into the market in order to capture higher sale prices

9    before the value of ICP bottomed out.

10        **C.     Defendants Cause The Foundation To Implement Technological Roadblocks
         To Effectively Preclude Seed Investors, Like Kobayashi, From Claiming
11       Their ICP Tokens On May 10, 2021**

12        110.    In the same *Medium* article that announced that seed investor Tokens were subject

13   to vesting restrictions, Williams included a link to instructions (not previously disseminated)

14   describing how seed investors could access the few Tokens that had been made available. A post-

15   mortem research report dated June 28, 2021, released by crypto-asset intelligence service Arkham

16   Intelligence (the "Arkham Report") explained that "Seed supporters who viewed [the

17   instructions] eager to claim their tokens were confronted with pages of complicated technical

18   steps that many say they weren't able to complete."

19        111.    In fact, Defendants devised technological roadblocks, and caused the Foundation

20   to impose those roadblocks and other policies, to further delay and even prevent Kobayashi and

21   other seed investors from selling the few Tokens made available to them.

22        112.    The roadblocks were by design: Defendants' intent was to ensure that seed

23   investors, like Kobayashi, would not be able to access and sell their ICP Tokens, to reduce Token

24   supply, and to allow Defendants to capture high Token prices. Defendants induced the

25   Foundation to impose these roadblocks in breach of industry norms and in breach of the ICP

26   Agreement, which did not allow the Foundation to fail to provide Kobayashi with access to his

27   ICP Tokens based on contingencies not found in the Agreement. The misconduct also reinforces

28   that Defendants' tortious acts toward Kobayashi were in bad faith.

1

2

        **1.**        **Defendants Induced the Foundation to Delay the KYC Process Until the Launch Date—and Forced Kobayashi to Go Through the KYC Process Twice**

3        113.    *First*, seed investors were informed just before Network launch on May 10, 2021,

4  that they would have to submit information regarding their identities as part of a Know Your

5  Customer ("KYC") process to access their Tokens. As a result, seed investors were forced to

6  jump through hoops that delayed their access to their Tokens when time was of the essence. As

7  one seed investor posting on the ICP Network online forums observed:

8

9

10

> Come on Dfinity, you had almost 4.5 years to ask seed investors to do KYC. Are you really going to launch first and only then start asking them for information and start providing documentation for those who financed and enabled you in the first place? Seems quite dishonest actually.

11     114.    The ICP Agreement does not purport to impose any KYC requirement on

12  Kobayashi as a contingency for receiving an allocation of ICP Tokens. Indeed, the Foundation

13  did not require Kobayashi to even enter his name—let alone perform a full KYC process—at the

14  time he made his investment in February 2017.

15     115.    For Kobayashi, the KYC requirement was especially arbitrary: he had already

16  submitted KYC information to the Foundation in 2017 and completed all KYC requirements.

17  Kobayashi was nevertheless told by Hanke on May 28, 2021, that he would be required "to go

18  through KYC" again to access his ICP Tokens.

19

20

        **2.**        **Defendants Induced the Foundation to Permit Only Certain Types of Computers to Access the ICP Tokens**

21     116.    *Second*, on May 10, 2021, while Defendants were busy coordinating the sale of

22  billions of dollars' worth of ICP Tokens, seed investors discovered that they needed certain types

23  of computers to access their Tokens. Specifically, the Foundation instructed seed investors that

24  they needed to install special software "on Intel-based macOS and Linux computers."

25     117.    This meant, as the Arkham Report observed, that seed investors could not access

26  Tokens "on a Windows computer or newer Macs built with Apple M1 chips." On the launch date,

27  seed investors were forced to run out to buy new laptops. One seed investor stated on the ICP

28  Network's online forum: "I have bought a macbook (never used one before)."

- 30 -

3. **Defendants Induced the Foundation to Implement a Byzantine Token Access Process to Purposefully Delay Seed Investor Access to Their ICP Tokens**

118. *Third*, at the behest of Defendants, the Foundation adopted a byzantine, nine-step process that seed investors had to navigate to access their ICP Tokens.

119. The first step in the process was to install a program called Keysmith. That process, which sounds simple enough, involved (i) downloading a .tar file from the software developer GitHub, (ii) inputting no fewer than six commands into the command-line, and (iii) verifying that those commands returned certain results. As part of the process, the user had to confirm a command contained one of six specified 64-digit character strings.

120. That was step one. The remaining steps were no simpler and required, for example, seed investors to input dozens of additional command-line codes and verify output from those codes. Seed investors predictably struggled. At Network launch, seed investors desperately sought help, as reflected on the ICP Network's forums, where investors, for instance, wrote:

    a. "[W]hen I install keysmith I get this 'install: keysmith exists but is not a directory' and when I try to run keysmith I get '-bash: keysmith: command not found[.]' anyone can help me with what's up?"

    b. "[G]etting 'EOF while parsing a value at line 2 column 0' when trying to ping or create the message.json file (ubuntu 20.04). Btw. Can you create a discord server with a proper support channel? This is ridiculous ffs[.]"

    c. "Is it possible for the team to create an interface so that users without a technical profile can claim the seed tokens without problems, please? I don't like to play commandos when money is involved."

    d. "Hi! I follow the steps for claim seed participans [sic], but the KYC process I have an error, when I try to submit my info and documents appears an error 'Invalid Principal ID,' I try a lot of format, with passport, National ID card, Drivers liscense [sic], all, but always the same error…"

    e. "Yup there's going to be a lot of seed people that are unable to access until a better interface is out."

121.    These technical roadblocks were designed to impede seed investors from accessing their tokens and selling them on the open market.

### 4. Defendants Induced the Foundation to Implement an Error-Ridded Access Process to Purposefully Delay Seed Investor Access to Their ICP Tokens

122.    *Fourth*, the seed investors that could navigate the Token access instructions encountered errors and bugs that prevented them from completing the process. As the Arkham Report stated: "Besides being highly technical, the process appears to have been buggy. Many seed supporters who could decipher the steps say they ran into errors."

123.    Complaints where widespread, with one seed investor on the ICP Network forum observing: "The KYC page seems to be struggling, any likely resolution. It throws tons of 400 and 502 errors on the websocket polling."[2] Other investors concurred, noting numerous other issues.

### 5. Seed Investors Seeking Their Tokens Received Kafkaesque Support

124.    *Finally*, seed investors seeking to troubleshoot technical issues were given circular, Kafkaesque "support." When seed investors sought assistance on the ICP Network forum, for example, they were informed that the process was "highly technical" and were instructed to "submit a ticket." But when they submitted a ticket, they were told to ask for help on the forum—where they had started.

***

125.    In sum, Defendants in bad faith designed constraints imposed by the Foundation without any notice to seed investors, like Kobayashi, to prevent them from accessing their Tokens.

### D. Kobayashi Was Subjected To An Additional Six-Month Lockup On His ICP Tokens To Prevent Him From Accessing And Selling His Tokens

126.    In addition to the foregoing constraints, Defendants implemented and induced the

---

[2] A 400 error indicates that the server cannot or will not process the request due to something that is perceived to be a client error (for example, malformed request syntax, invalid request message framing, or deceptive request routing). A 502 error indicates that the server, while acting as a gateway or proxy, received an invalid response from the upstream server.

Foundation to accept technical measures that effectively imposed an additional six-month lockup on Kobayashi in violation of industry norms and the ICP Agreement. As part of the instructions detailed above, seed investors were told that they could access their Tokens only if they provided the twelve-word seed phrase that was supposed to have been shown to them more than four years earlier, when they initially made their investments.

127.    Kobayashi is an experienced crypto investor who takes security seriously and knows the importance of preserving private keys and seed phrases. When Kobayashi made his investment in February 2017, he was not able to access and save his phrase due to a bug in the ICP Chrome extension that was supposed to provide the phrase, a technical failure that violated industry norms and the terms of the ICP Agreement. Kobayashi is not alone: according to data obtained from ic.rocks[3] in 2021, approximately 34% of seed investors could not claim their Tokens:



128.    Kobayashi notified Williams promptly that he had been unable to obtain his seed phrase. In response, Williams repeatedly assured Kobayashi that his lost seed phrase was a non-issue that would have no impact on his ability to access and sell his ICP Tokens.

129.    In July 2017, for example, Kobayashi texted Williams: "So my Dfinity [T]oken

---

[3] Ic.rocks is a website that tracks various transactions and data related to the ICP Network.

1   can be recovered soon or before the [T]oken gets listed?" In response, Williams stated: "Don't

2   worry about your Tokens. We are changing the contracts to run Main differently. Will add errata

3   contract then."

4          130.   On October 26, 2017, Williams further reassured Kobayashi via text that he did

5   not need to worry about "private key issues" and that he could get an "official letter from the

6   foundation if it worries you."

7          131.   In December 2017, Williams connected Kobayashi with Tom Ding, a co-founder

8   of Dfinity USA who lives in San Francisco, so that Kobayashi could provide the necessary

9   information for the "errata," which Kobayashi promptly provided.



17         132.   Indeed, at all relevant times, Defendants and the Foundation could verify

18  Kobayashi's rights by tracing investment to his Ethereum wallet. (A wallet is an electronic place

19  to store information, such as crypto-assets; Kobayashi's wallet has a unique, traceable signature.)

20         133.   The Network launch date, however, came and went and Kobayashi was provided

21  with neither his Tokens nor his seed phrase. This meant Kobayashi could not sell a single ICP

22  Token in the ICO.

23         134.   Kobayashi yet again asked about the status of his access to his Tokens, the value

24  of which was plummeting. On May 13, 2021, acting at the request of the Foundation, Kobayashi

25  signed an affidavit and agreement to indemnify the Foundation in certain limited circumstances.

26  Kobayashi was told that, in exchange for signing this agreement, he would at last receive his

27  Tokens. Indeed, the affidavit and agreement provides it was "made for the purpose of inducing

28  the Foundation and its agents . . . (i) to refuse to recognize any person or entity other than

[Kobayashi] as the holder of the Seed Phrase and the Seed Tokens, (ii) to refuse to make any delivery of the Seed Tokens to any person or entity other than [Kobayashi] and (iii) to refuse to take any other action with respect to the Seed Tokens pursuant to the request or demand of any person or entity other than [Kobayashi]." It thus reflected that the Foundation had agreed to provide Kobayashi with his Tokens. Yet still Kobayashi did not receive his Tokens or a seed phrase.

135.   On May 27, 2021, Kobayashi contacted the Foundation to follow-up, stating: "It's been a couple of weeks since I sent the email below and I still haven't heard back from you or [Williams]. Is it a coincidence that I have not received any response from both of you, or are you guys just simply ignoring me?" He added: "I'm extremely disappointed that you decided to treat one of your largest seed investor [sic] and early supporters in this manner."

136.   Hanke finally responded the next day, informing Kobayashi—for the first time—that because Kobayashi did not have his seed phrase, his ICP Tokens would be subject to an additional *six-month* lockup period. According to Hanke, this restriction, which was neither previously disclosed nor part of the ICP Agreement, had been baked into the software developed by Defendants:

> As you know from blog posts, all seed donation participants receive a basket of 49 neurons with dissolve delays from 0 to 48 months . . Seed folks normally claim their neurons from the genesis token canister (GTC). The GTC is mirroring the state of the public Ethereum smart contract that recorded all token allocations and access rights in 2017. The GTC is programmed such that for a period of 6 months anyone with the original seed can claim their tokens in a completely trustless way by signing with their original key. If neurons remain unclaimed for 6 months then they go to foundation control so that the foundation can manually determine the rightful owner and assign the neurons to a new key of the rightful owner. This is the feature of the GTC that we rely on in your case. If someone has lost their seed phrase they can simply wait 6 months and then have the foundation re-assign the neurons to a different address.

137.   Citing this supposed technical limitation—which Defendants had created and induced the Foundation to adopt—Hanke told Kobayashi: "There is no particular urgency to do anything immediately. We have to wait 6 months before the GTC detects that your neurons are unclaimed and then gives control to the foundation."

138.   Incredibly, Hanke asked that Kobayashi "put in a good word" for the Dfinity team in the "Dfinity community" to the extent that there was "negative chatter circulating."

139.   Kobayashi responded by asking if Hanke could "remind [him] when and how the seed investors were told … about the 6 month wait period . ?" He added: "I'm an investor and the way I am being treated here is just plain wrong... even in crypto-verse standards."

140.   On June 6, 2021, Hanke admitted: "There was no public announcement about the 6 month wait period." Nevertheless, Hanke asserted that, in his view, "seed participants were treated not only fairly but in fact very (or even extremely) favorably." In support, Hanke claimed that both "strategic" and "presale" investors' tokens were subject to "real lockups, meaning that it is not a staggered release (i.e. they have to wait the full term before even the first token is released)."

141.   Of course, Kobayashi had been treated far from fairly—due to Defendants' misconduct, he lost out on billions of dollars in earnings. But, at least, Kobayashi had an expectation that he would receive his ICP Tokens at some point. As he would find out, Defendants would not even permit that, in malicious disregard of his rights. *See* Section V, *infra*.

**E.   Defendants' Tortious Efforts Succeeded In Preventing The Seed Investors From Accessing And Selling Their Tokens On May 10, 2021—Allowing Defendants To Effectively Corner The ICP Token Market**

142.   Defendants' tortious efforts, individually and collectively, succeeded in preventing seed investors from accessing and selling their Tokens in connection with the ICO. Kobayashi sold zero Tokens as a result of the misconduct; other seed investors fared no better.

143.   Absent the vesting restrictions, seed investors should have been able to sell approximately 116 million ICP Tokens on May 10, 2021. Even with the vesting restrictions, they should have been able to sell approximately 2.4 million Tokens.

144.   Instead, as shown in a research report from Cycle Dao published on June 29, 2021, seed Investors *and* early contributors—another category of investor that should have been able to access another 44.5 million Tokens—*combined* to access a mere *1,660* Tokens on May 10, 2021.

145.   By any measure, the seed investors were excluded from the market. Insiders had access to hundreds of millions of Tokens on May 10, 2021; seed investors may as well have not

traded anything. As one seed investor on the ICP Network forum concluded on May 10, 2021: "They're making it as difficult as possible for seed investors to claim their tokens, so they wont dump the price."

146.    Blocking out the seed investors from trading meant that the market was rigged so that only insiders could dump Tokens on May 10, 2021. Defendants represented to Kobayashi, as noted, that the Strategic Investors and other presale investors were fully locked up on May 10, 2021; according to Messari, they were locked up until May 30, 2021. Meanwhile, so-called airdrop investors were on a 12-month vesting schedule and at least one has reported that it did not receive any Tokens until well after May 10, 2021.

147.    The upshot, based on available data and as shown in the below table, is that Defendants and other insiders controlled approximately 98.6% of the ICP Token supply on May 10, 2021 (and potentially more, given that investors categories like "Initial Community and Developer" and "Node Operators" likely refer to, or at least include, insiders).

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

| Group | Disclosed Allocation | ICP Available on May 10, 2021 | Share of ICP Available on May 10, 2021 |
|---|---|---|---|
| *Predominately Outside Investors* | | | |
| Early Contributor and Seed Investors | 160,561,922 | 1,660 | 0.00% |
| Airdrop Investors | 3,763,448 | 0 | 0.00% |
| Strategic Investors | 50,640,910 | 0 | 0.00% |
| Presale Investors | 23,295,828 | 0 | 0.00% |
| Subtotal | 238,262,108 | 1,660 | 0.00% |
| *Likely Insiders* | | | |
| Initial Community and Developer | 2,242,179 | 2,249,179 | 0.97% |
| Node Operators | 1,050,000 | 1,050,000 | 0.45% |
| Subtotal | 3,292,179 | 3,292,179 | 1.43% |
| *Insiders* | | | |
| Internet Computer Association | 20,000,000 | 20,000,000 | 8.66% |
| Team Members and Dfinity | 196,419,717 | 196,419,717 | 85.05% |
| Advisors and Other Third Parties | 11,239,705 | 11,239,705 | 4.87% |
| Subtotal | 227,659,422 | 227,659,422 | 98.57% |
| *Total* | 469,213,709 | 230,953,261 | 100.00% |

## IV.   DEFENDANTS EXECUTE A PUMP-AND-DUMP SCHEME, SELLING ICP TOKENS FOR FANTASTIC PROFITS BEFORE THE PRICE OF THE TOKENS CRASHES

### A.   The Price Of ICP Tokens Skyrockets In Early Trading Before Plummeting

148.   While Kobayashi and other seed investors were desperately trying to access their meager slice of Tokens, Defendants and other insiders sold tremendous amounts of ICP Tokens at outrageous profit, which soon caused the price of the ICP Tokens to bottom out. (Those sales are discussed further below.)

149.    In the opening hour of trading on May 10, 2021, the ICP Token price skyrocketed to $731 per token. Over the next 90 minutes, the price fluctuated but continued to hit highs of over $600 per token.

150.    By the two-hour mark, the price of ICP Tokens had decreased considerably, dropping to approximately $250 per token before rising and hovering just around $400-$500 per token for hours. The chart below shows the price of ICP on Coinbase on May 10, 2021, in Eastern Standard Time.



151.    It did not last. By May 24, 2021, the price had fallen below $150 per token. By June 10, 2021, the price had fallen to approximately $80 per token. By the following week, the price had fallen to approximately $50 per token. The chart below shows the price of ICP Tokens from May 10 to July 1, 2021.

//

//

//

//

//

//



152.    ICP Tokens have continued to decline in value and currently trade at approximately $6 per token at very low volume. The prospects for a recovery appear dim, as it seems that investors are exiting their positions as fast as their Tokens vest. Indeed, the ICP Network has accomplished nothing of note under Williams's stewardship. Rather than developing a successful product, Williams has delved into the quixotic, for example, "conjur[ing] up an oddball plan to speed up the end of the Russian invasion of Ukraine," according to the crypto press.

**B.    Defendants And Other Insiders Dominate Early Selling Of ICP Tokens, Apparently By Disregarding Or Circumventing Vesting And Regulatory Restrictions**

153.    Just as the hype leading up to the launch of the ICP Network attracted media attention, so too did ICP's collapse. As the *New York Times* reported on June 28, 2021:

> [B]y last week, ICP's value had tanked by about 95 percent. Even in the famously volatile crypto market, ICP stands out. The stunning climb and crash of this prominent project has market watchers puzzling about what happened and who may have profited.

154.    The *New York Times* continued: "ICP fell more than any of the top 100 crypto-assets by market cap, worse than even the decline in Shiba Inu Coin, a joke token based on the meme crypto-asset Dogecoin, which itself was intended to mock crypto and internet culture." The

newspaper further observed: "In other words, a postmodern comedy project with no technological proposition backing it experienced less distress than the token underlying Dfinity's grand goals and that's a serious matter."

155.    The data shows that Token dumping by Defendants, the Foundation, and other insiders was responsible for the collapse of ICP. And it was Defendants that designed the technology and induced the Foundation to implement the polices that made it all happen.

156.    Indeed, as explained further below, nearly all selling on May 10, 2021, was necessarily done by Network insiders because they controlled nearly 100% of the Tokens. Network insiders continued to have outsized control over Token selling in the weeks after May 10, 2021.

157.    The Arkham Report reported its conclusion that, from May 10 to June 28, 2021, Network insiders deposited at least 18.9 million ICP (approximately $3.6 billion worth at the time) to four crypto-asset exchanges, with Coinbase receiving at least 2 million Tokens on May 10, and another 4.7 million on June 15. According to the Arkham Report, the Foundation and/or Dfinity USA directly deposited approximately 8.3 million Tokens on exchanges and transferred another 34.1 million Tokens to other Network insiders, who themselves deposited approximately 10.7 million of that ICP on exchanges. Neuron[4] 4000, which is controlled by the Foundation and/or Dfinity USA, and was responsible for transferring over 4.4 million ICP, including 3.2 million ICP directly, to crypto exchanges between May 10 and 12, 2021. The Arkham Report estimated that deposits directly from the Foundation, Dfinity USA, and other suspected ICP Network insiders accounted for approximately 75% of total ICP Token deposits to exchanges during this period.

158.    Data from ic.rocks validates the findings of the Arkham Report. That data shows that, on May 10, approximately 4 million ICP tokens were sold on Coinbase. Nearly all of those Tokens were sold by just twenty different accounts, which received their Tokens directly from the Foundation and/or Dfinity USA.

159.    Another way in which Network insiders sold was through the ICA. Formed in

---

[4] A "Neuron" is ICP Network parlance for an account that holds Tokens.

January 2021—just months before the launch of the Network—the ICA purports to be an independent members organization that advocates for the ICP Network. It is in reality under the control of Williams, who at all relevant points was its president.

160.    Before Network launch the Foundation transferred 20 million Tokens to the ICA. This enabled the Foundation to sell ICP Tokens into the ICO. The transfer of Tokens to the ICA occurred on May 3, 2021, a mere week before Network launch.

161.    Review of data publicly available on ic.rocks shows that Neurons associated with the ICA—including Neurons 3005 and 3006—transferred ICP Tokens to crypto-asset exchanges throughout May 2021. Williams apparently took the position that the ICA was under no trading restrictions, regulatory or otherwise. Upon information and belief, Williams directly profited from those sales.

**C.      ICP Network Insiders Misrepresented Or Disregarded Selling Restrictions To Take Advantage Of High ICP Token Prices**

162.    Before Network launch, as noted, Williams made numerous representations that Network insiders were bound by lengthy vesting schedules and would not dump their Tokens after an ICO. In his June 6, 2021, email to Kobayashi, which copied Williams, Hanke doubled down, asserting that "[T]eam members" were subject to "pretty standard" vesting periods—"employees generally have 4 year vesting in this industry."

163.    The evidence, however, shows that Defendants and other insiders either misrepresented or disregarded the multiyear vesting restrictions that were purportedly in place and simply ignored any applicable regulatory restrictions. There is no other way to explain how Network insiders could have possibly come to dominate nearly 100% of Token trading on May 10, 2021, and nearly as much in the weeks thereafter.

164.    It is dubious that any vesting restrictions existed in the first place—or at least that were meaningful. Indeed, Williams's post hoc explanations for the catastrophic decline in ICP Token price have never been coherent, plausible, or consistent with his prior representations.

165.    On May 18, 2021, a twitter user observed that Williams had "built a community of bagholders" and asked: "who supplied liquidity at launch?" Williams responded: "For regulatory

- 42 -

reasons, the foundation and key early team members were locked up at launch for a week (it's the reverse of what people think)." The implication of Williams's statement was that these stakeholders already held significant Tokens, albeit subject to a one-week regulatory lockup.

166.   Confirming the implication, on May 26, 2021, Williams admitted via twitter that the "Foundation didn't vest itself." In a June 11, 2021, *Medium* article, he attributed the catastrophic decline in ICP Token Price to "irresponsible token divesting stemm[ing] from former employees," and on July 2, 2021, posited: "Where did the mysterious supply come from? This is not difficult. There are probably 250 former and current team members that had accumulated vested tokens." Through these statements, Williams effectively admitted that ICP Network personnel flooded the market with Tokens even though they were supposedly subject to multiyear vesting periods.

167.   ICP agents typically received vested Tokens one year after beginning their employment, provided that the trading volume of ICP exceeded $20 million. Given that the trading volume of ICP for each day beginning on May 10, 2021, has easily exceeded that $20 million threshold, ICP Network personnel hired prior to May 11, 2020, have had the unrestricted right to sell their Tokens since the launch of the ICP Network.

168.   To the extent Williams was himself under any regulatory or contractual restriction that prevented him from selling, it appears he circumvented those restrictions.

169.   One way he appears to have circumvented those restrictions is through his children, as revealed by the recently unsealed complaint in the suit by Dominic Williams's son, Sacha Williams, over Dominic Williams's wrongful conversion of Sacha's Tokens. The complaint reveals that, in the *first week of ICP Token trading*, Dominic Williams *sold* a portion of Sacha's Tokens. Dominic Williams is treating cash proceeds as well as the remaining Tokens as if they are under his control.

170.   And Williams has never claimed that Dfinity USA was under any restriction that prevented it from selling.

171.   Williams's other tactic has been to try to pin the blame on outside forces to deflect from the wrongdoing of Defendants, who caused the Foundation to implement the policies that

caused this catastrophe. For example, Williams blamed the price downturn on selloffs by seed investors in his June 11, 2021, *Medium* article and on Strategic Investors, presale investors, early contributors, and airdrop investors in his July 2, 2021 Reddit post. But, as already demonstrated, these investors had virtually no access to ICP Tokens at Network launch and at best limited access thereafter.

172.    Commentors on Reddit made this point, with one pre-sale investor stating: "Pre-sale didn't get our tokens until after a month, so don't fucking blame us. Most seed investors are still trying to figure out how your CLI works. Pre-sale got doubly fucked over, paying 70x more than seed because everything was 'so close to launch.' Also, in what universe does the team vest before investors?" A community airdrop investor likewise explained: "Airdrop participants didn't get their tokens at launch either. They had to wait until the price was around 100$ if I'm not mistaken. I remember it was two or three days after the Coinbase Binance launch."

173.    And in an interview with the crypto-asset media source *CryptoSlate* published on September 25, 2021, Williams implausibly attributed the downturn to generic market forces, stating that other crypto-assets, such as Bitcoin, lost value coincident with the ICO and "the sudden change in sentiment had an outsize effect on ICP, because it is a new token." The claim holds no water—ICP has significantly underperformed crypto-other assets because it is built on a fraud. Meanwhile, in the same interview, Williams confirmed he has "sold" ICP Tokens personally and continues to do so.

174.    Most recently, to divert attention away from his own misconduct and punish his detractors, Williams has again sought to change the rationale for ICP's price collapse by blaming the *New York Times* and Arkham Intelligence for exposing that he "orchestrated a crypto scam." The defamation suit filed at Williams's direction is frivolous; it is of course the crypto scam that Williams actually orchestrated that caused the price of ICP to collapse.

175.    And Williams, through Crypto Leaks, has sought to attack competitors, lawyers pursuing claims against him, and reporters investigating his misconduct.  Crypto Leaks purports to be a website run to "expose . . . corruption," but is in reality a poorly disguised front for Williams to advance his own agenda:  the articles on the website transparently try to bolster ICP

while at the same time levying highly personal attacks against Williams's perceived enemies, such as reporters at the *New York Times*.

176. Sudden departures among ICP Network's senior leadership further confirm the wrongdoing at issue here. Based on averments in the Sacha action against Dominic Williams, Williams fled to Switzerland no later than August 2021. Saabar, former general counsel and interim COO (who worked in California), resigned in December 2020. Her replacement, Jennifer Sum (who also worked in California), lasted in the general counsel role all of 8 months, starting in January 2021 and resigning in August 2021. Nicholas Cooper, the Head of Finance, resigned in July 2021.

177. Ultimately, there is no innocent explanation for what happened here given the degree of control the Network insiders had over the market. Defendants' deflections and refusal to admit culpability is simply indicative of a guilty mind.

**V.    Defendants Induce The Foundation To Steal Kobayashi's ICP Tokens After Kobayashi Tries To Assert His Rights**

**A.    Williams Agrees To Compensate Kobayashi For His Losses, Only To Renege At The Last Moment**

178. The Foundation, as noted, had acknowledged that Kobayashi would eventually have access to his Tokens, albeit not before an unjustifiable lockup period had passed. Through text correspondence at the end of July 2021, Williams confirmed to Kobayashi that he would receive all 5,188,487 of his ICP Tokens and be eligible to sell 635,325 of those Tokens immediately, with the remaining Tokens subject to the 48-month vesting schedule.

179. Kobayashi's inability to sell his Tokens, however, had destroyed the bulk of the value of his ICP Tokens. So, to resolve the issues set forth in this Complaint, the parties discussed compensating Kobayashi for the losses attributable to his inability to sell.

180. Negotiations, however, failed to resolve the dispute. Feeling slighted and vindictive that he had failed to secure a settlement on his terms, Williams decided he would maliciously punish Kobayashi, one of his first supporters, for having the gall to complain about Williams's mistreatment of seed investors.

//

**B.      Defendants Maliciously Induce The Foundation To Steal Kobayashi's Tokens As A Punishment**

181.    On November 8, 2021, Williams revealed his plan to punish Kobayashi in a *Medium* article titled "NNS Proposal to End the Imminent Unclaimed Seed Neuron Sweep." In the article, Williams stated that the Foundation had pre-Network launch implemented a mechanism that would go into effect two days later on November 10, 2021, and finally provide unclaimed Tokens to seed investors who could not access their Tokens because they did not have their seed phrases.

182.    Williams, however, disclosed that the Foundation intended to *eliminate* the mechanism for all but four handpicked investors. The purported justification for the elimination related to owner identification: Williams claimed the Foundation was concerned about returning unclaimed Tokens to the proper claimant. According to Williams, the four investors would still receive their Tokens because the Foundation had been able to verify the "legitimacy of their claims" and the individuals "have accepted the process" and "shown good moral character." Kobayashi was not one of the four individuals—even though Defendants and the Foundation had long acknowledged Kobayashi's entitlement to his ICP Tokens. The true rationale for eliminating the mechanism was borne not out of concerns about owner verification, but out of malice and spite for Kobayashi, who had complained about the process because he had lost the bulk of his investment, and thus, in Williams's mind, neither "accepted the process" nor "shown good moral character."

183.    To give the scheme a veneer of propriety, Williams couched the plan to eliminate the mechanism as a "proposal" from the Foundation to the ICP Network investment community that could be voted on and, ostensibly, accepted or rejected. But the vote was a sham, as Williams controls the vote, and the proposal itself was motivated by malice for Kobayashi. Indeed, the supposed "voting power" of any Token holder is directly correlated with the number of ICP Tokens the holder owns and insiders own the most Tokens. Unsurprisingly, "proposals" set forth by the Foundation are rubber stamped. Review of available data from late 2021 on ic.rocks showed that the Foundation had put forth thousands of governance proposals to be voted on by

the investment community. Virtually all of the proposals passed by a margin of over 99%. The majority vote is *always* aligned with the votes of the Foundation.

184.    The vote to eliminate the mechanism to finally give Kobayashi access to his Tokens was no exception. The "voting period" was open for 24 hours. There were over 43 *million* votes in favor of eliminating the mechanism and a mere 23 *thousand* against. Of course, investors like Kobayashi that could not access their Tokens could not vote, not that it would have mattered, as the vote was rigged from the start.

185.    Indeed, to ensure that the measure would pass, Williams changed the Foundation's voting rules in two significant ways immediately prior to opening the "voting period." First, to pass a proposal, the Foundation historically required an absolute majority of total voting power (over 50%) in favor; early morning on November 8, 2021, at the direction of Defendants, the Foundation changed the rules such that a proposal would be adopted if as little as *3%* of the total voting power voted in favor. Second, to pass a proposal, the Foundation historically required the voting period to be open for 48 hours for most types of proposal; early morning on November 8, 2021, at the direction of Defendants, the Foundation changed the rules such that a proposal could be adopted after a voting of period of only 24 hours. In these ways, the Foundation, at the direction of Defendants, left nothing to chance and guaranteed that it would eliminate Kobayashi's ability to access his Tokens.

186.    And, although undisclosed to the public, the four individuals who Williams handpicked to receive their Tokens were Williams's personal friends—indeed, three of the four were former co-workers. This further illustrates that the ICP Network is not decentralized. The decision to return the Tokens was simply about Williams helping his friends and had nothing to do with concerns over ownership verification or proper Network governance. Indeed, like Kobayashi, all four individuals are highly sophisticated in the crypto-space, understand the import of seed phrases, and could not access their Tokens through no fault of their own, but rather due to the Foundation's buggy software. But, unlike Kobayashi, the four were personal friends with Williams, so they received their Tokens.

187.    However this is sliced, it was wrong and malevolent. Nothing in the ICP

Agreement as originally drafted permitted the Foundation to prevent Kobayashi from accessing his Tokens, whether under the guise of a vote by investors or otherwise. And the agreements Kobayashi and the Foundation reached on the Foundation providing access to his Tokens— whether construed as an amendment to the ICP Agreement or a separate agreement—certainly did not permit the Foundation to take steps to frustrate that obligation. But Williams and Dfinity USA nevertheless went ahead and maliciously acted to frustrate the obligation, including at least by devising the "proposal" to eliminate the mechanism, encouraging votes in favor of the proposal, and voting in favor of the proposal themselves.

188.    These most recent acts taken by Defendants against Kobayashi were part and parcel of their misconduct toward Kobayashi throughout, which sated the pettiness and greed of Williams. By eliminating the mechanism, Defendants, who control the technology behind the ICP Network, have effectively stolen Kobayashi's Tokens, which remains in a Neuron controlled by them.

## VI.    But For Defendants' Egregious Misconduct, Kobayashi Would Have Sold His ICP Tokens For Substantial Profits

189.    Kobayashi eagerly awaited the launch of the ICP Network and sought to sell his ICP Tokens post-launch. But for Defendants' misconduct, Kobayashi would have sold his ICP Tokens, for hundreds of millions of dollars.

190.    Likewise, had Kobayashi been given access to some portion of his Tokens on and after May 10, 2021, he would still would have been able to sell his Tokens for a similarly substantial profit.

191.    But not only was Kobayashi deprived of his ability to sell on May 10, 2021, he remains unable to sell any ICP Tokens today and has no reasonable prospect that he will ever be allowed to sell them. By any measure, Kobayashi has suffered substantial damages because of Defendants' egregious misconduct.

//

//

//

COMPLAINT

1

## CAUSES OF ACTION

2

### FIRST CAUSE OF ACTION
**Tortious Interference with Contract**
**(Against Defendants)**

3

4
192.    Kobayashi incorporates the allegations above.

5
**1.    The Non-Party Foundation Owes Kobayashi Contractual Obligations**

6
193.    Kobayashi and the non-party Foundation are party to the ICP Agreement, which is

7
a legally binding and enforceable agreement supported by good consideration. Kobayashi has

8
materially performed all of his obligations thereunder.

9
194.    Dfinity USA is in all respects a separate legal entity from the Foundation.

10
195.    Williams performed the tortious acts described in this Complaint in his capacity as

11
the CEO of Dfinity USA and/or in his personal capacity and in furtherance of his own private

12
pecuniary interests in violation of his duties to both the Foundation and Dfinity USA and/or in

13
violation of applicable law. Kobayashi further alleges that Williams (i) engaged in the tortious

14
acts described in this Complaint to capture personal wealth at the expense of Dfinity USA, the

15
Foundation, and seed investors, such as Kobayashi and (ii) did capture for himself wealth that,

16
but for his actions, would have benefited Dfinity USA, the Foundation, and seed investors, such

17
as Kobayashi.

18
196.    Further, Defendants' acts were at all times malicious and in bad faith.

19
197.    Under the ICP Agreement, the obligations the Foundation owes Kobayashi include

20
the following:

21
198.    *First,* the Foundation was required to allocate Tokens on Network launch in

22
accordance with paragraph 33 of the Agreement, including by allocating 78% of Tokens to Pool

23
A investors and 12.5% to the Foundation.

24
199.    *Second*, the Foundation was required to allocate Tokens that were free and clear of

25
alienability restrictions, including vesting and lockup restrictions.

26
200.    *Third*, the Foundation could not make access to the Tokens contingent on

27
obligations not found in the Agreement, including on completing a KYC process; accessing

28
Tokens through "Intel-based macOS and Linux computers" only; navigating access instructions

- 49 -

intentionally designed to be so obtuse and difficult to complete that doing so would delay access to the Tokens; and bypassing bugs intentionally inserted into the process to delay access to the Tokens; all while navigating circular "troubleshooting" advice that was intended to be unhelpful.

201. *Fourth*, the Foundation was obligated to provide Kobayashi with access to his 5,188,487 Tokens at Network launch and could not withhold those Tokens based on its own failure to provide a seed phrase that Kobayashi could access and save. To the extent there was any doubt on this point, the Foundation through its subsequent conduct amended the ICP Agreement such that it became obligated to provide, pre-Network launch, the Tokens to Kobayashi irrespective of the seed phrase or, in the alternative, arrived at a new agreement with Kobayashi to the same effect. That subsequent conduct included:

- On July 12, 2017, Kobayashi asking, "So my Dfinity [T]oken can be recovered soon or before the [T]oken gets listed?" and Williams responding on behalf of the Foundation: "Don't worry about your Tokens. We are changing the contracts to run Main differently. Will add errata contract then."

- On October 26, 2017, Kobayashi stating, "Please fix my private key issues before listing," and Williams responding on behalf of the Foundation: "Don't worry abt ur private key issues, all is fine. Can get you official letter from the foundation if it worries you. Of course, your seed investment worth a lot now."

- In December 2017, the Foundation asking for and Kobayashi providing "data for the errata" so that the Foundation could provide him with his Tokens irrespective of his Seed Phrase.

202. At worst, the Foundation was obligated to provide the Tokens post-Network launch, as confirmed by the following:

- On May 13, 2021, Kobayashi signing the affidavit and agreement to indemnify the Foundation on the promise that it would provide the Tokens.

- On May 28, 2021, Hanke on behalf of the Foundation promising that Kobayashi would receive his Tokens in November 2021, which Williams on behalf of the Foundation later re-confirmed in July 2021, as did Dfinity counsel subsequently.

Each Defendant Knew of the ICP Agreement

203.     Each Defendant knew about the ICP Agreement, which upon information and belief is a form agreement and contract of adhesion drafted by the Foundation that each and every seed investor entered into with the Foundation. Defendants were at all relevant times aware of Kobayashi's Agreement, including through their relationship to the ICP Network. Defendants, including through their relationship to the ICP Network, were also aware of the amendment to the Agreement, or, in the alternative, a separate agreement reached between the Foundation and Kobayashi, regarding providing Kobayashi with access to his Tokens irrespective of a seed phrase.

### 2.     Defendants Intentionally Interfered with the Foundation's Legal Obligations

204.     Defendants intentionally induced the Foundation to breach the obligations owed to Kobayashi and knew that substantial interference with the ICP Purchase Agreement would result.

205.     Defendants induced at the very least the following breaches:

206.     *First*, Defendants induced the Foundation to allocate Tokens on Network launch in breach of paragraph 33 of the Agreement. As a result of Defendants' inducements, the Foundation, among other things, allocated far less than 78% of Tokens to outside investors and far more than 12.5% to the Foundation, as well as to other insiders. Doing so diluted Kobayashi's investment and also killed the promise of a decentralized ICP Network. Among other things, Defendants designed, implemented, and induced the Foundation to adopt the technology and policies that controlled Token allocation.

207.     *Second*, Defendants designed, implemented, and induced the Foundation to adopt technology and policies imposing alienability restrictions on Kobayashi's Tokens, including a four-year vesting period and six-month lockup, in breach of the ICP Agreement.

208.     *Third*, Defendants designed, implemented, and induced the Foundation to adopt technology and policies that made access to the Tokens contingent on obligations not found in the Agreement, including on completing a KYC process; accessing Tokens through "Intel-based macOS and Linux computers" only; navigating access instructions intentionally designed to be so obtuse and difficult to complete that doing so would delay access to the Tokens; and bypassing

bugs intentionally inserted into the process to delay access to the Tokens; all while navigating circular "troubleshooting" advice that was intended to be unhelpful. Forcing Kobayashi to complete a KYC process coincident with Network launch was in particular unjustifiable and arbitrary given that Kobayashi had already completed a KYC process before Network launch.

209. *Fourth*, Defendants designed, implemented, and induced the Foundation to adopt technology and policies that prevented Kobayashi from accessing his Tokens at all, including by withholding Kobayashi's access to his Tokens based on the Foundation's own failure to provide a seed phrase that Kobayashi could access and save in accordance with the ICP Agreement and later by eliminating the mechanism designed to give Kobayashi access to his Tokens irrespective of a seed phrase.

### 3. Defendants Successfully Induced the Foundation to Breach the ICP Purchase Agreement

210. As a result of Defendants' misconduct, and although Kobayashi has complied with the material terms of the ICP Agreement, Defendants successfully induced the Foundation to materially breach the ICP Agreement.

### 4. Kobayashi Has Suffered Harm Due to Defendants' Misconduct

211. As a result of Defendants' misconduct, Kobayashi has suffered damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Tortious Interference with Prospective Economic Advantage
### (Against Defendants)

212. Kobayashi incorporates the allegations above.

213. Kobayashi brings this claim in addition to and in the alternative to his claim for tortious interference with contract.

### 1. Kobayashi and the Foundation Formed an Economic Relationship with the Prospect of Future Economic Benefit to Kobayashi

214. Dfinity USA is in all respects a separate legal entity from the Foundation.

215. Williams performed the tortious acts described in this Complaint in his capacity as the CEO of Dfinity USA and/or in his personal capacity and in furtherance of his own private

1    pecuniary interests in violation of his duties to both the Foundation and Dfinity USA and/or in

2    violation of applicable law. Kobayashi further alleges that Williams (i) engaged in the tortious

3    acts described in this Complaint to capture personal wealth at the expense of Dfinity USA, the

4    Foundation, and seed investors, such as Kobayashi and (ii) did capture for himself wealth that,

5    but for his actions, would have benefited Dfinity USA, the Foundation, and seed investors, such

6    as Kobayashi.

7        216.    Further, Defendants' acts were at all times malicious and in bad faith.

8        217.    Kobayashi formed an economic relationship with the Foundation before Network

9    launch that should have resulted in his receipt of ICP Tokens. That relationship existed even if the

10   Foundation and Kobayashi were not bound by contract, in that Kobayashi used funds to purchase,

11   and the Foundation accepted those funds in exchange for, the prospective delivery of ICP Tokens

12   at Network launch. Indeed, Kobayashi transferred to the Foundation, and the Foundation

13   accepted, 15,000 ETH for the prospective delivery of 5,188,487 ICP Tokens upon Network

14   launch, as further confirmed by a digital receipt.

15       218.    This business relationship was reasonably likely to benefit Kobayashi because,

16   among other things, it would allow Kobayashi to capture the appreciation in the value of ICP

17   Tokens that the Foundation and Kobayashi reasonably expected.

18       219.    As part of the economic relationship, Kobayashi reasonably expected the

19   following:

20       220.    *First*, that the Foundation would allocate Tokens on Network launch in accordance

21   with Williams's communications to Kobayashi, including by allocating 78% of Tokens to

22   investors like himself and 12.5% to the Foundation.

23       221.    *Second*, that, consistent with industry norms, Kobayashi would be allocated

24   Tokens that were free and clear of alienability restrictions, including vesting and lockup

25   restrictions. Indeed, representatives for the ICP Network specifically said that his Tokens would

26   not be subject to any such restrictions.

27       222.    *Third*, that Kobayashi would be able to access his Tokens consistent with industry

28   norms and would not be subject to arbitrary and obfuscatory barriers designed to prevent him

from accessing his Tokens, including based on completing a KYC process; accessing Tokens through "Intel-based macOS and Linux computers" only; navigating access instructions intentionally designed to be so obtuse and difficult to complete that doing so would delay access to the Tokens; bypassing bugs intentionally inserted into the process to delay access to the Tokens; and receiving circular troubleshooting advice designed to be unhelpful.

223.    *Fourth*, that the Foundation would provide Kobayashi with access to his 5,188,487 Tokens at Network launch and would not withhold those Tokens based on its own failure to provide a seed phrase that Kobayashi could access and save, in violation of industry norms—and certainly not eliminate a mechanism specifically designed to enable Kobayashi to access his Tokens irrespective of a Seed Phrase.

### 2.    Each Defendant Knew of the Economic Relationship

224.    Defendants were at all relevant times aware of the economic relationship, including through their relationship to the ICP Network.

### 3.    Each Defendant Acted Intentionally and Wrongfully to Disrupt Kobayashi's Economic Relationship with the Foundation

225.    Defendants intentionally and wrongfully disrupted Kobayashi's economic relationship with the Foundation and knew that substantial interference with that relationship would result. They did so in at least the following ways:

226.    *First*, Defendants induced the Foundation to allocate Tokens in a manner inconsistent with Kobayashi's reasonable economic expectations. At the behest of Defendants, the Foundation allocated far less than 78% of Tokens to early investors and far more than 12.5% to the Foundation, as well as to other insiders. Doing so diluted Kobayashi's investment and also killed the promise of a decentralized ICP Network. Among other things, Defendants designed, implemented, and induced the Foundation to adopt the technology and policies that controlled Token allocation.

227.    *Second*, Defendants designed, implemented, and induced the Foundation to adopt technology and policies imposing alienability restrictions on Kobayashi's Tokens, including a four-year vesting period and six-month lockup.

228.   *Third*, Defendants designed, implemented, and induced the Foundation to adopt technology and policies that made access to the Tokens contingent on overcoming technological roadblocks that were inconsistent with industry norms and Kobayashi's reasonable commercial expectations, including on completing a KYC process; accessing Tokens through "Intel-based macOS and Linux computers" only; navigating access instructions intentionally designed to be so obtuse and difficult to complete that doing so would delay access to the Tokens; bypassing bugs intentionally inserted into the process to delay access to the Tokens; and receiving circular troubleshooting advice designed to be unhelpful. Forcing Kobayashi to complete a KYC process coincident with Network launch was in particular unjustifiable and arbitrary given that Kobayashi had already completed a KYC process before Network launch.

229.   *Fourth*, Defendants designed, implemented, and induced the Foundation to adopt technology and policies that prevented Kobayashi from accessing his Tokens at all, including by withholding Kobayashi's access to his Tokens based on the Foundation's own failure to provide a seed phrase that Kobayashi could access and save and later by eliminating the mechanism designed to give Kobayashi access to his Tokens irrespective of a seed phrase.

### 4.   Kobayashi Has Suffered Harm Due to Defendants' Misconduct

230.   As a result of Defendants' misconduct, Kobayashi has suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
#### Breach of Fiduciary Duty
#### (Against Defendants)

231.   Kobayashi incorporates the allegations above.

232.   At all relevant points, Defendants owed Kobayashi fiduciary duties as promoters of ICP Tokens.

233.   Defendants rampantly breached those duties, including in a manner inconsistent with Kobayashi's expectations, and by preferring the interests of themselves and other ICP insiders, and by authorizing, directing, and participating in the following:

- The allocation upon Network launch of Tokens amongst investors in a manner that disadvantaged Kobayashi.

- 55 -

- The imposition of alienability restrictions on Kobayashi's Tokens, including a four-year vesting period and six-month lockup.

- The imposition of technological roadblocks that made it difficult, if not impossible, to access Tokens, including by making Token access contingent on completing a KYC process; accessing Tokens through "Intel-based macOS and Linux computers" only; navigating access instructions intentionally designed to be so obtuse and difficult to complete that doing so would delay access to the Tokens; and bypassing bugs intentionally inserted into the process to delay access to the Tokens; all while navigating circular "troubleshooting" advice that was intended to be unhelpful.

- The failure to provide Kobayashi with a seed phrase that he could access and save before Network launch.

- The refusal to provide Kobayashi with access to his 5,188,487 Tokens at Network launch on the purported basis that he did not have a seed phrase and the subsequent elimination of a mechanism specifically designed to give Kobayashi access to his Tokens irrespective of a seed phrase.

- Trading ahead of Kobayashi, thereby diluting the value of his investment.

234.    As a result of Defendants' misconduct, Kobayashi has suffered damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Conversion**
**(Against Defendants)**

235.    Kobayashi incorporates the allegations above.

236.    Kobayashi owns and, as of May 10, 2021, has the right to possess 5,188,487 ICP Tokens.

237.    Defendants have substantially interfered with Kobayashi's right to possess his Tokens by knowingly and intentionally preventing Kobayashi from accessing his property, taking control of it, and refusing to return it after Kobayashi demanded its return.

238.    Defendants have knowingly and intentionally prevented Kobayashi from accessing

- 56 -

his Tokens, including by authorizing, directing, and participating in the following:

- The imposition of alienability restrictions on Kobayashi's Tokens, including a four-year vesting period and six-month lockup.

- The imposition of technological roadblocks that made it difficult, if not impossible, to access Tokens upon Network launch, including by making Token access contingent on completing a KYC process; accessing Tokens through "Intel-based macOS and Linux computers" only; navigating access instructions intentionally designed to be so obtuse and difficult to complete that doing so would delay access to the Tokens; and bypassing bugs intentionally inserted into the process to delay access to the Tokens; all while navigating circular "troubleshooting" advice that was intended to be unhelpful.

- The failure to provide Kobayashi with a seed phrase that he could access and save before Network launch.

- The refusal to provide Kobayashi with access to his 5,188,487 Tokens at Network launch on the purported basis that he did not have a seed phrase and the subsequent elimination of a mechanism specifically designed to give Kobayashi access to his Tokens irrespective of a seed phrase.

239.    Moreover, Defendants have control of the Neuron(s) that contain Kobayashi's ICP Tokens.

240.    Moreover, Kobayashi has never consented to Defendants' interference with his property; to the contrary, he has demanded the return of his Tokens. Defendants have, however, refused to comply.

241.    Defendants have been a substantial factor in causing harm to Kobayashi. Indeed, as a result of Defendants' conduct, Kobayashi has suffered damages, including by suffering emotional distress and by being denied possession of his ICP Tokens in an amount to be determined at trial.

//

//

//

1

**FIFTH CAUSE OF ACTION**
**Trespass to Chattels**
**(Against Defendants)**

2

3        242.    Kobayashi incorporates the allegations above.

4        243.    Kobayashi owns and, as of May 10, 2021, has the right to possess 5,188,487 ICP

5    Tokens.

6        244.    Defendants have intentionally interfered with Kobayashi's use and/or possessions

7    of his Tokens by knowingly and intentionally preventing Kobayashi from accessing his property,

8    taking control of it, and refusing to return it after Kobayashi demanded its return.

9        245.    Defendants have knowingly and intentionally prevented Kobayashi from accessing

10   his Tokens, including by authorizing, directing, and participating in the following:

11       •    The imposition of alienability restrictions on Kobayashi's Tokens, including a four-year

12            vesting period and six-month lockup.

13       •    The imposition of technological roadblocks that made it difficult, if not impossible, to

14            access Tokens upon Network launch, including by making Token access contingent on

15            completing a KYC process; accessing Tokens through "Intel-based macOS and Linux

16            computers" only; navigating access instructions intentionally designed to be so obtuse

17            and difficult to complete that doing so would delay access to the Tokens; and bypassing

18            bugs intentionally inserted into the process to delay access to the Tokens; all while

19            navigating circular "troubleshooting" advice that was intended to be unhelpful.

20       •    The failure to provide Kobayashi with a seed phrase that he could access and save before

21            Network launch.

22       •    The refusal to provide Kobayashi with access to his 5,188,487 Tokens at Network

23            launch on the purported basis that he did not have a seed phrase and the subsequent

24            elimination of a mechanism specifically designed to give Kobayashi access to his

25            Tokens irrespective of a seed phrase.

26       246.    Moreover, Defendants have control of the Neuron(s) that contain Kobayashi's ICP

27   Tokens.

28       247.    Moreover, Kobayashi has never consented to Defendants' interference with his

1   property; to the contrary, he has demanded the return of his Tokens. Defendants have, however,

2   refused to comply.

3       248.    Defendants have been a substantial factor in causing harm to Kobayashi. Indeed,

4   as a result of Defendants' conduct, Kobayashi has suffered damages, including by suffering

5   emotional distress and by being denied possession of his ICP Tokens in an amount to be

6   determined at trial.

7   

**SIXTH CAUSE OF ACTION**
**Unfair Competition (Bus. & Prof. Code § 17200, *et seq*.)**

8   **(Against Defendants)**

9       249.    Kobayashi incorporates the allegations above.

10      250.    Defendants have committed acts of unfair competition, as defined by Business &

11  Professions Code § 17200 and as alleged above, including taking the following acts to harm

12  Kobayashi:

13      •    The imposition of alienability restrictions on Kobayashi's Tokens, including a

14          four-year vesting period and six-month lockup.

15      •    The imposition of technological roadblocks that made it difficult, if not

16          impossible, to access Tokens upon Network launch, including by making Token

17          access contingent on completing a KYC process; accessing Tokens through "Intel-

18          based macOS and Linux computers" only; navigating access instructions

19          intentionally designed to be so obtuse and difficult to complete that doing so

20          would delay access to the Tokens; and bypassing bugs intentionally inserted into

21          the process to delay access to the Tokens; all while navigating circular

22          "troubleshooting" advice that was intended to be unhelpful.

23      •    The failure to provide Kobayashi with a seed phrase that he could access and save

24          before Network launch.

25      •    The refusal to provide Kobayashi with access to his 5,188,487 Tokens at Network

26          launch on the purported basis that he did not have a seed phrase and the

27          subsequent elimination of a mechanism specifically designed to give Kobayashi

28          access to his Tokens irrespective of a seed phrase.

- 59 -

- Precluding Kobayashi from receiving, alienating, or liquidating Kobayashi's ICP Tokens, while simultaneously, on information and belief, receiving and using for their own benefit the 15,000 ETH that Kobayashi provided for his ICP Tokens.

The harm to Kobayashi from such acts outweighs the utility of Defendants' practice. Defendants' conduct threatens an incipient violation of the consumer protection law in California.

251.    Defendants have committed acts of unlawful competition, as defined by Business & Professions Code § 17200 and as alleged above, including by tortiously interfering with Kobayashi's contracts, as alleged in the First Cause of Action; by tortiously interfering with Kobayashi's prospective economic advantage, as alleged in the Second Cause of Action; tortiously breaching their fiduciary duties to Kobayashi, as alleged in the Third Cause of Action; committing the torts of conversion and trespass to chattels as alleged in the Fourth and Fifth Causes of Action.

252.    As a result of the aforementioned acts, Kobayashi lost money or property and suffered injury in fact. On information and belief, Defendants received and continue to hold the 15,000 ETH (currently worth over $25 million) or the proceeds thereof belonging to Kobayashi.

253.    In the absent of any other alternative legal remedy, Kobayashi is entitled to restitution consisting of anything of value provided to Defendants, including, without limitation, the 15,000 ETH that he paid for the ICP tokens that Defendants have precluded him from receiving, alienating, or liquidating.

**PRAYER FOR RELIEF**

WHEREFORE, Kobayashi respectfully requests the following relief:

1. An award of damages against Defendants jointly and severally in an amount to be determined at trial, including compensatory and punitive damages;

2. An award of pre- and post-judgment interest;

3. Restitution in the form of disgorgement of Defendants' unjust enrichment and wrongfully obtained profits;

4. A constructive trust for the benefit of Kobayashi over any and all gains Defendants

may have received from wrongfully retaining Kobayashi's property;

5. In the absence of any other legal remedy, restitution in the form of returning the 15,000 ETH (currently worth over $25 million) that Kobayashi paid for the ICP tokens;

6. An award to Kobayashi of its costs of suit, including, but not limited to, reasonable attorneys' fees; and

7. An award of all other such relief as the Court may deem just and proper under the circumstances.

Dated: May 8, 2023

By: _____

TIBOR L. NAGY, JR.
(pro hac vice forthcoming)
tibor@dnfllp.com
GREGORY N. WOLFE
(pro hac vice forthcoming)
greg@dnfllp.com
DONTZIN NAGY & FLEISSIG LLP
980 Madison Avenue
New York, NY 10075
Telephone:    (212) 717-2900

CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700

*Attorneys for Plaintiff*
*Satoshi Kobayashi*

COMPLAINT

**<u>DEMAND FOR A JURY TRIAL</u>**

Kobayashi requests a trial by jury of all issues that are properly tried to a jury.

Dated: May 8, 2023

By: _____

TIBOR L. NAGY, JR.
(pro hac vice forthcoming)
tibor@dnfllp.com
GREGORY N. WOLFE
(pro hac vice forthcoming)
greg@dnfllp.com
DONTZIN NAGY & FLEISSIG LLP
980 Madison Avenue
New York, NY 10075
Telephone:   (212) 717-2900

CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   (415) 773-5700

*Attorneys for Plaintiff*
*Satoshi Kobayashi*

COMPLAINT