1
2
3
4
5

Steven L. Derby, Esq. (SBN 148372)
WADE LAW GROUP - APC
262 East Main Street
Los Gatos, CA 95030
Direct Line:(408) 884-4018
Telephone: (408) 842-1688
Facsimile:  (408) 852-0614
Email: elivingstone@wadelitigation.com

Attorneys for Plaintiff EFTYCHIOS THEODORAKIS

6

**UNITED STATES DISTRICT COURT**

7

**NORTHERN DISTRICT OF CALIFORNIA**

8
9
10
11
12
13
14
15
16

| EFTYCHIOS THEODORAKIS | Case No. 3:23-cv-02280 |
|---|---|
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | 1.  Violation of 18 USC §1962(a) |
| DOMINIC WILLIAMS, GIAN BOCHSLER AND DFINITY STIFTUNG, A FOREIGN ENTITY OF UNKNOWN FORM | 2.  Violation of 18 USC §1962(b) 3.  Violation of 18 USC §1962(c) 4.  Violation of 18 USC §1962(d) 5.  Violation of 15 USC§78j(b) and Rule 10(b)-5 |
| Defendants. | 6.  Violation of Cal. Penal Code 496(c) 7.  Common Law Trespass to Chattels |
| | **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

17
18

1.   Beginning in 2015, Defendant DOMINIC WILLIAMS ("WILLIAMS") together with

19

Defendant GIAN BOCHSLER ("BOCHSLER") embarked upon an elaborate scheme to steal

20

hundreds of millions if not billions of dollars by creating businesses both in <u>California</u> and in

21

Switzerland in order to make what they told the world was a revolutionary decentralized and

22

autonomous cloud computing architecture that would rival Cloud systems from Google and

23

Amazon. These claims are demonstrably **false** as will be demonstrably proven below.

24

2.    In reality, WILLIAMS and BOCHSLER conspired together using companies that they

25

owned, governed and controlled to obtain and retain control over the Internet Computer

26

(DFinity) Tokens and with it, the Internet Computer itself.

27

3.   To pay for this massive undertaking, Defendants WILLIAMS and BOCHSLER began

28

soliciting "seed" investors who would be willing to invest over One Hundred Million Dollars in

this project in exchange for the project's first product – an autonomous form of decentralized digital currency. WILLIAMS promised these "seed" investors that once this digital currency was made available to the general public, they could hang onto their tokens (as he promised that he and BOCHSLER would do) or sell them.

4. WILLIAMS and BOCHSLER worked together from different sides of the world. WILLIAMS "founded" a California Limited Liability Company with its headquarters in Palo Alto, California which he called Dfinity Research USA, LLC (Dfinity USA). WILLIAMS rented impressive offices and invited potential "seed" investors to see the "operations" in the heart of the Silicon Valley. BOCHSLER stayed in Switzerland running the operations of Defendant DFINITY STIFTUNG. He also used his tremendous wealth, his banking connections and his previous ventures into cryptocurrency to give the project credibility and legitimacy which WILLIAMS, who had not previously been involved in any similar projects, lacked.

5. There was a total of three rounds of investment. Each time BOCHSLER (a wealthy Swiss National who already had substantial holdings in digital currency) led the way giving prominent California-based Silicon Valley Venture Capitalists such as PolyChain Capital and Andreesen-Horowitz and Draft Ventures as well as noted digital currency pioneer Satoshi Kobayashi (who invested 15,000 Ethereum tokens, now the equivalent of $25,000,000) confidence to follow suit.

6. By the third round of investment in 2020, WILLIAMS and BOCHSLER had raised over One Hundred and Two Million Dollars ($102,000,000) for this project which they called "the Internet Computer" or ICP for short. That money was not given to DFinity USA but was instead given to a later-formed Swiss Company, Defendant DFINITY STIFTUNG which WILLIAMS and BOCHSLER have intentionally falsely claimed is a "non-profit." [1]DFINITY STIFTUNG was only seen as a legitimate company because of BOCHSLER's banking and financial connections, which gave it credibility and legitimacy.

7. In reality, DFINITY STIFTUNG has been and continues to be a vehicle by which WILLIAMS and BOCHSLER are able to funnel money from their scheme out of the United

---

[1] Under Swiss Law, an organization can only be a non-profit if it "does not engage in any activities aimed at acquisition and if it is not in competition with other market participants."

First Amended Complaint

States to avoid taxes by claiming that Defendant DFINITY STIFTUNG is a "charitable organization" and thus exempt from Swiss taxes and that it has no connection to DFinity USA. Both of these claims are demonstrably false as shown by their own words as will be laid out below.

8.   WILLIAMS also began hiring scientists and engineers (including Plaintiff EFTYCHIOS THEODORAKIS "Plaintiff"). Like he did with the "seed" investors, WILLIAMS promised these scientists and engineers that they would have the opportunity to purchase this new digital currency -  which they were helping to create with their labor and ideas- and could keep them or sell them once these "Dfinity Tokens" were made available to the general public -- much the same way as "startups" offer "stock options" to employees to attract the quality talent that they need to be successful without offering them competitive compensation. WILLIAMS never intended to keep that promise, either.

9.   As the scientists and engineers hired by WILLIAMS ostensibly to work for DFinity USA continued to work for the promise of being on the "ground floor" of this new technology, WILLIAMS embarked on a "public relations campaign" to sell the ICP in general and the DFinity token in particular to the world. As will be set forth in much greater detail below, WILLIAMS convinced the world (including his own employees) that the ICP was going to create a fully autonomous and decentralized currency (which he now called the ICP Token). It was not.

10. There was a considerable delay before these ICP Tokens were released to the public for sale in the United States due to what WILLIAMS called "regulatory issues." However, in the early months of 2021, WILLIAMS announced the "Genesis" "launch" which was scheduled for May 10, 2021. On this day, WILLIAMS promised, the ICP Token would be available for sale on U.S. currency exchanges such as COINBASE in San Francisco to "U.S. Persons." In fact, WILLIAMS and BOCHSLER used their connections to get listed specifically on COINBASE, a feat unheard of before through normal means, just to target the rich U.S. and California market.

11. In reality, it was WILLIAMS and BOCHSLER as the sole "Council Members" of Defendant DFINITY STIFTUNG who controlled the allocation, distribution and sale of these

First Amended Complaint

ICP tokens so that when these ICP tokens were finally available for sale in the United States, on May 10, 2021, they (WILLIAMS and BOCHSLER) were the only ones who could sell non-trivial amounts of tokens.

12. As will be set forth in greater detail below, WILLIAMS and BOCHSLER through their control of DFINITY STIFTUNG and with that the ICP itself, prevented "seed" investors like Mr. Satoshi Kobayashi from even receiving his tokens. They also prevented Plaintiff EFTYCHIOS THEODORAKIS ("Plaintiff") from receiving 12,608 tokens and they blocked him, through a series of misrepresentations, promises without intent, and threats, as will be expanded later, from acquiring possession as per contract in December 2020 and from selling an additional 41,666 tokens allocated to him at "launch." WILLIAMS used the threat of withholding tokens to coerce employees, including at least 10 residing in California, to agree to restrict the sale of their tokens.

13. For employees who would not agree, WILLIAMS and BOCHSLER refused to allow Defendant DFINITY STIFTUNG to release the tokens which the employees had purchased through a "donation" to Defendant DFINITY STIFTUNG. Most employees just gave up and signed waivers of their rights. Some agreed to sign documents forcing them to travel to Switzerland and try to sue in Swiss Courts only to find that nearly impossible and prohibitively expensive. Plaintiff refused to do either prompting WILLIAMS himself to personally threaten Plaintiff in Palo Alto, California saying that if he did not sign the agreement, "they would come for him."

14. On May 10, 2021, the ICP token was "launched" and tradeable in the United States. With the highly successful public relations campaign orchestrated by WILLIAMS, the demand for ICP tokens was tremendous and the price shot up over $750 per token in the United States and over $3,000 per token elsewhere putting it in the Top Five cryptocurrency and blockchain in the world. It seemed the dream and years of work by the engineers including the Plaintiff had been achieved.

15. Yet, at launch on May 10, 2021, WILLIAMS and BOCHSLER were the only ones with significant numbers of ICP Tokens to sell to the public who awaited the sale with bated breath thanks to Defendant's own "public relations" campaign. WILLIAMS and BOCHSLER had the

ability to sell their tokens on "launch" while seed investors like Mr. Kobayashi and employees like Plaintiff were blocked by WILLIAMS and BOCHSLER. WILLIAMS and BOCHSLER anonymously listed and sold hundreds of millions of ICP Tokens on various cryptocurrency exchanges; BOCHSLER used "traders" from his own Hedge Fund to sell his tokens and those of DFINITY STIFTUNG. WILLIAMS sold his own tokens, and he took tokens that he had given to his children and ex-wife Melissa and sold them, keeping the money and eventually leaving the country.

16. The glut in the market caused by WILLIAMS and BOCHSLER selling the tokens that WILLIAMS pledged they would hold for 8 years, caused the price to crash. By the end of June 2021, the price per token was down to around $30-$48.

17. Even after the majority of employees received their tokens when the price was down to $30 per token or less, DFINITY STIFTUNG warned them not to sell or face charges of insider trading. Meanwhile, BOCHSLER and WILLIAMS continued to sell their own tokens and those held by DFINITY STIFTUNG without restriction or fear of consequence.

18. Since WILLIAMS had publicly pledged that he and other "founders" including BOCHSLER would hold their tokens for years, everyone began to wonder where all of these anonymous tokens came from. WILLIAMS was asked this question repeatedly and each time he continued to deny having sold "very many" of his tokens. Instead, he blamed "former employees" such as Plaintiff for taking advantage of the situation.

19. BOCHSLER was publicly silent but told employees of DFinity USA and DFINITY STIFTUNG USA that he and WILLIAMS had orchestrated the sale to raise revenue. He said that he had his own private hedge fund traders sell ICP Tokens and he expressed his "disappointment" that they could not have gotten more. He claims that they got less than One Billion Dollars but in actuality, the number was much higher. Also, he publicly backed WILLIAMS on social media saying he (WILLIAMS) was being "accused wrongly" and that he (BOCHSLER) has had the "honour" of working with WILLIAMS since 2016. BOCHSLER also personally reassured employees who felt that they had been cheated and lied to by WILLIAMS that the company was behind him.

1    20. On May 10, 2024, with much fanfare Defendant DFINITY STIFTUNG celebrated the

2    "Third Anniversary" of the ICP. Despite the cataclysmic fall of the ICP's first product, the ICP

3    Token, WILLIAMS and BOCHSLER continue to intentionally make publicly the false claim

4    that the ICP is an autonomous decentralized "virtual cloud." The DFinity website home page

5    continues to falsely state "We are a Swiss-based not-for-profit organization with the largest R&D

6    team in blockchain." (https:as dfinity.org last accessed May 20, 2024)

7    21. Companies still invest in the ICP and the ICP Token is still trading openly on

8    cryptocurrency exchanges around the world on the lies told by WILLIAMS and BOCHSLER

9    and the theft of billions of dollars from "seed" investors, employees, and former employees like

10   Plaintiff. Further, the ICP Token is still traded on cryptocurrency exchanges by unwitting

11   investors. According to Messari, on May 20, 2024, the ICP Token sold at $13.49 each with a

12   trading volume of $568,000,000 and a Market Capitalization of $6,290,000,000. With a majority

13   of this volume demand coming from Coinbase from U.S. token buyers, and businessmen, as well

14   documented in SEC 10K and other filings and publications. WILLIAMS also boasts in a

15   declaration to this Court that the ICP has attracted hundreds of businesses and enterprises which

16   now, through their scheme, are controlled by BOCHSLER and WILLIAMS.

17                                    **JURISDICTION AND VENUE**

18   22. This court has subject matter jurisdiction pursuant to 28 U.S. Code § 1331 and 18 U.S.

19   Code § 1964(c), exclusive jurisdiction pursuant to Section 27 of The Exchange Act (15 USC

20   §78aa) and the Private Securities Litigation Standards Act. This Court has pendent jurisdiction of

21   Plaintiff's State Law Claims pursuant to 28 U.S. Code §1367(a) because such claims arise

22   against the same parties based upon the same nucleus of operative facts.

23   23. Venue lies in the United States District Court for the Northern District of California

24   pursuant to 28 U.S. Code § 1391(b)(1), because a substantial part of the events or omissions

25   giving rise to Plaintiff's claims occurred in the Northern District of California. Venue in this

26   district is also proper under 18 U.S. Code § 1965(a) because Defendants transact their affairs in

27   the Northern District of California.

28

1

## JURISDICTIONAL FACTS REGARDING THE PARTIES

2    24. Plaintiff EFTYCHIOS THEODORAKIS is a Greek National who is now a citizen of the

3    United States, domiciled in California. Plaintiff was hired to work as a software engineer in Palo

4    Alto, California for DFinity USA. As part of his compensation package, he was promised the

5    opportunity to buy 80,000 "DFinity Tokens" in exchange for a "donation" to Defendant

6    DFINITY STIFTUNG. These "Dfinity tokens" (later renamed ICP Tokens) were to be generated

7    by the internet blockchain that he was helping to create. Ultimately, Plaintiff received only

8    41,666 tokens in exchange for his "donation."

9    25. At all times relevant herein, Defendant WILLIAMS was a British Citizen who lived and

10   worked in Palo Alto, California. He owned a home and raised a family there from at least 2012

11   and through June 2021, even after he left in June 2021, WILLIAMS continued to fully avail

12   himself of the legal processes in the State of California up until at least September 2023.

13   26. WILLIAMS remained in Palo Alto, California to and through the "launch" of the ICP

14   token on May 10, 2021. In a text message to his now ex-wife Melissa, WILLIAMS stated that he

15   was leaving California for a "Summer Holiday" and "work" but did not indicate any intent to

16   leave for good.

17   27. As more and more public reports blamed DFINITY STIFTUNG (that is to say

18   WILLIAMS and BOCHSLER, its only two "Council" members) for "dumping" ICP Tokens at

19   "launch." WILLIAMS and DFINITY STIFTUNG were named in two class action lawsuits. The

20   first was filed in July 2021.

21   28. Earlier in June of 2021, WILLIAMS was sued by his own son, Sasha Williams in Santa

22   Clara County Superior Court (Case No. 21CV384865). In that case Sacha alleged that

23   WILLIAMS had sold ICP Tokens which were allegedly gifted to WILLIAMS' four children and

24   kept the money. WILLIAMS responded to the complaint without challenging jurisdiction and

25   litigated in that court until the matter was dismissed on September 14, 2023, after this instant

26   case was filed.

27   29. WILLIAMS responded to the threat of that complaint on June 24, 2021, by filing his own

28   Verified Petition to Declare a Trust in the same court (Case No. 21PR190461). In that petition,

First Amended Complaint

WILLIAMS declared under penalty of perjury *inter alia* (1) that he was residing in Palo Alto, California (2) that he prepared Token Transfer Agreements for the benefit of each child in Palo Alto, California. (3) that in May of 2021 (one month prior) he opened a 'fiduciary bank account" at First Republic Bank in Palo Alto, California into which he deposited the "proceeds of sales" of his children's tokens. Williams thereby petitioned a California Court to declare him trustee of a trust for his child (Sasha) who was then 18 years old. That action remained pending <u>without amendment to those sworn statements</u> until March 7, 2022, when the action was dismissed.

30.  In the aforementioned Sacha Williams v. Dominic Williams (Case No. 21CV384865), WILLIAMS filed a sworn declaration in support of a motion to quash, stating:

> *"I am the signatory to more than my own personal bank account at First Republic Bank. Due to my role as the founder and Chief Scientist of the DFINITY Foundation ("DFINITY Stiftung"), I am also the signatory to bank accounts associated with the DFINITY Foundation, which is not a party to this litigation. Sacha's subpoena, as it is currently drafted, would force First Republic Bank to disclose the private financial information of the DFINITY Foundation."* Thus, WILLIAMS admits that both he and DFINITY STIFTUNG have bank accounts at the same California bank. Based upon orders issued in those actions, WILLIAMS would have bene forced to maintain those bank accounts until at least September 2023.

31. Although in a declaration to this Court, WILLIAMS has claimed that he "permanently relocated to Zurich Switzerland" and has "no plans to establish residency in any other country," and that he has "no plans to visit the US." WILLIAMS in text messages with his now ex-wife indicated his intent to move to Europe temporarily for tax reasons and then return to California. He texted her on April 28, 2021:

> "I think maybe you misunderstand. The idea would be we both relocate to UK with Theo for a short time to extract liquidity with less tax damage. The older kids would be able to continue on and we would return."

In response to her protests, WILLIAMS assured her:

> "I like it here too but now___in sales will net us ___ each, at the most. In reality selling ___ worth of ICP is a colossal sale but the changes have greatly reduced the receipts. By contrast, in the UK, it would net us ___, which is, pretty incredibly, double the money. Potentially a couple of years outside the US would allow us to retain twice the money. At some point, enough cash would have been extracted that it's not so painful to wait for a reversal of tax policy, in the sense we would each have enough liquidity to buy homes here in California and do anything else we wanted with the money."

32. Further, WILLIAMS was granted multiple patents by the U.S. patent office, embodying the work of 10s of non-cited California engineers. The patents were assigned to DFINITY STIFTUNG. These patents were filed from 2019 to September 30, 2021 (and likely others later). WILLIAMS filed his location in of these patents as PALO ALTO, CA (US). The patents have publication dates of even 2023, with no attempts made to correct the "PALO ALTO, CA (US)" in these public filings to the patent office, a U.S. government agency.

33. Based upon these facts, upon information and belief, WILLIAMS is deliberately staying outside of the United States so that he and his lawyers can argue that he cannot be sued here.

34. At all times relevant herein, Defendant BOCHSLER was a Citizen of Switzerland who, acting in concert with Defendant WILLIAMS, owned and controlled Defendant DFINITY STIFTUNG which in turn exercised exclusive governance over DFinity USA and all of its California employees and operations.

35.    At all times relevant herein, Defendant DFINITY STIFTUNG is a business entity of unknown form that claims to be a "non-profit" but upon information and belief cannot qualify as such under Swiss law due, among other things, to the requirement that any Swiss Non-Profit cannot be in competition with any other market participants. In a declaration to this Court (ECF 18-1) WILLIAMS stated:

(DFINITY STIFTUNG) is a major native Swiss technology and high-science endeavor, developing the Internet Computer network. It has employed and employs some of the world's top cryptographers, computer science researchers, and engineers. For example, the Foundation's CTO, Jan Camenisch, previously led crypto research at IBM, and was hired from IBM European Research, just outside Zürich. The Foundation employs numerous senior people from IBM, Google and Zürich ETH. The Foundation is believed to be the largest Swiss employer of senior Google Research personnel (Google maintains its second largest campus outside Mountain View in Zurich)

36. Therefore, DFINITY STIFTUNG competes with other "market participants" (Google) and cannot be a "non-profit."

37. At all times relevant herein, DFINITY STIFTUNG was and is owned and controlled by Defendants WILLIAMS and BOCHSLER who are its only "Council Members" which under Swiss Law, Plaintiff is informed and believes, is the equivalent of a Board of Directors. Further,

Plaintiff is informed and believes based upon a review of public documents that the structure of DFINITY STIFTUNG, at all times relevant herein WILLIAMS could not act alone but required the consent of BOCHSLER to any action taken by DFINITY STIFTUNG. Therefore, any action regarding distribution, allocation or withholding of DFinity (ICP) Tokens necessarily required the consent and participation of both WILLIAMS and BOCHSLER including decisions regarding Dfinity (ICP) tokens promised to Plaintiff and at least 10 other California-based employees.

38. BOCHSLER and WILLIAMS caused DFINITY STIFTUNG to state in a Reuters article on February 2018 (https://www.reuters.com/article/us-blockchain-investment-andreessen/blockchain-project-raises-61-million-from-andreessen-horowitz-u-s-hedge-fund-idUSKBN1FR1IX/) that it raised "$61 million in funding from U.S. venture capital firm Andreessen Horowitz and hedge fund Polychain Capital,"

> *"Of the $61 million funding, $21 million will go directly to research and development of the network, while the rest is going to DFINITY's Ecosystem Venture Fund.*
> *The fund will be a capital pool, co-managed by the founders of DFINITY and Polychain Capital. It will invest in specific projects building applications on the DFINITY platform. Blockchain is the technology that underpins bitcoin and other cryptocurrencies."*

39. WILLIAMS thus admitted that both WILLIAMS and BOCHSLER (The Founders) are co-managing during the relevant period tens of millions of dollars that are part of the Fund.

40. Further, Plaintiff is informed and believes, upon review of public filings, there are financial outflows and there is active use of the funds. Both BOCHSLER and WILLIAMS would have to make decisions to co-manage the fund and the use of the capital.

41. BOCHSLER as the sole signatory must and was involved in the allocation of funds for the acquisition and operations of that large number of servers, which upon review of publications from Defendants and other information was in the order of $30,000 each. Including for contracts for payments to the servers run by during the relevant periods in San Francisco and Boston.

42. On June 27, 2022, DFINITY STIFTUNG filed a defamation suit in the United States against the New York Times, Mr. Sorkin, Ms. Livni, and Arkham Intelligence, among others, for exposing Williams for "orchestrating a crypto scam." See Dfinity Foundation v. The New York

Times Company et al., No. 22-cv-05418 (S.D.N.Y.).

43. In a "Tweet" begun by WILLIAMS regarding the alleged falsity of the NYT account specifically blaming WILLIAMS and DFINITY STIFTUNG for the collapse of the ICP Token, BOCHSLER stated:



44. BOCHSLER and WILLIAMS through their control of DFINITY STIFTUNG have gone to great lengths to make sure that the American public continues to stay ignorant of the truth of their lies and deception. In addition to the NYT lawsuit referenced above (which although

dismissed is still on appeal) DFINITY STIFTUNG has taken other steps to squelch any criticism of its behavior or that of WILLIAMS and BOCHSLER. This includes offering a "Bounty" of $5,000-$10,000 for information leading to the identity of an anonymous "Reddit" user who attempted to expose their fraud and deception.

45. DFINITY STIFTUNG has also filed suit against Meta Platforms (the purveyor of Facebook) for trademark infringement. See *Dfinity Foundation v. Meta Platforms, Inc.,* No. 22-cv-02632 (N.D. Cal.). BOCHSLER and WILLIAMS and DFINITY STIFTUNG maintain active trademarks in the U.S. and take active steps to "defend" them in the U.S. and California.

46. BOCHSLER and WILLIAMS via BOCHSLER continue raising money from U.S. Venture Capital investors. BOCHSLER raised at least $21 million dollars for Origyn from U.S. based investors Paris Hilton, Bill Ackman, with the lies of decentralization and others as will be expanded below.

47. At each round of fundraising, BOCHSLER, himself, not only agreed on the Marketing Material and Promotional videos on each "launch," which were pre-recorded. But BOCHSLER participated (with WILLIAMS always being the face) in said Marketing Material broadcasted in and to California. In one such clip posted on YouTube on October 7, 2020, while WILLIAMS was front and center, BOCHSLER participated as a separate "business" and failed to disclose his position as DFINITY STIFTUNG board member and his exertion of control over DFINITY STIFTUNG. But instead, the clip advertised BOCHSLER's (and upon information and belief WILLIAMS)' next "business," again identified as "non-profit." And promising decentralization via the decentralization of the Internet Computer Network.

48. Furthermore, BOCHSLER would have to know and participate in the decision and approve the "node provider" rewards (Node provider, an entity that offers and leases its servers that comprise the network and gets paid in tokens in return).

49. BOTH BOCHSLER and WILLIAMS rushed and signed the extortionate demand against the Plaintiff demanding that he release his negotiated rights to litigate in California among other, for a "pinky promise" that maybe he would get his stolen tokens back. With that action they took an active step in an attempt to further defraud Plaintiff and deprive him of his property, both

under California jurisdiction.

50. Both BOCHSLER and WILLIAMS conspired, dominated, orchestrated and set in action the theft via aforementioned individuals of Plaintiff's tokens, a property in California of a California resident, now domiciled in California as a citizen, and received and divested the value of such property, knowing it to be stolen. And moved it across state lines.

51. At all times relevant herein, DFINITY STIFTUNG, in turn, is and was the sole manager and single member of a Limited Liability Company called DFinity Research USA, LLC ("DFinity USA") which was created by WILLIAMS. As such, DFINITY STIFTUNG (which is owned and controlled by WILLIAMS and BOCHSLER) exercises exclusive rights of governance over Dfinity USA including all of its California operations in San Francisco and two locations in Palo Alto where it employed over 100 people, most of whom at various times including Plaintiff, were California Residents.

## ALTER EGO ALLEGATIONS

52. The operations of DFinity USA include a large research facility and a secondary location in Palo Alto, California, more than 100 employees, phones, internet, janitorial services, and other vendors. Further, WILLIAMS has declare in divorce proceedings that he receives a substantial sum monthly from DFinity USA (believed to be $25,000 per month). DFinity USA's employees worked exclusively on the creation of the ICP architecture and therefore DFinity USA had no source of funding for its operations other than money funneled to it by WILLIAMS and BOCHSLER individually or through their joint ownership and control of DFINITY STIFTUNG.

53. There exists as a matter of law and fact a unity of interest and control between WILLIAMS, BOCHSLER, DFINITY STIFTUNG and DFinity USA. Dfinity USA has represented in other courts in the State of California including in the matter of *Kobayashi v. DFinity USA Research, LLC AND Dominic Williams (Santa Clara Superior Court Case No. 23CV415981)* that it is just a shell and a "wholly owned subsidary" of DFINITY STIFTUNG and that DFINITY STIFTUNG is its "corporate parent" who was exclusively responsible for the creation of the Internet Computer (ICP) and the ICP Token. Inside the organization, employees treated DFinity USA and DFINITY STIFTUNG as one company. Frequently, employees hired

and paid by one entity would be portrayed to the outside world as belonging to the other or both at various times. Even in litigation, the same employee would sign as "President" on behalf of both entities. With one small exception, employees of both companies were allowed to and in fact encouraged to work together and to share information and resources freely without regard to proprietary interests. WILLIAMS himself has claimed various titles with both entities.

54. Dfinity USA employees (on paper) and DFINITY STIFTUNG employees had and shared the same slack workspace, work emails, google doc workspace, notion workspace, zoom workspace, and other tools and services. They utilized and committed code and other documents and material in the same github organization(s).

55. In numerous public statements, including the LinkedIn profile of WILLIAMS himself, employees of DFinity USA (including Plaintiff) were identified as employees of DFINITY STIFTUNG.

56. Finally, DFinity USA had no revenue stream. Therefore, the only way for DFinity USA to operate and to function is from infusions of capital from WILLIAMS, BOCHSLER individually and through their joint ownership and control of DFINITY STIFTUNG whose only source of capital in 2017 was (1) money raised by WILLIAMS and (2) funds "invested" by BOCHSLER (believed to be in excess of $50,000,000). Therefore, DFinity USA and DFINITY STIFTUNG are the alter egos of WILLIAMS and BOCHSLER and any recognition of a separate identity of any of these entities from WILLIAMS and BOCHSLER would fly in the face of equity and substantial justice.

57. DFINITY STIFTUNG as the sole member of DFinity USA would be responsible for the payment of any California or Federal Taxes owed by DFinity USA due to its operations because all of the money raised by WILLIAMS, including substantial amounts raised from California based entities through his position as "Founder and Chief Scientist" of Dfinity USA, went to DFINITY STIFTUNG.

58. DFinity USA has represented in other courts in the State of California including in the matter of *Kobayashi v. DFinity USA Research, LLC AND Dominic Williams (Santa Clara Superior Court Case No. 23CV415981)* that initial "seed" investors such as Mr. Kobayashi and

BOCHSLER paid their "investment" funds to DFINITY STIFTUNG, not to DFinity USA.

59. Dfinity USA has represented in the matter of *Kobayashi v. DFinity USA Research, LLC AND Dominic Williams (Santa Clara Superior Court Case No. 23CV415981)* that WILLIAMS began fundraising for the Internet Computer (ICP) before he created DFinity USA.

60. DFINITY STIFTUNG was started by WILLIAMS in October 2016. The Internet Computer (ICP) was and still is its only marketable product. BOCHSLER has publicly admitted to being involved with WILLIAMS in the ICP project since 2016. WILLIAMS has at various times called himself its "President" "Founder" and now "Council Member." Development of the ICP took years and during that time, DFINITY STIFTUNG had no source of revenue. The money to "incubate" DFINITY STIFTUNG came from another company "founded" by WILLIAMS, String Labs, Inc.

61. The only source of funding the ambitious operations of WILLIAMS, BOCHSLER and DFINITY STIFTUNG which included hiring top scientists from Google and a "large research center" in Zurich, Switzerland, was selling ICP tokens to "seed" investors with most of the money coming from BOCHSLER – one of the richest men in Switzerland and a substantial contributor in each of three "seed" rounds between 2017 and 2019.

62. Furthermore, Plaintiff is informed and believes upon review of WILLIAMS divorce and other lawsuit filings, that WILLIAMS and BOCHSLER used DFINITY STIFTUNG tokens – and not their allocated tokens – as their personal tokens and kept the money from the sale of those tokens personally. During the divorce in or around 2019-2020, it became apparent that WILLIAMS had a beforehand hidden sum around $6,700,000, in a bank account in California, previously unknown to his ex-wife prior to divorce proceedings. Further, in connection with the sale of those personal tokens, WILLIAMS has declared under penalty of perjury in his divorce proceedings that he relies on the advisors from DFINITY STIFTUNG on what to claim on his taxes. Finally, WILLIAMS has declared that his only intent and purpose in creating DFinity USA was so that DFINITY STIFTUNG could do business (leases payroll etc.) in the United States.

63. Upon belief and information provided, WILLIAMS had sold at least 1,000,000 DFINITY

STIFTUNG's ICP tokens. As WILLIAMS made it extremely clear in his filings that all of his tokens, received for his labor and his share, were hidden behind shell companies and that he as paid as a "consultant" of DFINITY STIFTUNG when in reality, WILLIAMS was paying himself with BOCHSLER'S agreement and consent.

64. WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to "pay" WILLIAMS for his work on the ICP and his fundraising efforts with a significant amount (believed to be in excess of 1,000,000) in DFinity (ICP) Tokens. For his "investment" in a company which he and WILLIAMS owned and controlled, WILLIAMS and BOCHSLER caused BOCHSLER to be "paid" in an even larger number (believed to be in excess of 2,000,000) of DFinity (ICP) Tokens.

65. Any such gifts and/or allocations to WILLIAMS would of necessity require the consent of BOCHSLER and thus BOCHSLER was complicit and an integral part of WILLIAMS' scheme to defraud his own family as well as seed investors employees like Plaintiff and the general public. The scheme to defraud his family was part of the larger scheme to conceal the fact that WILLIAMS and BOCHSLER never intended to hold their ICP tokens but to sell them at the earliest opportunity.

66. Without substantial contributions by BOCHSLER as well as his banking and finance connections in cryptocurrency which lent legitimacy to WILLIAMS' project, DFINITY STIFTUNG could not have existed, nor could it have created the Internet Computer (ICP). Thus, BOCHSLER'S contributions "behind the scenes" were essential to the scheme to defraud "seed" investors (other than BOCHSLER who was essentially paying himself) investors, employees and former employees including Plaintiff. It was also essential for BOCHSLER to stay silent as WILLIAMS spun the tale of the autonomous and decentralized virtual cloud that never was and still isn't.

**WILLIAMS FOCUSES HIS FUNDRAISING ON CALIFORNIA WHERE HE LIVES AND WORKS PROMISING THAT THE ICP WILL BE AUTONOMOUS AND DECENTRALIZED AND THAT HE AND BOCHSLER AS FOUNDERS WILL NOT SELL THEIR TOKENS**

67. WILLIAMS deliberately targeted and focused his fund-raising efforts in the Silicon

Valley of California. For example, he gave "seed" investor Mr. Kobayashi a personal tour of the Palo Alto facility. In addition to BOCHSLER, WILLIAMS announced major investments in the Internet Computer (ICP) Project from Andreesen Horowitz (based in Silicon Valley), PolyChain Capital (based in San Francisco), SV Angel (based in Silicon Valley), and Draft Ventures (a Venture Capital firm based in San Francisco, California, now in Austin, Texas), Village Global (based in San Francisco), DTC Capital (based in U.S.), Aspect Ventures (based in Palo Alto, CA), Amino Capital (based in Palo Alto, CA), Scalar Capital (based in San Francisco), Continue Capital (based in San Mateo, CA), 9Yards (based in San Francisco), MultiCoin Capital (based in Austin, Texas), and Warburg Serres Investments.

68. In August 2019, Williams gave an interview to the Silicon Valley Business Journal (based in Silicon Valley California and widely read by Silicon Valley Venture Capitalists). Reporting on the "Swiss nonprofit that operates out of Palo Alto" with WILLIAMS as its only identified source at DFinity, that publication touted ICP as "Cloud 3.0" (a term coined by WILLIAMS elsewhere) and claimed that it could be "bad news" for Amazon, Google Alphabet, Salesforce, Microsoft, Oracle and IBM.

69. In an article published on internet news source TechCrunch.com on September 2020,
WILLIAMS announced
that he had raised $102,000,000 from those California-based sources.

70. In that article, Williams is quoted as saying:

> The NNS now means the Internet Computer is feature complete. It represents a seminal moment in the history of the internet. For the first time, internet services will be governed in a completely independent, decentralized manner. It is the technical solution to the systemic problems Big Tech has created with its monopoly over the internet, a public utility that should be completely open — bringing back the concept of the programmable web. The NNS is the catalyst for the open internet we were promised in the 1990s, and it ensures that the future of the internet remains open and free.

Following this announcement, valuation of the DFinity (ICP) Token jumped from Two Billion Dollars to over 9.5 Billion Dollars.

71. In a blog post published in the Internet Computer Review on June 21, 2017, WILLIAMS published his "'Don't Be Evil' Rules" in which he promised seed investors (including California

based seed investors referenced above) that Dfinity would not:

> "5. Bad captain – Neglect to tie in founders and key technical personnel with *vesting incentive packages* where tokens are released *slowly over years* contingent upon continued contributions being made. Founders should not be able to cash out early, walk away and start working on competitive projects."

72. On April 4, 2018, in a blog post published in the Internet Computer Review, WILLIAMS repeated that due to "regulatory issues" which he stated, "have substance" US entities would not be able to participate in and "Airdrop" of Dfinity (ICP) Tokens but that "Prior to the airdrop, we will also run a private 'presale' fundraiser of limited size." Later in the same blog post WILLIAMS clarified that the "private Presale fundraiser" would only be available to past contributors (including California based seed investors like Polychain and Andreessen Horowitz). This further targeted California-based companies as part of an exclusive group who would be asked to contribute more money before a single token had actually been created.

73. In that same blog post, WILLIAMS reported that 9.5% of Dfinity (ICP) Tokens "were allocated numerous early contributors including entities that have been bankrolling developer salaries, legal and other expenses, and team members, some of whom have been working unpaid for years and contributed substantial intellectual property." Finally, in that same blog post he further targeted California investors to increase their funding commitment by promising "Our endowment tokens are expected to fund aggressive operation for years in the mode of an agile Silicon Valley startup." He further reinforced his "Silicon Valley" connection by stating in bold:

**We already have teams distributed across Switzerland, the USA (with primary research center in Palo Alto) Germany and Japan.**

74. In June of 2020, as the ICP was continuing to develop, DFINITY STIFTUNG further affirmed WILLIAMS' connection to the Silicon Valley by calling him "Founder, President and Chief Scientist" of the Internet Computer Project (ICP). DFINITY further reports about WILLIAMS "He hails from the UK but moved to Palo Alto, California in 2012."

75. In a video published by Dfinity on YouTube on October 7, 2020, WILLIAMS

explained that the blockchain would also enable ICP holders to manually "dial" their own lock-up periods, known as "dissolve delays," of up to eight years. He stated, "Personally, I plan to twist all my dissolve dials the right way around to eight years, to maximize my voting power and rewards, as this is a long-term project." Neither WILLIAMS nor BOCHSLER ever "corrected" that statement which was exactly the opposite of what BOCHSLER and WILLIAMS intended.

## WILLIAMS AND BOCHSLER SELL THE LIE OF THE INTERNET COMPUTER IN THE UNITED STATES AND AROUND THE WORLD

76. Between 2018 and 2021 and continuing through the present, Defendants DFINITY STIFTUNG and WILLIAMS used the internet to make at least 25 intentionally false statements with the design and intention of deceiving seed investors, employees and the public into believing that ICP Tokens were a stable and safe investment, that ICP itself was "autonomous" and "decentralized" and that the company supposedly behind it all was a benevolent public-spirited non-profit foundation. All of these statements were and are demonstrably false.

77. As early as August 2017 (and hundreds of times thereafter), WILLIAMS described the technology he named "the Internet Computer" (ICP) as an "intelligent decentralized cloud." (https://dfinity.org/pdf-viewer/library/an-intelligent-decentralized-cloud.pdf). WIILIAMS and other spokespersons for DFINITY STIFTUNG have claimed the ICP is a mainframe computer in cyberspace, a super massive mainframe shared by the world, that was simpler to use, unstoppable and tamperproof, that DFINITY did not need backup, databases, or firewalls, that DFINITY would slash enterprise IT costs by 90%, and that it was autonomous.

78. This statement was and is false and known By WILLIAMS to be so each time it was made. In reality, the ICP's governance is based upon "voting neurons" of which at all times up until today are controlled by WILLIAMS and BOCHSLER acting in concert with "voting neurons" controlled by DFINITY STIFTUNG which they in turn control.  Further, earlier acquired neurons have more voting power than those acquired later.

79. In February 2020, Defendants WILLIAMS and BOCHSLER established the Internet Computer Association ("ICA"), a Swiss membership association claiming that it would facilitate

and encourage productive connections and collaborations between participants in the Internet

Computer ecosystem. The ICA website, WILLIAMS and BOCHSLER falsely state:

> The independent members of the Internet Computer Association (ICA) together create an Internet Computer ecosystem with the highest possible levels of integrity. Members consist of geographically distributed and diverse businesses and nonprofit organizations, including data centers and node providers, startups building decentralized services and their investors, participants in decentralized finance, enterprises migrating to the open internet, universities and research organizations [sic], educators and many others. The ICA continues to welcome new members that support its mission of stewarding the adoption of the Internet Computer. https://association.internetcomputer.org/become-a-member

80. This statement is intentionally false and known by WILLIAMS and BOCHSLER to be

false. In reality, Internet Computer Association (ICA) does not welcome or accept new members.

The only members of the ICA are WILLIAMS and BOCHSLER. Through the ICA, along with

their control of DFINITY STIFTUNG, they have achieved the *appearance* of decentralization

and autonomy while maintaining a very tight grip.

81. As the "launch" was announced and approaching, WILLIAMS, BOCHSLER and

DFINITY STIFTUNG escalated their false claims. The following paragraphs are examples of

Defendants' intentionally false statements, with the false facts emphasized in italics.

82. On January 6, 2021, Defendant WILLIAMS published an article on the website

Medium.com, titled, "Announcing the Internet Computer Main net and a 20-Year Roadmap," in

which he stated:

> *The Internet Computer and its controller, the NNS, are autonomous, and by design, emphasize that neither I nor DFINITY can control what the NNS does* — this will ultimately be a product of the tens of thousands of neurons that will exist at Genesis. The network will transition into beta when the NNS triggers the Genesis event. This will allow those who have acquired ICP utility tokens by contributing to the project, or through community participation, to withdraw them into "voting neurons," swelling their number, which is currently in the tens, to around 50,000. Genesis will be triggered by the NNS adopting a proposal that anyone can submit. (https://medium.com/dfinity/announcing-internet-computer-mainnet-and-a-20-year-roadmap-790e56cbe04a)

83. This statement was false and known by WILLIAMS to be false when made, because

Defendants WILLIAMS and BOCHSLER individually and through their control of DFINITY

STIFTUNG controlled and still control more than half of the voting neurons in the Internet

Computer (ICP) network, which gives Defendants absolute control over Internet Computer

network. Therefore, it is neither decentralized nor autonomous.

84. On January 10, 2021, WILLIAMS published a "tweet" on the social media platform formerly known as Twitter in which he stated:

> We're not a Silicon Valley unicorn (*the DFINITY Stiftung is a Swiss not-for-profit*, so no IPO will ever happen). *We are not a traditional cryptocurrency pump and dump.*

85. This statement was false and known by WILLIAMS to be false when made, because DFINITY STIFTUNG does not qualify as and is not-for-profit organization under Swiss law, and Defendants' scheme to fraudulently promote and sell ICP Tokens <u>was</u> a traditional cryptocurrency pump and dump scheme as more fully explained below.

86.WILLIAMS and BOCHSLER, admitted in public they knew their actions would cause a destruction of the price: On May 7th 2021, BOCHSLER and WILLIAMS caused the "Genesis" video to be broadcasted saying again that the Network was launched. With the voice of WILLIAMS they made a series of admissions, in a pre-recorded marketing material, among other statements at or around 3:00:00:

> *"But then a financier who has accumulated surplus cycles begins to sell them. Naturally, the price of cycles falls because the financier will sell them for less [...] to liquidate his surplus."*

There they also dropped the bomb that only 26% of the tokens will be liquid. And while everyone was processing or catching up on the 3-hour plus video with that *minute detail hidden as a note:*

87. On May 9th 2021, BOCHSLER and WILLIAMS directed a post to be published informing that seed investors and others will be locked over years. Yet, WILLIAMS and BOCHSLER had admitted prior in an interview in January 2021, that since December 2020 they had access to tokens and had started accumulating voting power.

(See https://cointelegraph.com/news/dfinity-quietly-launched-the-internet-computer-mainnet-last-month.)

88. In the same marketing material (https://dfinity.org/mercury/ ) WILLIAMS stated around 3:14:. *"In my case I will be locking a bunch of my ICP in 8-year neurons"*

89. This statement was patently false as WILLIAMS himself admits in various court filings including his own verified petition before the Santa Clara Superior Court.

90. In February of 2021, DFINITY STIFTUNG "convened top investors and entrepreneurs" for an event entitled "Trillion Dollar Opportunity: How a New Internet Will Completely Reimagine Your Business Model" which addresses how "businesses can seize this opportunity." This event was sponsored by Forbes. WILLIAMS spoke on behalf of DFINITY STIFTUNG.

91. On February 23, 2021, WILLIAMS published a "tweet" on the social media platform formerly known as Twitter in which he stated:

> Worth noting, *DFINITY has not got a coin in market, and are not trying to sell people coins.* This is the opposite approach to projects that push shell blockchains involving little novel R&D live so they can get tokens in market. Its ironic many people think lack of token = scam.

92. This statement was false and known by WILLIAMS to be false when made. On May 10, 2021, the very day of the "launch" of ICP Tokens in the United States WILLIAMS and BOCHSLER caused 3,100,000 to be deposited "anonymously" in COINBASE (the largest cryptocurrency seller in the United States) and other exchanges around the world.

93. On February 23, 2021, WILLIAMS also tweeted,

> Exact. *Note DFINITY Stiftung only holds ~25% of ICP supply* and will also share a portion of that with the Internet Computer Association formed in Geneva recently. *So, we do not control the NNS at all.* Don't want whales or anyone else massively accumulating. Decentralization.

94. These italicized statements were false or at least misleading and known by WILLIAMS to be false when made. BOCHSLER and WILLIAMS owned and controlled both DFINITY STIFTUNG and the ICA. Coupling the ICA holdings with their personal cache of ICP Tokens, WILLIAMS and BOCHSLER owned and controlled, and still own and control, more than 50% of the supply of ICP Tokens, and thus more than 50% of the voting neurons in the Internet Computer network. Further, because WILLIAMS and BOCHSLER were able to acquire early tokens, they were able to acquire more voting power assuring their control over the ICP in perpetuity.

95. On May 6, 2021, DFINITY STIFTUNG published an article on the website of

First Amended Complaint

Medium.com, titled "Understanding the Internet Computer's Network Nervous System, Neurons, and ICP Utility Tokens," which stated:

> The Network Nervous System works by allowing users to stake ICP governance tokens to create voting neurons. *The NNS decides whether to adopt or reject proposals by watching how neurons emit votes.* Anyone can create a neuron by locking balances of the Internet Computer's native utility token (ICP) that is hosted on a ledger inside the NNS. (https://medium.com/dfinity/understanding-the-internet-computers-network-nervous-system-neurons-and-icp-utility-tokens-730dab65cae8)

96. The italicized statements were false or at least misleading and known by WILLIAMS to be false when made. BOCHSLER and WILLIAMS owned and controlled both DFINITY STIFTUNG and the ICA. Coupling those holdings with their personal cache of ICP Tokens, WILLIAMS and BOCHSLER owned and controlled, and still own and control, more than 50% of the supply of ICP Tokens, and thus more than 50% of the voting neurons in the Internet Computer network.

97. On May 9, 2021, WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to publish a "tweet" on the social media platform formerly known as Twitter which stated:

> *"The Swiss nonprofit* has just launched blockchain-based web hosting capability that aims to break Big Tech's stranglehold on the internet" https://businessinsider.com/vcs-crypto-blockchain-investment-billions-startups-dfinity-chief-2021-5 by @BusinessInsider businessinsider.com The founder of $24 billion crypto startup Dfinity thinks tech giants like AWS and Google have...*The Swiss nonprofit* which launched blockchain-based web token ICP earlier this month is now valued at around $24 billion."
> *https://twitter.com/dfinity/status/1391514314482372614?s=20*

98. The italicized statement was false and known by WILLIAMS and BOCHSLER to be so at the time it was made, because DFINITY STIFTUNG is not and cannot be a non-profit organization under Swiss Law.

99. On May 10, 2021, WILLIAMS and BOCHSLER caused Defendant DFINITY STIFTUNG published an article on the website Medium.com, titled "How to Access 'Seed' and 'Airdrop' ICP Tokens and Participate in the Internet Computer Network," which stated:

> *Seed donors will have immediate control of their neurons — they can reconfigure them, participate in governance to earn rewards, or immediately set them to dissolve so that they can recover the staked ICP tokens inside.* (https://medium.com/dfinity/how-to-access-seed-and-airdrop-icp-tokens-and-participate-in-the-internet-computer-network-e6cd663a0c3c)

100. This statement was false and was known by WILLIAMS and BOCHSLER to be

false. Seed investors like Satoshi Kobayashi, who, on information and belief based upon the allegations of his complaint, was entitled to receive 5,188,487 ICP Tokens at network launch, did not have immediate control of their neurons, and could not immediately dissolve them and obtain their ICP Tokens. In the weeks before "launch" WILLIAMS personally assured Mr. Kobayashi via text that he would have "no problem" accessing his tokens. This was not an accident. On information and belief, WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to block Mr. Kobayashi and other "seed" investors Defendants deliberately prevented these seed investors from accessing their Tokens so that at "Genesis" only WILLIAMS and BOCHSLER were the only ones who had a significant number of tokens to sell.

101. On May 10, 2021, WILLIAMS and BOCHSLER caused to be published an article on the website Messari.io, titled "An Introduction to Dfinity and the Internet Computer," which stated:

> Internet Computer Protocol (ICP) has formed the world's first web-speed, web-serving public blockchain network, which can grow its capacity with demand, and is *self governing*. Like all blockchains, it is unstoppable, and *the code it hosts is tamperproof. Dfinity currently has nearly 100,000 academic citations and 200 patents. There will be 469,213,710 ICP tokens at genesis and the token supply will be distributed as follows.*

## ⅢMESSARI
## Genesis Token Allocation
Total token distribution on May 10 2021

|  | Genesis Initial State Allocations | % | Number of Participants |
|---|---|---|---|
| Early Contributors | 44,575,228 | 9.50% | <50 |
| Seed | 115,986,694 | 24.72% | 370 |
| Strategic Partnerships | 32,845,140 | 7.00% | <50 |
| Presale | 23,295,828 | 4.96% | 110 |
| Strategic Partnerships | 17,795,770 | 3.79% | <50 |
| Community Airdrop | 3,763,448 | 0.80% | 50,000+ |
| Initial Community and Developer | 2,242,179 | 0.48% | <50 |
| Node Operators | 1,050,000 | 0.22% | 57 |
| Internet Computer Association | 20,000,000 | 4.26% | 1 |
| Team Members | 84,480,829 | 18.00% | 200 |
| Advisors and Other Third-parties | 11,239,705 | 2.40% | <50 |
| DFINITY Foundation | 111,938,888 | 23.86% | 1 |
| **Total** | **469,213,709** | **100.0%** |  |

**Data as of:** May 10, 2021
**Source:** Dfinity, Messari

102. The italicized statements in this chart is intentionally deceptive and misleading and

known by WILLIAMS and BOCHSLER to be so at the time that it was created, ICP

Tokens in the Early Contributors category (9.50%), Seed investors category (the

Strategic Partnerships category (7.00%), the second Strategic Partnership category

(3.79%), the Initial Community and Developer category (0.48%), the Node Operators

category (0.22%), the Internet Computer Association category (4.26%), the Advisors and

Other Third-parties category (2.40%), and the DFINITY Foundation category (23.86%).

BOCHSLER also owns additional tokens as an investor in all three "seed" rounds and

thus owns a substantial portion of the 24.72% of Tokens allocated to Seed investors.

Further, BOCHSLER's control via those tokens is enhanced because he and WILLIAMS

caused DFINITY STIFTUNG to block "seed" investors such as Mr. Kobayashi, from

accessing his promised tokens (5,188,487 of them which is over 11%) at "Launch."

102. As a result, Defendants BOCHSLER, WILLIAMS personally and through their

ownership and control of DFINITY STIFTUNG own and controlled more than 50% of the ICP

Tokens released at the cryptocurrency launch on May 10, 2021.

103. The May 10, 2021, article published by Defendants Messari.io, also stated:

> While the unlocking schedule is publicly known for strategic investors and private sales, *the number of tokens unlocked from the Internet Computer Association, team members, advisors, early contributors, and the Foundation is unknown.* (https://messari.io/report/an-introduction-to-dfinity-and-the-internet-computer)

104. This statement was intentionally false. WILLIAMS and BOCHSLER knew

precisely the number of tokens unlocked from the Internet Computer Association, team

members, advisors, early contributors, to WILLIAMS and BOCHSLER through DFINITY

STIFTUNG and were thus able to sell as many ICP Tokens as possible upon network launch on

May 10, 2021, and the following weeks in May and June 2021, before seed investors like

Kobayashi, DFINITY employees and ex-employees could sell their ICP Tokens.

105. On May 18, 2021, WILLIAMS published a "tweet" on the social media platform

formerly known as Twitter in which he stated:

> For regulatory reasons, *the foundation and key early team members were locked up at launch for a week* (it's the reverse of what people think). (https://twitter.com/dominic_w/status/1394744099278790657)

106. This statement was false and known by both WILLIAMS and BOCHSLER to be false when made. WILLIAMS and BOCHSLER were not "locked up" at "launch." According to an independent study by Arkham Intelligence (published on June 28, 2021)[2], on May 10, 2021, the official "launch" of the ICP Token and the "Genesis" of the Internet Computer and the first day, according to WILLIAMS that ICP tokens could be purchased by "US Persons", WILLIAMS and BOCHSLER acting jointly caused DFINITY STIFTUNG to transfer at least Two Million (2,000,000) ICP Tokens to COINBASE for sale and another One Million One Hundred Thousand (1,100,000) ICP Tokens to other exchanges around the world.

107. On June 9, 2021, BOCHSLER and WILLIAMS caused DFINITY STIFTUNG to publish an article on the website Medium.com, titled "Earn Substantial Voting Rewards by Staking in the Network Nervous System," which stated:

> Since Genesis, *the DFINITY Stiftung, Internet Computer Association, and their team members and affiliates have always maintained less than 50% of the total voting power within the Network Nervous System*, ensuring control over the Internet Computer network remains fully decentralized and that governance actions express the will of the broader community. (https://medium.com/dfinity/earn-substantial-voting-rewards-by-staking-in-the-network-nervous-system-7eb5cf988182)

108. These italicized statements were intentionally false and known by WILLIAMS and BOCHSLER to be so at the time they were made. BOCHSLER and WILLIAMS owned and controlled both DFINITY STIFTUNG and the ICA. Coupling those holdings with their personal cache of ICP Tokens, WILLIAMS and BOCHSLER owned and controlled, and still own and control, more than 50% of the supply of ICP Tokens, and thus more than 50% of the voting neurons in the Internet Computer network (ICP). Further, having acquired voting neurons earlier gave them even greater control over the network.

109. On June 11, 2021, BOCHSLER and WILLIAMS caused Defendant DFINITY Stiftung published an article on the website Medium.com, titled "The Community-Led Governance of the Internet Computer," which stated:

---

[2] Worthy of note, DFINITY STIFTUNG sued Arkham along with the New York Times. The case was dismissed but is still on appeal.

First Amended Complaint

> Since the Internet Computer underwent "Genesis" and became a public blockchain running at web speed with internet scale, *the reins of network governance are firmly in the hands of the broader community, which controls around 60% of the voting power.* (https://medium.com/dfinity/the-community-led-governance-of-the-internet-computer-b863cd2975ba)

110. This italicized statement was false and known by BOCHSLER and WILLIAMS to be so when made. WILLIAMS and BOCHSLER owned and controlled both DFINITY STIFTUNG and the ICA. Coupling those holdings with their personal cache of ICP Tokens, WILLIAMS and BOCHSLER owned and controlled, and still own and control, more than 50% of the supply of ICP Tokens, and thus more than 50% of the voting neurons in the Internet Computer network. Thus, governance of the Internet Computer network has always remained firmly in the hands of WILLIAMS and BOCHSLER acting in concert through DFINITY STIFTUNG and ICA, not in the hands of the broader community.

111. On July 2, 2021, WILLIAMS published a "tweet" on the social media platform formerly known as Twitter in which he stated:

> Just so you know, in the first week, *foundation and founders+directors locked. Foundation did not sell for several weeks*" (https://twitter.com/dominic_w/status/1410936466193125383)

112. This italicized statement was false and known by WILLIAMS to be false when made. According to the Arkham Report referenced above, DFINITY STIFTUNG (controlled by WILLIAMS and BOCHSLER) transferred Four Hundred Million (400,000,000) tokens which is 85% of all the tokens in the world at "launch" according to DFINITY STIFTUNG's statement above, in the first month after "launch." So, after one month of formal existence, WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to divest itself of 85% of the company.

113. In July 2021, Defendant Dominic Williams published a post on Reddit.com in which he stated:

> However, regarding the *DFINITY Stiftung, it did not sell anything for 5 weeks*, and then to cover tax liabilities created by RTU schemes. *Founders and execs were locked for the first week, and since then, I have sold substantially less than 5% of my holdings. Seed participants together held 24.7% of all the ICP at Genesis, or about 117M ICP.* (https://www.reddit.com/r/dfinity/comments/pwkdz5/has_the_arkham_report_ever_been_addressed/)

114. These italicized statements were intentionally deceptive and known by WILLIAMS

to be so when made. As stated above, in the first month, WILLIAMS and BOCHSLER caused

DFINITY STIFTUNG to sell 85% of the ICP tokens which were in existence at "launch."

Further, the statement ignores the fact that a substantial "seed" investor (Mr. Kobayashi) was

blocked from access to 5,188,487 (another 11% of the total) at "launch."

115. Despite the fact that WILLIAMS, BOCHSLER personally and jointly caused

DFINITY STIFTUNG to sell at least 85 percent of the ICP tokens by June 15, 2021,

WILLIAMS continued to publicly deny that he, BOCHSLER or DFINITY STIFTUNG had been

responsible for the "dump" of ICP tokens which caused the price to fall precipitously in the first

few weeks after "launch." This was necessary because the goal of the scheme launched by

WILLIAMS and BOCHSLER years before was to sell the world on the lie that the Internet

Computer *itself* was autonomous and decentralized in order to gain control of the "virtual cloud"

technology space as more particularly described below.

116. On July 30, 2021, WILLIAMS published a "tweet" on the Social media platform

formerly known as Twitter in which he stated:

> We didn't. *The foundation didn't sell 1 token for weeks. The founders didn't sell in first week and then not much.* Demand sent price out of control and then it fell. Do I look like a founder who would want to undermine his own project.. seriously..
> https://twitter.com/dominic_w/status/1421188347427442691

117. These italicized statements were false and known by WILLIAMS to be so at

the time they were made. As stated above, in the first month, WILLIAMS and BOCHSLER

caused DFINITY STIFTUNG to sell 85% of the ICP tokens in existence at "launch." Further, the

statement ignores the fact that a substantial "seed" investor (Mr. Kobayashi) was blocked from

access to 5,188,487 (another 11% of the total) at "launch." WILLIAMS' rhetorical question at

the end of this "tweet" is also misleading because the "project" was and still is to sell the world

the lie of the autonomous and decentralized Internet Computer which never was, still isn't and is

not intended by WILLIAMS and BOCHSLER to be.

118. On September 3, 2021, WILLIAMS published a "tweet" on the Social media

platform formerly known as Twitter in which he stated:

> *DFINITY Stiftung didn't sell for 5 weeks. Founders & execs were locked at launch.*

https://twitter.com/dominic_w/status/1433832599865200644

119. These italicized statements were false and known by WILLIAMS to be so at the time that they were made. As stated above, in the first month, WILLIAMS and BOCHSLER (the "Founders") caused DFINITY STIFTUNG to sell 85% of the ICP tokens in existence at "launch."

120. On September 25, 2021, WILLIAMS gave an interview to Crytoslate.com, titled "Dfinity founder shoots down all 'rugpull' allegations around Internet Computer (ICP) tokens," in which he stated:

> "Certainly, some shadowy players will have then made fortunes shorting ICP, which upsets me greatly," he concluded, claiming that neither the DFINITY Stiftung nor he performed any kind of rug pull. He underlined that "the DFINITY Stiftung didn't sell any ICP for the first five weeks after Genesis, and then only to cover tax liabilities created by vesting RTUs paid to staff (Restricted Token Units)." "Founders and executives were locked up entirely for the first week. For my part, I have sold substantially less than 5% of my holdings since Genesis – after working day and night on the project for years," he added. (https://cryptoslate.com/exclusive-dfinity-founder-shoots-down-all-rugpull-allegations-around-internet-computer-icp-tokens/)

121. This statement was false unless by "shadowy players" he meant himself and BOCHSLER who sold at least 85% of the ICP tokens in the first month after launch. According to a sworn declarations by WILLIAMS' son Sacha and his ex-wife Melissa, WILLIAMS bragged about selling "tens of millions" of tokens at a hefty profit shortly after "launch." Further, in his own Verified Complaint to Establish a Trust filed on June 24, 2021, WILLIAMS admitted to selling tokens belonging to his children as their "Trustee." BOCHSLER admitted in a virtual conference with employees that he and WILLIAMS had ordered and orchestrated the sale of ICP tokens at launch. At first, he had an employee do it but then had his "private traders" finish the job. Also, shortly before "launch" BOCHSLER convened an "emergency" meeting with WILLIAMS and others to strategize the sale of ICP Tokens by DFINITY STIFTUNG, which sale only he and WILLIAMS acting together could authorize.

122. On November 30, 2021, WILLIAMS published a "tweet" on the social media platform formerly known as Twitter in which he stated:

> *Foundation didn't sell for weeks, founders locked first week, I sold less 5%*; main sellers were vested employees & Seed
> https://twitter.com/dominic_w/status/1465759067834621959

1    123. These italicized statements were false and known by WILLIAMS to be so when

2    made. As stated above, in the first month, WILLIAMS and BOCHSLER caused DFINITY

3    STIFTUNG to sell 85% of the ICP tokens in existence at "launch." Further, the statement

4    ignores the fact that a substantial "seed" investor (Mr. Kobayashi) was blocked from access to

5    5,188,487 (another 11% of the total) at "launch."

6    124. On or about November 21, 2022, WILLIAMS published comments on the

7    internet in which he stated:

> For the record. The ICA is meant to be a members organization, but there are two challenges that have put its development on the back burner: (1) there are far more important things for the team to be working on right now, (2) we could not transfer legal ownership of ICP to the ICA for tax reasons; essentially that it would involve a gift, and in Zürich, where DFINITY is based, a substantial gift tax would be involved. So for now it controls voting neurons for security purposes (distribution of keys etc) and that's it. . . . As everybody can see, *the Network Nervous System controls the Internet Computer, and it's completely transparent. . . .* We at DFINITY will remain focused on doing our best to help the ecosystem through this incredibly difficult time, and out the other side in a winning position for the benefit of everyone involved - which *is our not-for-profit purpose*.
>
> The Internet Computer blockchain is fully controlled by a permissionless transparent DAO, called the Network Nervous System (NNS). *The governance and control of the Internet Computer is fully automated and decentralized, by design.* Anyone can propose improvements, for example by submitting motions to gather support for a particular idea, followed by the submission of compiled code that upgrades the protocol, which if adopted, will be automatically applied to the node machines hosting the network. Through the NNS, the network adaptively improves not just its efficiency, speed, functionality, and tokenomics, but also NNS governance, recursively. It is a self-improving network, and this is one of the reasons it is succeeding. Anyone can participate, either by submitting proposals, or by staking ICP and creating voting neurons.
>
> For these reasons, it is wrong to conflate the governance of the decentralized Internet Computer network, which is self-governing, with the governance of the DFINITY Foundation. We are an independent *not-for-profit organization* that pursues a purpose, which is essentially 1. helping bootstrap the Internet Computer ecosystem, 2. developing World Computer technology and contributing it for use within the ecosystem, and 3. supporting ecosystem participants, with the ultimate overall objective of helping the ecosystem succeed as soon as possible, and driving what we call a "blockchain singularity".
>
> Although *DFINITY is a not-for-profit organization*, *with no members or shareholders*, which pursues a defined purpose rather than profits, we pursue our purpose very competitively, like a tech startup. We are passionate and relentless.
> https://forum.dfinity.org/t/what-is-the-internet-computer-association/15969/50

28   125. Multiple italicized statements in this post are false and misleading and known

to be so when made by WILLIAMS. The Network Nervous System that controls the Internet Computer is not completely transparent, because the network hides the identities of the individuals and entities who control the neurons that vote on network governance proposals. DFINITY STIFTUNG is not a not-for-profit organization. On information and belief, it has never been granted not-for-profit status by the Swiss government. That is because in order to qualify as a non-profit, DFINITY STIFTUNG must not be in direct competition with for-profit entities like Google and Amazon. Because DFINITY STIFTUNG does (or tries to) directly complete with those entities, it cannot qualify as a non-profit under Swiss law. Also, governance and control of the Internet Computer is not fully automated and decentralized. The Internet Computer is governed by two individuals, WILLIAMS and BOCHSLER who personally and through their governance and control of DFINITY STIFTUNG, control a majority of the voting neurons in the Internet Computer's Network Nervous System.

## WILLIAMS AND BOCHSLER TOGETHER CAUSE DFINITY STIFTUNG TO BLOCK NON-INSIDERS FROM SELLING THEIR ICP TOKENS

126. As set forth above, during the six-week time period from May 10, 2021 to June 24, 2021, Defendants DFINITY STIFTUNG, WILLIAMS and BOCHSLER were liquidating hundreds of millions of ICP Tokens they owned or controlled. To maximize their profit from this maneuver, Defendants employed various schemes to prevent non-insiders such as certain seed investors, employees and ex-employees from selling ICP Tokens which they were entitled to sell. This was not a coincidence.

127. Specifically, to Plaintiff, Defendants delayed delivery of ICP Tokens to DFINITY USA employees until June 24, 2021, through various "vesting" schedules and "restricted trading agreements." by which time the value of ICP Tokens had fallen from a high of $750.73 per Token to approximately $34.59 per Token. At that same time, WILLIAMS admitted to certain employees via "Slack" that the "trading volume" requirement which he and BOCHSLER acting as DFINITY STIFTUNG imposed, was actually met on the first day – May 10, 2021.

128. Then, DFINITY USA (under the control of DFINITY STIFTUNG, WILLIAMS AND BOCHSLER) told its employees that they could not sell their ICP Tokens for an additional two

weeks because of a company imposed "blackout" period. The reason for this delay was to enable WILLIAMS, BOCHSLER and the company they controlled and governed DFINITY STIFTUNG to liquidate hundreds of millions of tokens at a high price before DFINITY USA's employees could sell their tokens and further drive the price down.

129. Defendants WILLIAMS and BOCHSLER necessarily acting jointly caused DFINITY STIFTUNG as the exclusive controller of the distribution, allocations and delivery of DFinity (ICP) Tokens, to unilaterally impose long-term vesting periods on the ICP Tokens of seed investors. On May 10, 2021, the day of "launch" WILLIAMS and BOCHSLER caused DFINITY STIFTUING to announce that seed investors would be subject to a four-year vesting period and could only access 2% of their ICP Tokens in May 2021. The reason for this delay was to enable Defendants to liquidate Tokens at a higher price before seed investors, who had been allocated millions of ICP Tokens, sold their Tokens and further drove the price down. On information and belief based upon public records and employee accounts, these same restrictions were <u>not</u> imposed upon BOCHSLER – one of the largest seed investors.

130. Defendants WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to impose last minute "Know Your Client" (KYC) requirements on seed investors already known to DFINITY STIFTUNG to delay giving seed investors access to their ICP Tokens. The reason for this delay was to enable Defendants BOCHSLER, WILLIAMS personally and through their control and governance of DFINITY STIFTUNG to liquidate ICP Tokens at a high price before seed investors sold their Tokens and drove further the price down.

131. Defendants WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to impose technical barriers to prevent or delay seed investors from accessing their ICP Tokens, including requiring investors to purchase special computers, install complicated software, utilize pass phrases which Defendant purposely made unusable, and prevented a third of seed investors from accessing and saving their seed phrases, a 12-word password needed to access their ICP Tokens. WILLIAMS and DFINITY STIFTUNG then accused these seed investors including Mr. Kobayashi of "losing" their seed phrase.

132. Specific to Plaintiff, Defendants WILLIAMS and BOCHSLER necessarily

acting jointly cause DFINITY STIFTUNG to prevent Plaintiff from receiving 12,608 ICP Tokens which he was entitled to receive by May 10, 2021, by insisting that Plaintiff sign documents relinquishing important rights such as forcing Plaintiff to sue in Switzerland and agreeing to further restrict and delay Plaintiff from selling his tokens, The reason Defendants refused and continue to refuse to transfer these 12,608 ICP Tokens to Plaintiff, was to enable Defendants WILLIAMS and BOCHSLER personally and through their control and governance of DFINTIY STIFTUNG to liquidate tokens at a high price before Plaintiff and other employees sold their tokens and drove the price further down.

## DEFENDANTS' FRAUDULENT SCHEME GAINS BILLIONS, WHILE INVESTORS AND PLAINTIFF LOSE BILLIONS

133. False statements made by WILLIAMS individually and by WILLIAMS and BOCHSLER through their joint control and governance of DFINITY STIFTUNG about their inability to sell ICP Tokens at the time of the cryptocurrency's launch, allowed Defendants, collectively, to sell millions of ICP Tokens at high price to the unwitting public, before many seed investors, employees and ex-employees entitled to ICP Tokens had a chance to sell their Tokens.

134. Defendants' false statements that they did not control the Internet Computer network, and that the network was decentralized and autonomous, and that DFINITY STIFTUNG was a not-for-profit organization, gave the cryptocurrency buying public a false sense of confidence in the value of ICP Tokens, luring buyers into paying a high price for tokens that quickly lost value at "launch.". Further, for employees of DFinity USA such as Plaintiff who did receive 41,666 tokens which he purchased through a "donation" to DFINITY STIFTUNG and which he could have sold, Defendants WILLIAMS and BOCHSLER continued to conceal their complicity in the "pump" and "dump" scheme and continued to extol the virtues of the Internet Computer so that employees and former employees (like Plaintiff) held their tokens trusting that the price dip was just a "blip on the radar" and the price would stabilize over time.

135. Had Plaintiff known the true facts, he would not have held his tokens and would have sold all of 41,666 tokens at a higher price closer to what was attained by WILLIAMS,

BOCHSLER and DFINITY STIFTUNG.

136. Defendants' pattern of deceptive statements was a fraudulent scheme that enabled BOCHSLER and WILLIAMS personally and through their control and governance of DFINITY STIFTUNG to profit from the early sale of ICP Tokens while simultaneously damaging the value of ICP Tokens belonging to seed investors, employees, ex-employees, and the unwitting buyers in the United States and around the world who bought ICP Tokens from Defendants in May and June 2021.

137. As a result of Defendants' conduct, the value ICP Token plummeted from a high of $750.73 on Coinbase, and $3000 on Binance on May 10, 2021, to $30.39 on June 26, 2021. As a further result of Defendants' ongoing false statements throughout the latter half of 2021, throughout 2022, and in 2023, the value of ICP Tokens has continued to fall, so that now each ICP Token is worth about $14.

138. May 10, 2024 (this year), was touted by DFINITY STIFTUNG on its website and through a public media campaign as the Third Anniversary of the ICP. To this date, WILLIAMS and BOCHSLER through their ownership, control and governance of DFNITY STIFTUNG continue to deny that neither they personally nor the company they control DFINITY STIFTUNG had anything to do with the collapse of the ICP token. They further continue to falsely claim (1) That DFINITY STIFTUNG is a "non-profit" and (2) that the only marketable product DFINITY STIFTUNG has ever made, the Internet Computer is autonomous and decentralized continuing to lure investors, purchasers of ICP tokens and those interested in placing their software and programs on the "Virtual Cloud" with false promises and statements.

**DEFENDANTS TRANSFER PROCEEDS FROM THEIR FRAUDULENT SCHEMES VIA WIRE TRANSFER OUT OF THE UNITED STATES TO AVOID US TAXES**

139. In 2014, the United States Internal Revenue Service classified cryptocurrency such as ICP Tokens as a capital asset like stocks or bonds. As such, when ICP Tokens are sold for a short-term gain, like the hundreds of millions "created" by DFINITY STIFTUNG at the direction of WILLIAMS and BOCHSLER, the gain is subject to Federal Income Tax.

140. This is true for foreign individuals (such as WILLIAMS and BOCHSLER) and

companies (such as DFINITY STIFTUNG) when such individuals or companies have a US Trade or Business such as DFinity USA. Further, the Internal Revenue Service has taken the position that a large amount of cryptocurrency sales (such as hundreds of millions of ICP Tokens in days or at most a month) is subject to United States tax when sold on a US-based exchange such as COINBASE.

141. As alleged above, WILLIAMS and BOCHSLER individually and through their control and governance DFINITY STIFTUNG sold hundreds of millions of ICP Tokens through cryptocurrency exchanges including through COINBASE the largest cryptocurrency exchange in the United States, based in San Francisco, California.

142. COINBASE requires a two-step process to convert the proceeds of sales of cryptocurrency to cash. First, the funds must be received in a "wallet" then once the funds are received, they must be "sold" out of the "wallet" to a bank account. Therefore, all proceeds of sales of ICP tokens by BOCHSLER, WILLIAMS personally or through DFINITY STIFTUNG first reside in COINBASE'S US bank accounts before being "sold" to a bank account in the United States or abroad. US banks are required by the Bank Secrecy Act of 1970 to report any transfer of $10,000 or more.

143. By selling millions of ICP Tokens through cryptocurrency exchanges such as COINBASE, WILLIAMS, BOCHSLER personally and through their ownership, control and governance of DFINITY STIFTUNG avoided having to file IRS Forms 1040-NR. Although the Internal Revenue Service and other government entities are attempting to force currency exchanges to adhere to the same reporting requirements as National Banks, currently they must reply on the "good faith" of large foreign cryptocurrency traders like WILLIAMS, BOCHSLER and DFINITY STIFTUNG.

144. In his litigation with his son Sasha and his ex-wife Melissa, WILLIAMS has admittedly transferred the proceeds of the sale of millions of ICP tokens to banks outside the United States.

145. Likewise on information and belief, WILLIAMS and BOCHSLER have caused DFINITY STIFTUNG to transfer the proceeds of sales of hundreds of millions of ICP

Tokens from a COINBASE wallet here in the United States to accounts in Switzerland and elsewhere in Europe.

**DEFENDANTS WILLIAMS AND BOCHSLER USE THE PROCEEDS OF THEIR FRAUDULENT SCHEME TO CONSOLIDATE CONTROL OVER OTHER COMPANIES**

146. Defendants BOCHSLER and WILLIAMS individually and through their ownership, control, and governance of DFINITY STIFTUNG have used the money gained through their fraudulent scheme to consolidate control over the emerging technology known as the "Virtual Cloud", blockchain technology and to continue to "lock out" other potential members of the ICA and to strengthen their control on other companies including Bity, ORIGYN FOUNDATION, and other "players" in the emerging technology surrounding cloud computing and cryptocurrency. They continue to invite other companies to use the Internet Computer Blockchain as a replacement for Google Cloud or AWS. They also continue to use the money obtained from their fraudulent scheme to expand their influence by offering "grants" to "promising individuals and teams" to catalyze the growth of the Internet Computer." Therefore, the consequences of their ongoing fraud continue to grow.

146. This dumping allowed them to divest and suppress the power of all other token owners, while they themselves were accumulating large amounts of money with minimal use of tokens, leaving the rest to accumulate voting power and give them maximum rewards.

147. Furthermore, as WILLIAMS and BOCHSLER caused DFINITY STIFTUNG to admit in the *Cointelegraph*, they uniquely were the first to have neurons and tokens, issued back in December 2020, making it impossible for anyone to accumulate more voting power than them, even if they end up with a minority of token ownership at any point. As the older a neuron is, the more voting power it can and has accumulated.

148. And as WILLIAMS with the help of an employee explained around 3:10:00 of the Genesis video at https://dfinity.org/mercury/, one has to actively vote to participate and gain "token rewards." But one can decide by default to follow either DFINITY or the INTERNET COMPUTER ASSOCIATION, and essentially lend them your voting power. This is another

First Amended Complaint

reason for the continuous misrepresentations and lies, WILLIAMS and BOCHSLER already in control of the network, get free votes.

149. In the Genesis Video, WILLIAMS admitted that DFINITY STIFTUNG and the ICA follow and pass their voting power to specific individuals (e.g WILLIAMS and BOCHSLER).

150. WILLIAMS and BOCHSLER continue to actively attract new companies and individual to invest in the ICP which they control. For example, WILLIAMS and BOCHSLER cause DFINITY STIFTUNG to publish articles this one on March 27, 2024, at https://venturebeat.com/games/internet-computer-blockchain-has-raised-77m-dfinity-foundation/

Which states: "the ICP has evolved into one of the first Bitcoin Layer-2s, with over $67 million in ckBTC (chain-key Bitcoin) transactions and 300-plus developers crafting Bitcoin-enabled decentralized apps (dApps)."

**COUNTS FOR RELIEF**

151. Plaintiff intentionally pleads the various counts of this complaint in the alternative as expressly permitted under Federal Rule of Civil Procedure 8(d)(1).

**COUNT I**

**Racketeer Influenced & Corrupt Organization Act – 18 U.S. Code § 1962(a)**

**(Against Defendants WILLIAMS and BOCHSLER)**

152. Plaintiff incorporates the allegations of Paragraphs 1 to 151 into the allegations of this cause of action.

153. Defendants WILLIAMS individually BOCHSLER individually and WILLIAMS and BOCHSLSER jointly through their ownership, control and governance of alter egos DFINITY STIFTUNG and DFinity USA (collectively referred to as "THE ENTERPRISE") committed the following predicate crimes which are racketeering activities common to all Plaintiff's Racketeer Influenced & Corrupt Organization Act (RICO) claims:

Wire Fraud (18 U.S. Code § 1343)

154. As described in detail above, since at least 2018, THE ENTERPRISE engaged in a

pattern of racketeering activity in violation of 18 U.S. Code section 1343, by transmitting over 25 false statements over the internet for the purpose of executing a scheme to defraud owners and buyers of ICP Tokens, in order to obtain money by selling ICP Tokens themselves and by continuing to deny their involvement in the collapse of the ICP Token to this day in order to convince unwitting investors in ICP tokens to continue to buy them in the mistaken belief that they are investing in a decentralized autonomous block chain that is not controlled by THE ENTERPRISE and further to convince companies to utilize the ICP itself as a "Virtual Cloud" alternative to Google and Amazon by continuing to spread the same lies through the DFINITY STIFTUNG website to this day. Finally, THE ENTERPRISE continues to spread the lie that DFINITY STIFTUNG is a non-profit or that it could become one in order to induce investors to trade their tokens and to trust the integrity of the ICP.

155. As set forth in detail above, THE ENTERPRISE knowingly participated in and devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. Since at least 2017, THE ENTERPRISE has falsely claimed that the ICP was/is autonomous and decentralized when in reality it has always been under the control of THE ENTERPRISE as shown by the huge profit made by THE ENTERPRISE in the month after "launch" and the collapse of the market for ICP Tokens thereafter. THE ENTERPRISE further defrauded "seed" investors such as Mr. Kobayashi who was promised that he would be able to immediately have access to his ICP Tokens and would be able to trade or sell them. Through its scheme to defraud "seed" investors, THE ENTERPRISE was able to secure at least $102,000,000 to finance its larger fraud on the "US Persons" who were given their first "opportunity" to buy ICP Tokens on May 10, 2021. Further, by continuing (to this day) to hide its complicity in the collapse of the ICP Token only a month after "launch" and blaming the collapse on "seed investors, employees and former employees" THE ENTERPRISE was and is able to perpetuate the fiction that the ICP is decentralized and autonomous when in reality it has been and still is controlled by THE ENTERPRISE.

156. The statements made as part of the scheme were material; that is, they had a

natural tendency to influence, or were capable of influencing, a person to part with money or property. False statements regarding the decentralized and autonomous nature of the ICP caused investors in the United States and around the world to pour billions of dollars into the purchase of ICP Tokens believing that the "Founders" were committed to their product and the "seed" investors so strongly believed in the product that they were likewise willing to wait before selling any of their stake in the ICP. THE ENTERPRISE also publicly stated that 50 percent of the ICP Tokens that would be available at "launch" were from other sources.

157. Later, after the crash, THE ENTERPRISE blamed "employees, former employees, and seed investors" for selling their ICP Tokens. These false accusations calmed public outcry and inquiry by various news organizations such as those who interviewed WILLIAMS. Further, THE ENTERPRISE has squelched any inquiry or criticism leveled at it by aggressive (and baseless litigation) and offers of a "bounty" for the identity of anonymous critics. With that false explanation unchallenged, THE ENTERRPISE was and still is able to deceive investors in ICP Tokens, other would-be investors and companies considering an alternative to Google and Amazon for their cloud-based applications and services.

158. Defendants acted with the intent to defraud, that is, the intent to deceive and cheat. Deception was a necessary part of the scheme of THE ENTERPRISE because if "seed" investors, employees (former and current) and those who chose to buy ICP Tokens at "launch" knew the truth, THE ENTERPRISE would not have been able to secure billions of dollars in their one month sell-off of 85% of the existing ICP Tokens. Once the sale was completed and the ICP Token price crashed, THE ENTERPRISE still must conceal its involvement to attain the ultimate goal of THE ENTERPRISE which was and is to control the world of cryptocurrency and cloud-based services – a goal which THE ENTERPRISE continues to pursue to this day.

159. THE ENTREPRISE used, or caused to be used, an interstate or foreign wire communication to carry out an essential part of the scheme. In order for the scheme to be successful, THE ENTERPRISE had to be able to disseminate its lies to a large and diverse audience and very quickly to generate the necessary "buzz" before the ICP Token "launch" to create the number of willing buyers who would pay on Coinbase as much as  $750.00 or on

Binance around $3,000 to buy the ICP tokens THE ENTERPRISE needed to sell and sell quickly. Further, the multiplying effect of internet-based news sources and social media "re-posts" and "retweets" made the internet the perfect place to spread their lies. Finally, since the target market was very much internet-savvy and THE ENTERPRISE was selling a "digital" product, their most successful advertising campaign would be using the worldwide web.

<u>Financial Transaction to Promote Unlawful Activity (18 U.S.C. § 1956(a)(1)(A)):</u>

160. 18 U.S. Code section 1956(a)(1)(A) makes it unlawful to knowingly conduct a financial transaction which involves the proceeds of a specified unlawful activity (such as wire fraud) with the intent to promote the carrying on of the specified unlawful activity. As set forth above, THE ENTERPRISE defrauded "seed" investors with false promises that their ICP Tokens would be immediately accessible and tradeable on "launch." This was in order to secure the funds necessary to create the ICP Token and prepare it for "launch" in order to perpetrate an even larger fraud on the unsuspecting "U.S. Persons" caught up in the "buzz" around the ICP Token at "launch" allowing THE ENTERPRISE to sell 85% of the available ICP Tokens in the first month. They then used the proceeds of that scheme to continue to defraud those who invest in ICP Tokens, those who otherwise invest time or money or both in the ICP controlled by THE ENTERPRISE and those who consider the ICP as an alternative to Google or Amazon cloud services. That deception continues to this day.

161. As set forth in detail above, THE ENTERPRISE knowingly conducted a financial transaction involving the proceeds of Defendants' fraudulent scheme to defraud seed investors to defraud "U.S. Persons" on "launch" and used the proceeds of that scheme to continue to defraud investors in the ICP Token and the ICP itself in violation of 18 U.S. Code § 1343.

162. As set forth in detail above, THE ENTERPRISE knew that the money represented the proceeds from unlawful activity to wit wire fraud which THE ENTERPRISE itself perpetrated.

163. As set forth above in detail, THE ENTERPRISE acted with the intent to promote the carrying on of a fraudulent scheme described in detail above in violation of 18 U.S.

Code § 1343.

Laundering Monetary Instruments (18 U.S.C. § 1956(a)(1)(B))

164. 18 U.S. Code section 1956(a)(1)(B) makes it unlawful to conduct a financial transaction, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity, or to avoid a transaction reporting requirement under State or Federal law.

165. THE ENTREPRISE conducted one or more financial transactions involving property that represented the proceeds of Defendants' fraudulent schemes defraud seed investors to defraud "U.S. Persons" on "launch" and used the proceeds of that scheme to continue to defraud investors in the ICP Token and the ICP itself in violation of 18 U.S. Code § 1343.

166.THE ENTERPRISE knew that the property represented the proceeds of their fraudulent scheme because they themselves perpetrated the fraudulent scheme.

167. THE ENTERPRISE knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds. Specifically, THE ENTERPRISE chose to offer its ICP Tokens for sale in order to conceal the fact that THE ENTERPRISE 's statements regarding "founders" not being able to sell or pledging not to sell the autonomous and decentralized nature of the ICP and ICP Tokens and the status of the "seller" being a "non-profit" were all false.

168. As set forth above, THE ENTERPRISE sold 85% of the available ICP Tokens within a month of "launch." However, THE ENTERPRISE had to conceal the ownership of the tokens offered for sale in order to preserve the lie that "founders" such as WILLIAMS and BOCHSLER were not holding onto their tokens as promised. Public knowledge of that fact would defeat the scheme because there would be no market for the ICP Tokens as such high prices.

169. Even after the sale of ICP Tokens by THE ENTERPRISE was completed, THE ENTERPRISE still actively concealed the source of the ICP Tokens offered for sale which collapsed the market for such tokens and blamed "seed investors, employees and former employees" because such continued denial and scapegoating was necessary to induce additional

First Amended Complaint

investors in ICP Tokens, in the ICP itself and companies considering using the ICP as an alternative to Google and Amazon in the cloud services space. Therefore, concealment of the source of the "glut" of ICP Tokens at "launch" continues to be necessary to THE ENTERPRISE.

Transporting Funds to Promote Unlawful Activity (18 U.S.C. § 1956(a)(2)(A))

170. 18 U.S. Code section 1956(a)(2)(A) makes it unlawful to transfer funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity. In this case, as set forth above THE ENTERPRISE transferred the proceeds of the sale of millions of ICP Tokens on COINBASE from a number of "wallets" to accounts in banks outside the US to further the scheme to defraud additional investors in ICP Tokens, in the ICP itself and companies considering using the ICP as an alternative to Google and Amazon in the cloud services space. This was a necessary part of the scheme to defraud (in addition to avoiding taxes) because if the funds remained in the United States, then that would force COINBASE or any United States Bank subject to the Bank Secrecy Act of 1970 to report the profit from sale of property to the Internal Revenue Service. This in turn would have resulted in a very public investigation which would have unearthed the entire scheme to defraud.

171. THE ENTERPRISE acted with the intent to promote the carrying on of the fraudulent scheme as set forth in detail above in violation of 18 U.S. Code section 1343.

Transporting Monetary Instruments (18 U.S.C. § 1956(a)(2)(B))

172. 18 U.S. Code section 1956(a)(2)(B) makes it unlawful to transfers funds from a place in the United States to a place outside the United States knowing that the funds involved in the  transfer represent the proceeds of some form of unlawful activity and knowing that such transfer is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity or to avoid a transaction reporting requirement under State or Federal law.

173. In this case, in addition to avoiding a very public investigation of the failure to report gains from the sale of millions of ICP Tokens as set forth in detail above, THE ENTERPRISE transported money from various "wallets" at COINBASE to various banks

outside of the United States in order to avoid filing the necessary IRS Forms such as IRS Form 1040-NR and paying the resulting taxes.

Money Laundering (18 U.S.C. § 1957)

174. 18 U.S. Code section 1957 makes it unlawful to knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity takes place in the United States.

175. As set forth in detail above, THE ENTERPRISE used wire fraud to defraud "seed" investors including Polychain Capital, Andreessen Horowitz and Draft Ventures all based in California for sums far in excess of $10,000 each. Further THE ENTERPRISE defrauded hundreds of "U.S. Persons" on the day of "launch" and in the weeks thereafter which upon information and belief based upon public reporting as described above far exceeded $10,000 all in violation of 18 U.S. Code § 1343.

176. THE ENTERPRISE has thereafter taken money from the United States and has transferred it to other countries including Switzerland to be invested in other businesses including Origyn, Bity, Bochsler Art, SA and Gold DAO, among others.

177. Defendants knew the transaction involved criminally derived property.

178. The property was, in fact, derived from a pattern of fraudulent wire transactions in violation of 18 U.S.C. 1343, as described above.

Violation of 18 U.S. Code § 1962(a)

179. 18 U.S. Code section 1962(a) makes it unlawful for any person who has received any income derived from a pattern of racketeering activity in which such person has participated as a principal, to use such income to invest that income in an enterprise which is engaged in interstate or foreign commerce.

180. As described in detail above, THE ENTERPRISE engaged in a pattern of racketeering activity in violation of the following: Wire Fraud (18 U.S. Code § 1343) Financial Transaction to Promote Unlawful Activity (18 U.S.C. § 1956(a)(1)(A)): Laundering Monetary Instruments (18 U.S.C. § 1956(a)(1)(B)); Transporting Funds to Promote Unlawful Activity (18 U.S.C. § 1956(a)(2)(A)); Transporting Monetary Instruments (18 U.S.C. § 1956(a)(2)(B)) and

Money Laundering (18 U.S.C. § 1957)

181. THE ENTERPRISE received billions of dollars from the pattern of racketeering activity as described above which continues to this day.

182. THE ENTERPRISE used those funds to perpetuate their fraudulent scheme and through their control of the ICP which WILLIAMS stated in a declaration to this Court (ECF 18-1) now includes "hundreds of projects and enterprises" they have acquired and continue to acquire greater control and dominance in the emerging field of "Virtual Cloud" technology.

183. THE ENTERPRISE has also used the billions of dollars derived from this scheme to acquire greater control over the market for cloud-based services and cryptocurrency through companies which include Origyn, Bity, Bochsler Art SA, Gold DAO. Each of these companies is engaged in interstate commerce between the United States and foreign countries including Switzerland.

184. 18 U.S. Code section 1964(c) provides that any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees.

185. Plaintiff was damaged by THE ENTERPRISE'S fraudulent scheme because he was prevented from selling his 41,666 tokens through various "roadblocks" placed by THE ENTERPRISE and through THE ENTERPRISE's elaborate scheme to defraud investors in ICP Tokens causing Plaintiff to delay selling his unrestricted ICP Tokens which resulted in losses of at least $41,000,000 based upon a sale price of $1,000 per token which was 1/3 of the "high watermark" sales price on Binance.

## COUNT II

### Racketeer Influenced & Corrupt Organization Act – 18 U.S. Code § 1962(b)

### (Against Defendants WILLIAMS and BOCHSLER)

186. Plaintiff incorporates the allegations of Paragraphs 1 to 185 into the allegations of this cause of action.

187. 18 U.S. Code section 1962(b) makes it unlawful for any person to acquire or

First Amended Complaint

maintain, any interest in or control of an enterprise which is engaged in interstate or foreign commerce through a pattern of racketeering activity.

188. As described in detail above, THE ENTERPRISE engaged in a pattern of racketeering activity in violation of 18 U.S. Code section 1343, including Wire Fraud (18 U.S. Code § 1343) Financial Transaction to Promote Unlawful Activity (18 U.S.C. § 1956(a)(1)(A)): Laundering Monetary Instruments (18 U.S.C. § 1956(a)(1)(B)); Transporting Funds to Promote Unlawful Activity (18 U.S.C. § 1956(a)(2)(A)); Transporting Monetary Instruments (18 U.S.C. § 1956(a)(2)(B)) and Money Laundering (18 U.S.C. § 1957)

189. As described in detail above, THE ENTERPRISE used the proceeds of their racketeering activity to acquire or maintain an interest in or control of Origyn, Bity, Bochsler Art, SA and Gold DAO, among others. Moreover, THE ENTERPRISE has used their ongoing lie that the ICP is decentralized, autonomous and not under their control to obtain control over, in the words of WILLIAMS "hundreds of projects and enterprises" many of whom, along with those referenced above engage in interstate commerce between the United States and other countries including Switzerland.

190. Defendants did so through a pattern of racketeering activity as described above.

191. 18 U.S. Code § 1964(c) provides that any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees.

192. Plaintiff was damaged by THE ENTERPRISE'S fraudulent scheme because he Was prevented from selling his tokens through various "roadblocks" placed by THE ENTERPRISE and through THE ENTERPRISE's elaborate scheme to defraud investors in ICP Tokens causing Plaintiff to delay selling his unrestricted ICP Tokens which resulted in losses of at least $41,000,000 based upon a sale price of $1,000 per token which was 1/3 of the "high watermark" sales price on Binance.

1

## COUNT III

2

### Racketeer Influenced & Corrupt Organization Act – 18 U.S. Code § 1962(c)

3

### (Against Defendants WILLIAMS and BOCHSLER)

4      193. Plaintiff incorporates the allegations of Paragraphs 1 to 192 into the allegations

5   of this cause of action.

6      194. 18 U.S. Code section 1962(c) makes it shall be unlawful for any person employed

7   or associated with an enterprise engaged in interstate or foreign commerce, to conduct or

8   participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

9      195. As described in detail above, THE ENTERPRISE engaged in pattern of

10  racketeering activity which included Wire Fraud (18 U.S. Code § 1343) Financial Transaction to

11  Promote Unlawful Activity (18 U.S.C. § 1956(a)(1)(A)): Laundering Monetary Instruments (18

12  U.S.C. § 1956(a)(1)(B)); Transporting Funds to Promote Unlawful Activity (18 U.S.C. §

13  1956(a)(2)(A)); Transporting Monetary Instruments (18 U.S.C. § 1956(a)(2)(B)) and Money

14  Laundering (18 U.S.C. § 1957).

15     196. THE ENTERPRISE included alter egos of BOCHSLER and WILLIAMS, to wit

16  DFINITY STIFTUNG and Dfinity USA, which were and are engaged in activities of interstate

17  commerce between the United States and foreign countries including Switzerland.

18     197. As such THE ENTERPRISE conducted its affairs through a pattern of

19  racketeering activity designed and intended to influence interstate commerce between the United

20  States and foreign countries including Switzerland.

21     198. 18 U.S. Code section 1964(c) provides that any person injured in his

22  business or property by reason of a violation of section 1962 of this chapter may sue therefor in

23  any appropriate United States district court and shall recover threefold the damages he sustains

24  and the cost of the suit, including a reasonable attorney's fees.

25     199. Plaintiff was damaged by THE ENTERPRISE'S fraudulent scheme because he was

26  prevented from selling his 41,666 tokens through various "roadblocks" placed by THE

27  ENTERPRISE and through THE ENTERPRISE's elaborate scheme to defraud investors in ICP

28  Tokens causing Plaintiff to delay selling his unrestricted ICP Tokens which resulted in losses of

at least $41,000,000 based upon a sale price of $1,000 per token which was 1/3 of the "high watermark" sales price on Binance.

## COUNT IV

### Racketeer Influenced & Corrupt Organization Act – 18 U.S. Code § 1962(d)

### (Against Defendants WILLIAMS and BOCHSLER)

200. Plaintiff incorporates the allegations of Paragraphs 1 to 199 into the allegations of this cause of action.

201. 18 U.S. Code section 1962(d) makes unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c).

202. As described in detail above, THE ENTERPRISE which included individuals BOCHSLER and WILLIAMS engaged in a pattern of racketeering activity which includes Wire Fraud (18 U.S. Code § 1343) Financial Transaction to Promote Unlawful Activity (18 U.S.C. § 1956(a)(1)(A)): Laundering Monetary Instruments (18 U.S.C. § 1956(a)(1)(B)); Transporting Funds to Promote Unlawful Activity (18 U.S.C. § 1956(a)(2)(A)); Transporting Monetary Instruments (18 U.S.C. § 1956(a)(2)(B)) and Money Laundering (18 U.S.C. § 1957).

203. In order for THE ENTERPRISE to engage in such activities, it was necessary for WILLIAMS and BOCHSLER each to fulfill their roles. WILLIAMS operated out of Palo Alto, California as the ICP's "Founder and Chief Scientist." He was the public face of THE ENTERPRISE wooing California-based Venture Capital firms like Polychain Capital, Andreesen Horowitz and Draft Ventures to pay hundreds of millions of dollars for an ICP Token (and the ICP itself) that was not even in existence. BOCHSLER operated out of Switzerland where he hides while reaching out to affect interstate commerce through organizations such as THE ENTERPRISE.

204. BOCHSLER'S tremendous personal wealth, his banking connections and previous experience in cryptocurrency lends credibility, stability and legitimacy to the false promises of WILLIAMS and THE ENTERPRISE. Further, BOCHSLER has publicly supported WILLIAMS as "accused wrongly" regarding the lies that WILLIAMS has talked about the activities of THE ENTERPRISE and its lack of involvement in the crash of the ICP Token a

First Amended Complaint

month after "launch." However, in order for DFINITY STIFTUNG which, on paper, controlled the release and distribution of ICP Tokens to act including putting up "roadblocks" to access or to put out false public statements, it required the joint consent of its two "Council Members" WILLIAMS and BOCHSLER. Finally, while WILLIAMS sold his personal cache (including those stolen from his family) of ICP Tokens, BOCHSLER sold not only his own but those that were, on paper, allocated to DFINITY STIFTUNG using his own employees as "proxies" to conceal the true seller, and upon belief helped WILLIAMS sell or launder his "personal" (including the stolen) cache.

205. Based upon the foregoing, WILLIAMS and BOCHSLER conspired to violate 18 U.S. Code sections 1962(a), 1962(b) and 1962(c).

206. 18 U.S. Code section 1964(c) provides that any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees.

207. Plaintiff was damaged by THE ENTERPRISE'S fraudulent scheme because he was prevented from selling his 41,666 tokens through various "roadblocks" placed by THE ENTERPRISE and through THE ENTERPRISE's elaborate scheme to defraud investors in ICP Tokens causing Plaintiff to delay selling his unrestricted ICP Tokens which resulted in losses of at least $41,000,000 based upon a sale price of $1,000 per token which was 1/3 of the "high watermark" sales price on Binance.

## COUNT V

### Violation of Section 10(b) of the Securities Act

### (Against WILLIAMS, BOCHSLER and DFINITY STIFTUNG)

209. Plaintiff incorporates the allegations of Paragraphs 1 to 51 and 67 to 151 into the allegations of this cause of action.

210. The Dfinity (ICP) Tokens described above are a "security" as defined in the Securities and Exchange Act of 1936 (The Act). In 2019, years before "launch" the Securities and Exchange Commission (SEC) published its analysis of "digital assets" which includes

cryptocurrencies such as DFinity (ICP) Tokens.

211. A number of the public comments set forth above made by WILLIAMS individually and speaking for DFINITY STIFTUNG, indicated both a concern and a realization that the ICP Token would be classified as a "security" subject to various United States laws including The Act.

212. WILLIAMS, BOCHSLER and DFINITY STIFTUNG had good reasons to be concerned. The SEC stated in 2019 that under the United States Supreme Court's decision in *SEC v. Howey*, the so-called *Howey* Test, the transactions by which money or other currency is offered in exchange for a digital asset in an "investment contract" subject to The Act.

213. Under the *Howey* Test, an investment contract involves the participation in a "common enterprise" where the "fortunes of digital asset purchasers have been linked to each other and/or to the success of the promoter's efforts."

214. In this case, investors who chose to purchase ICP Tokens were tied to each other's fortunes in at least two ways. First, the price they had to pay for their investment depended greatly on the trading volume of the ICP Token on any given day. Second, all operated under the deliberate falsehood that WILLIAMS, BOCHSLER and DFINITY STIFTUNG were not able to manipulate the supply of ICP Tokens and that any tokens offered for sale were free of any such influence.

215. Also in this case, investors who chose to purchase ICP Tokens had their fortunes tied to the "promoter's efforts." The "promoter" was WILLIAMS, BOCHSLER and, with WILLIAMS and BOCHSLER necessarily acting jointly, DFINITY STIFTUNG. The "effort" was to create a viable "Virtual Cloud" to rival Amazon and Google and to challenge them for dominance in that space.

216. Under established Ninth Circuit precedent, where an employee is offered "stock options" as part of his compensation for work performed, whether or not he chooses to purchase under those options, the transaction is subject to The Act. *See Falkowski v. Imation Corp. 309 F. 3d. 1123, 1130 (9th Cir – 2002)*

217. In this case, Plaintiff as an employee (on paper) of DFinity USA living and working in

California was offered the opportunity to "purchase" DFinity (ICP) Tokens for a "donation" to DFINITY STIFTUNG, this characterization of the payment for the Tokens was required by DFINITY STIFTUNG to maintain the fiction that it was or ever could be a "non-profit" foundation (the translation of "Stiftung").

218. Plaintiff, like any other potential investor, believed the false statements of WILLIAMS and through the ownership, control and governance of DFINITY STIFTUNG, WILLIAMS and BOCHSLER necessarily acted jointly.

219. Plaintiff, like any passive investor, expected to sell the DFinity (ICP) Tokens at some point to make a profit. Whether there would be any profit and if so, how much, was directly tied to the efforts of WILLIAMS as the "Founder and Chief Scientist" based in Palo Alto, California and BOCHSLER running the operation in Switzerland. The DFinity (ICP) Tokens offered to Plaintiff and other employees were offered before they even existed. Therefore, the Tokens had no intrinsic value and could not be used as payment for goods of services as other more established cryptocurrencies (such as Bitcoin) can be. The ICP Token was only as valuable as the ICP was successful.

210. DFINITY STIFTUNG acknowledged as much authorizing statements which directly tied the "value" of the DFinity (ICP) Token with the "success" of the ICP network. Further in its public statements, DFINITY (falsely) claimed that its "founders" were unable to trade their tokens and thus had committed to the long-term success of the project. As set forth above, WILLIAMS specifically rejected the assertion that anyone in upper management planned to sell and vehemently maintained that this was not a "pump and dump" scheme. So, from all outward appearances, the Dfinity (ICP) Token seemed like a worthwhile and profitable investment. In fact, it was marketed as such through a campaign that lasted years from solicitation of "seed" investors in 2017 through offers to purchase tokens made to employees like Plaintiff to a multi-month campaign to create "buzz" around the initial offering of ICP Tokens to "US Persons" on May 10, 2021.

211. Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated pursuant thereto make it illegal, in connection with the purchase or sale of any security, "for any person, directly or

1    indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or

2    of any facility of any national securities exchange … to make any untrue statement of a material

3    fact or to omit to state a material fact necessary in order to make the statements made, in the light

4    of the circumstances under which they were made, not misleading."

5    212. As set forth in detail above, WILLIAMS personally and WILLIAMS and BOCHSLER

6    through their ownership, control, and governance of DFINITY STIFTUNG have caused no less

7    than 25 false statements to be made about the DFinity (ICP) Token. These include false

8    statements about the nature of the ICP which created the token and the success of which the

9    value of Token is based upon, false statements about "restrictions" on trading imposed upon

10   "founders" "owners" and "seed investors" which all lead to the false conclusion that everyone

11   with inside knowledge of the ICP and thus its viability and chances for success believed so much

12   in the project that they were willing to "ride it out" for years before selling a single token. These

13   false statements began months before the initial offering of the Token to "US Persons" and

14   continued long after the price of ICP Tokens predictably crashed when WILLIAMS and through

15   the ownership, control and governance of DFINITY STIFTUNG, BOCHSLER and WILLIAMS

16   necessarily acting jointly, falsely blamed "seed investors, employees and former employees"

17   such as Plaintiff for the collapse. BOCHSLER, both publicly and to employees of DFinity

18   USA/STIFTUNG defended WILLIAMS' false statements claiming that he (WILLIAMS) was

19   "accused wrongly."

20   213. Further, DFINITY STIFTUNG, WILLIAMS and BOCHSLER as "inside traders" who

21   profited personally from this deception, had a duty to speak if they became aware of any false

22   statements by another "insider."

23   214. When considering whether or not to exercise the option to "purchase" DFinity (ICP)

24   Tokens, Plaintiff and other employees of DFinity USA in California were subjected to these

25   same public statements pre-launch but also were subject to internal communications designed to

26   promote and encourage in the pre-launch offering to employees of DFinity USA like Plaintiff

27   who were based in California. Even after the collapse of the ICP Token, employees were told by

28   BOCHSLER that this was all part of the plan and that the ICP Token would come back.

215. As a result of the knowingly false statements by Defendants as described above, Plaintiff was induced to hold off selling his ICP Tokens (41,666 of them) expecting that the price would increase or at least stay stable. Had Plaintiff sold at his earliest opportunity, Plaintiff would have derived a profit of at least $41,000,000 based upon a sale price of $1,000 per Token, which is less than 1/3 of the "high water mark" for the Tokens on Binance.

216. Instead, WILLIAMS and BOCHSLER individually and through their ownership, control, and governance of DFINITY STIFTUNG, WILLIAMS and BOCHSLER necessarily acting jointly, based upon information and belief through public reporting as set forth above, derived a profit from their deliberate falsehoods of at least $12,000,000,000. Plaintiff is entitled in addition to all other relief to an order of disgorgement of that sum from Defendants' wrongful conduct.

## Count VI

### (Violation of Penal Code 496(c))

### (Against WILLIAMS and BOCHSLER)

217. Plaintiff incorporates the allegations of Paragraphs 1 to 51 and 67 to 151 into the allegations of this cause of action.

218. As set forth in detail above, WILLIAMS and BOCHSLER acted in concert through their joint control of DFINITY STIFTUNG to prevent DFINITY STIFTUNG from giving Plaintiff 12,608 ICP Tokens which he purchased through a "donation" to the "non-profit" DFINITY STIFTUNG. Furthermore, via conversion, fraud, and trickery they divested the value, of the 41,666 tokens, while via fraud convincing the Plaintiff to withhold his tokens and misrepresenting that WILLIAMS and BOCHSLER did not have constructive possession of those 41,666 tokens via their domination of the network and the absence of decentralization.

219. ICP Tokens are personal property are subject to theft under Cal. Penal Code 484 and thus their loss is actionable under Cal. Penal Code 496.

220. As set forth above, this was part of a deliberate plan and scheme to restrict the sale of ICP Tokens allocated to Plaintiff and other employees and former employees, among others, so that at "launch" on May 10, 2021, when each ICP Token could be sold for $3,000 or more, only WILLIAMS, BOCHSLER and the company that they jointly owned and controlled, DFINITY

STIFTUNG would have tokens to sell.

221. ICP Tokens are generated by the ICP blockchain and thus at any given time there is a finite supply available. Thus, in order for WILLIAMS, BOCHSLER and DFINITY STIFTUNG to have more to sell, they must take them from others to whom they are allocated.

222. WILLIAMS and BOCHSLER through their joint control of DFINITY STIFTUNG consistently and continuously withheld the tokens when the Plaintiff asked for them back. Demanding Plaintiff provide his rights to California governing law and forum, and other concessions. BOCHSLER because of his position in Switzerland, BOCHSLER has repeatedly dared people to come to litigate to Switzerland knowing as has occurred that they will give up or they will fail.

223. WILLIAMS and BOCHSLER took and received or converted these ICP Tokens from Plaintiff and others knowing that they belonged to another which meets the definition of "theft" under Penal Code 484.

224. WILLIAMS and BOCHSLER further, as set forth above, with their actions and with criminal intent, destroyed the value of the tokens, reaching at points beyond $3,000, and furthering their control – their "chokehold" -- on the Network with their newfound stolen wealth.

225. Therefore, WILLIAMS and BOCHSLER received the ICP Tokens of Plaintiff and others knowing that they were stolen. Plaintiff calculates the amount of his damages to be at least $41,000,000 based upon a sale price of $1,000 per token which was 1/3 of the "high watermark" sales price on Binance.

226. Pursuant to Cal. Penal Code section 496(c), any person who has been injured by theft of such property may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.

**Count VII**

**(Common Law Trespass to Chattels)**

**(Against WILLIAMS and BOCHSLER)**

227. Plaintiff incorporates the allegations of Paragraphs 1 to 51 and 67 to 151 into the allegations of this cause of action.

228. As set forth in detail above, WILLIAMS and BOCHSLER acted in concert through their joint control of DFINITY STIFTUNG to prevent (1) prevent Plaintiff from selling the 41,666 ICP Tokens he purchased through a "donation" to DFINITY STIFTUNG. WILLIAMS admitted to employees that there was no reason to delay or restrict employees from selling their tokens on May 10, 2021, because the necessary trading volume (10M Tokens) was reached on the first day.

229. As set forth above, this was part of a deliberate plan and scheme to restrict the sale of ICP Tokens allocated to Plaintiff and other employees and former employees, among others, so that at "launch" on May 10, 2021, when each ICP Token could be sold for $750 or more in the United States and more abroad, only WILLIAMS, BOCHSLER and the company that they jointly owned and controlled, DFINITY STIFTUNG would have significant tokens to sell.

230. The conscious and deliberate actions of WILLIAMS and BOCHSLER unjustly, wrongfully and without good cause and without Plaintiff's consent, interfered with Plaintiff's right to use and possession of 41,666 ICP Tokens transferred to him on May 10, 2021. In the absence of such interference by WILLIAMS and BOCHSLER, Plaintiff would have and could have sold those ICP Tokens for at least $1,000 per token resulting in a loss of $41,000,000 based upon a sale price of $1,000 per token which was 1/3 of the "high watermark" sales price on Binance.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to the Seventh Amendment to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for judgment as follows:

**On the First Through Fourth Counts**:

(a)  Compensatory damages according to proof, in the amount of at least $41,000,000;

(b)  Treble damages pursuant to 18 U.S. Code § 1964(c);

(c)  Attorneys' fees as permitted by statute, including 18 U.S. Code § 1964(c);

(d)  Punitive and Exemplary Damages;

(e)  Costs of suit;

(f)  Such other relief as the Court may deem just and proper.

**In the Alternative to Counts First through Fourth, on the Fifth Count**:

(a) Compensatory damages according to proof, in an amount of at least $41,000,000;

(b) Prejudgment interest;

(c) Costs of Suit;

(d) Such other relief as the Court may deem just and proper.

**And in either alternative on the Sixth and Seventh Counts**

(a)  Compensatory damages according to proof

(b) Treble damages under Penal Code 496(c)

(c) Attorneys Fees under Penal Code 496(c)

(d) Costs of Suit

(e) Such other and further relief as the Court deems just and proper.

Dated: May 30, 2024                     WADE LAW GROUP, A Professional Corporation


                                        By:     <u>Steven L. Derby</u>
                                                Attorneys for Plaintiff
                                                EFTYCHIOS THEODORAKIS